

















SWD    8/10/05    9:54

3:05-CV-01581    SAN DIEGO POLICE V. AGUIRRE

*1*

*CMP.*

1 | Rex Hwang, Esq., CA Bar No. 221079
Henry Hwang, Esq., CA Bar No. 221884
2 | **CASTLE, PETERSEN & KRAUSE LLP**
**Attorneys at Law**
3 | 4675 MacArthur Court, Suite 1250
Newport Beach, California 92660
4 | Tele.:  (949) 417-5600
Fax:    (949) 417-5610
5 |
Gregory G. Petersen, Esq., CA Bar No. 77744
6 | **CASTLE, PETERSEN & KRAUSE LLP**
**Attorneys at Law**
7 | 8388 Vickers Street
San Diego, CA 92111
8 | Tele:    (858) 573-1199
Fax:     (858) 573-1574
9 |
Attorneys for Plaintiff,
10 | San Diego Police Officers Association



11

12 | **UNITED STATES DISTRICT COURT**

13 | **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 | SAN DIEGO POLICE
16 | OFFICERS' ASSOCIATION, on behalf of itself and on behalf of all of its members,

CASE NO. '05 CV 1581 H    (POR)

17 |        Plaintiff,

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

18 |     vs.

19 | MICHAEL AGUIRRE; CITY OF SAN DIEGO; SAN DIEGO CITY

**DEMAND FOR JURY TRIAL**

20 | EMPLOYEES' RETIREMENT SYSTEM;
SCOTT PETERS; JIM MADAFFER;
21 | RALPH INZUNZA; TONI ATKINS;
TONY YOUNG; BRIAN
22 | MAIENSCHEIN; DONNA FRYE;
MICHAEL ZUCCHET; HARRY
23 | MATHIS; BYRON WEAR; CHRISTINE
KEHOE; GEORGE STEVENS;
24 | BARBARA WARDEN; VALERIE
STALLINGS; JUDY MCCARTY; JUAN
25 | VARGAS; LAWRENCE GRISSOM;
CATHY LEXIN; MARY VATTIMO;
26 | TERRI WEBSTER; ED RYAN;

27

28

ORIGINAL

1

1    P. LAMONT EWELL; MICHAEL
2    UBERUAGA; JACK MCGRORY;
      SHARON WILKINSON; BRUCE
3    HERRING; AND DOES 1 THROUGH
      100, INCLUSIVE,

4                Defendants.

5

6

7                          **JURISDICTION AND VENUE**

8         1.       Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343(3)

9    which confer original jurisdiction to the District Courts of the United States for all civil actions

10   arising under the United States Constitution or the laws of the United States, as well as civil actions

11   to redress deprivation under color of state law, of any right, immunity or privilege secured by the

12   United States Constitution.  Jurisdiction is also conferred on this Court pursuant to 28 U.S.C. §

13   1343(4) to recover damages or to secure equitable or other relief under any Act of Congress

14   providing for the protection of civil rights.  Plaintiff also invoke the supplemental jurisdiction of this

15   Court to consider claims arising under the laws of the State of California pursuant to 28 U.S.C. §

16   1367(a).

17        2.       The acts, events, or omissions giving rise to the claims set forth herein occurred in

18   the Southern District of California.  Defendants named herein reside within the Southern District of

19   California.  Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b).

20        3.       This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under

21   color of state and/or local law of rights, privileges, immunities, liberty and property, secured to

22   Plaintiff by the First, Fifth and Fourteenth Amendments to the United States Constitution, without

23   due process of law.  This action seeks declaratory, injunctive and other extraordinary relief for

24   violations of California Government Code §§ 3500, *et seq.*, and such other statutes and regulations

25   as may apply to the facts.  The Plaintiff seek to invoke any and all state remedies that may be adopted

26   by this Court and elected thereby as supplemental to any other remedies as allowed by 42 U.S.C.

27   §1988, including, but not limited to, modified versions of such state remedies as are not inconsistent

28   with the right to trial by jury or other federal remedies sought herein.

                                              2
                **COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    4.    This action is also brought pursuant to the contract clause contained in U.S.

2    Constitution, Article I, § 10.

3                                              **THE PARTIES**

4    5.    Plaintiff SAN DIEGO POLICE OFFICERS' ASSOCIATION (hereinafter "SDPOA")

5    is and was at all relevant times hereto, a mutual benefit corporation organized and doing business

6    as a sanctioned police union under the laws of the State of California.  Pursuant to California

7    Government Code §§ 3500, *et seq*, the SDPOA is the recognized employee organization representing

8    police officers of the San Diego Police Department and brings this action against Defendants on

9    behalf of all of its members in its representative capacity with the specific intent to bring this lawsuit

10   for injunctive and declaratory relief.  The following members have already expressly indicated their

11   support of this lawsuit: MARCUS R. ABBE, THOMAS E. ABBOTT  JR., DAVID G. ABRAMS,

12   ERNEST ADAMS, JULIE M. ADAMS, KRISTEN B. ADAMS, LORI M. ADAMS, ROBERT H.

13   ADAMS, ROBERT ADAUTO JR., R. ELIZABETH ADDINGTON, RICHARD A.  AGUILAR,

14   EDWARD R. AGUIRRE, MICHAEL A. AIKEN, LESLIE A. ALBRECHT, DONALD A.

15   ALBRIGHT, MELVIN C. ALLEN, KATHERINE E. ALLISON, CATHY N. ALLISTER, ALAN

16   R. ALVAREZ, ARNOLFO B. AMBITO, JOHN G. AMPOL JR., TRAVIS W. ANDERSON,

17   OSCAR A. ARMENTA, JAMES W. ARTHUR, CHRISTOPHER T. ASBELL, ANTHONY A.

18   ATKINS, ROBERT W. ATWOOD, JOHN W. AUSTIN, GARY AVALOS III, LORI L. BACH,

19   JOHN B. BAILEY, TODD R. BAKER, JAMES D. BAKER  JR., SEAN A. BANNAN, KEVIN S.

20   BARNARD, SCOTT D. BARTOLOMEI, DAVID R. BAUTISTA, CHRISTOPHER S. BAYLESS,

21   MICHAEL A. BEAMESDERFER, JANA M. BEARD, CAROLE J. BEASON, DAVID W.

22   BEATHARD, DEBBIE K. BECKER, STEVEN T. BEERY, STEVEN M. BEHRENDT, BRIGITTA

23   J. BELZ, MICHAEL W. BELZ, MICHAEL R. BENDIXEN, TERYL L. BERNARD, STEVEN W.

24   BERNIER, MERYL A. BERNSTEIN, DANIEL M. BILLBERRY, GREGORY R. BISESTO, DEAN

25   R BISHOP, LYNN M BIXEL, GIFFORD D. BLAKESLEY, MARK T. BLAKESLEY, THOMAS

26   M. BOERUM, EUGENE H. BOJORQUEZ, DANIEL W. BOLDT, DONALD J. BORINSKI,

27   NICOLAS BORRELLI, THOMAS R. BOSTEDT, MATTHEW E. BOTKIN, ARTHUR O.

28   BOWEN, GARY L. BOWEN  JR., CHRISTOPHER P. BOWERS, ROGER E. BOWMAN,

                                                     3
                     **COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1   SCHUYLER V. BOYCE, PHILLIP K. BOZARTH, JAMES M. BRADLEY, JULIE M. BRADLEY,

2   TRACY D. BRAUN, DANIEL G. BRENT, PAUL D. BRINKERHOFF, RUSSELL D. BRISTOL,

3   MICHAEL D. BROGDON, JAMES A. BROOKS, RONALD BROUSSARD, JAMES R. BROWN,

4   WILLIAM M. BROWN, JOY M. BRUGMAN, CHRISTOPHER M. BRUSH, TERRANCE L.

5   BRYAN, DEBORAH W. BURGER, RANDY P. BURGESS, CHRISTINA D. BURHANS, BRETT

6   H. BURKETT, TIMOTHY A. BURNS, DANIEL A. BUROW, LAWRENCE B. CAHILL,

7   WILLIAM D. CAHILL, JENE L'MONT CALLOWAY, ARTHUR L. CALVERT, JANET M.

8   CAMPBELL, FRANK A. CANSON, CLAUDIA CANTO, THEODORE M. CARIGNAN, MARK

9   A. CARLSON, THOMAS J. CARLYON    IV, DANIEL P. CAROPRESO, FRANK L.

10  CAROPRESO JR, JAVIER CARRANZA, JOHN J. CARROLL, C. D'ANN CARTER, JEFFERY

11  S. CARTER, WILLIAM J. CARTER, ROBERTO A. CASILLAS, CLINTON E. CASTLE, CESAR

12  CASTRO, MARTIN G. CASTRO, RICKY F. CASTRO, RUDY P. CASTRO JR., ARTHUR H.

13  CAVADA, DAVID J. CAVANAUGH, MISTY R. CEDRUN, DANIEL E. CERAR, JESUS G.

14  CESENA, CARLOS CHACON, JOHN CHANEY, LYNN SUE M. CHAVEZ, YEZENIA E.

15  CHAVEZ, BLAKE A. CHEARY, JONATHAN C. CHENG, JON P. CHERSKI, JAMES H.

16  CHILES, JEFFREY W. CHIONE, RAPHAEL R. CIMMARRUSTI, DOLORES M. CIRINO,

17  BRENT E. CISNEROS, JAMES C. CLARK, JOHN C. CLARK, JOSEPH A. CLARK, RAYMOND

18  P. CLARK SR., REX COLE JR., KIMBERLY A. COLLIER, GARRY COLLINS, JAMES C.

19  COLLINS, BERNIE T. COLON, LUIS M. COLON, DONALD R. CONE, ROBERT D.

20  CONNAUGHY, SEAN R. CONWAY, LISA M. COOK, LLOYD E. COOK, PATRICK J.

21  COOLEY, GARY F. CORNER, ROBERT M. CORNETT, HENRY D. CORRALES, CHAD E.

22  CRENSHAW, JERRILOVE CROCKETT, TYRONE H. CROSBY, ROBERT P. CRUZ, PETER

23  H. CRUZ JR., CELSO G. CUEVA, JAMES P. CULLIGAN, FENELLA R. CUSTER, LEROY K.

24  DAILEY, JOSEPHINE I. DAINS, SCOTT W. DANIELS, ROBERT W. DARE, CHARLES R.

25  DAVIS, GARRY R. DAVIS, JOHN W. DAVIS, KELLY R. DAVIS, DEAN L. DAVISON,

26  JEROME DAWSON, WILLIAM G. DAY, ALEXANDER DE ARMAS, CHARLES DE LA CRUZ,

27  SUSAN M. DE LA PENA, JOSEPH D. DE VEAUX, MICHAEL J. DEAN, CONRADO V.

28  DECASTRO, MARIA I. DELGADILLO, ROBERTO L. DELGADILLO, CONSTANDINOS A.

4

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   DELIMITROS, JOVANNA R. DERROUGH, ALEJANDRO DIAZ, STEVE P. DICKINSON,

2   JOHN (JACK) R. DIDELOT, JENNIFER E. DISHON, FELICISIMOM. DIZON III, MATTHEW

3   W. DOBBS, DONALD J. DOLEZAL JR., STEPHEN C. DOUGLAS, ERIC T. DRILLING, BRETT

4   A. DUDLEY, JOHN G. DUNBAR, JOSEPH. M. DURAND, JOYCE EDGAR, RICHARD K.

5   EDGIL, ELMER M. EDWARDS, MICHAEL J. EDWARDS, ROLAND H. ELKINS, CHAD W.

6   ELLIOTT, CHRISTOPHER J. ELLIS, SHARI L. ELLITHORPE, WILLIAM ELLITHORPE JR.,

7   PHILIP C. ELLSWORTH, ERNESTO ENCINAS, JAMES D. ENGLISH, JULIE M. EPPERSON,

8   STEVEN S. EPPERSON, MANUEL ESCALANTE, CHRISTOPHER C. ESCUDERO, MARLON

9   J. ESTEPA, CHRISTINE M. FARMER, BILL FARRAR, JAY P. FARRINGTON, TIMOTHY K.

10  FAUBEL, DAVID L. FELKINS, ANDREW L. FELLOWS, JEFFREY M. FELLOWS SR.,

11  MICHAEL J. FENDER, JUNAR FERNANDEZ, JAMES D. FILLEY, ROBERT G. FILLEY,

12  ROBERT D. FINCH, RODNEY W. FISCHER, DALE A. FLAMAND, MICHAEL F. FLANAGAN,

13  MARK E. FOREMAN, KENNETH N. FORTIER, NATALIE F. FORTIER, RICHARD C.

14  FORTUNA, ROBERT M. FOWLER, RICHARD A. FOX, PHILLIP J. FRANCHINA, REGINALD

15  F. FRANK, BRIAN S. FRENCH, KEVIN B. FRENCH, KEVIN B. FRIEDMAN, AARON K.

16  FRODENTE, HECTOR E. FUENTES, MARCO A. FUENTES, JOHN P. FUNE, ANDREA S.

17  FURST, MARK S. GAIN, GERRY D. GAPUSAN, CARLOS A. GARCIA, LINDA E. GARCIA,

18  MIGUEL A. GARCIA, RALPH J. GARCIA JR., JUSTIN C. GARLOW, EDWIN R. GARRETTE,

19  GEORGE E. GARVEY, LARRY D. GATHRIGHT, RYAN P. GAULT, JAMES R. GEE, PAUL

20  B. GEIS, JOHN P. GENER, TROY A. GIBSON, ROBERT I. GILBERT, DAVID N. GILLIGAN,

21  CASEY D. GINI, SHANNAH W. GLAZEWSKI, LORETTA L. GLICK, BRIAN M. GOLDBERG,

22  JAMES G. GOLEMBIEWSKI, EDWARD R. GOMEZ, GARY S. GONZALES, JORDI

23  GONZALEZ, GREGG I. GOODMAN, DOROTHY GORE, JAMES E. GRAVES, OLUN W.

24  GRAVES, MARY K. GRESSEL, WILLIAM T. GRIFFIN, ERIC GROEGER, MICHAEL GROFF,

25  MANUEL E. GUADERRAMA, MIKE GUTIERREZ, MARK G. HAAS, GREGORY A. HAISAN,

26  DAVID C. HALL, LAWRENCE A. HALL, PATRICK S. HALL, RONALD G. HALL, TIMOTHY

27  C. HALL, MICHELLE HANSEN-GARCIA, JERRY P. HARA, JOHN J. HARBERTH, KENNETH

28  S. HARGROVE, JOSEPH P. HARPER, JEFFREY L. HARRINGTON, PAUL A. HARRIS,

5

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  SHANNON W. HART, MICHAEL A. HARTMAN, ULYSSES J. HARVEY, J. AARON

2  HARWICK, MUHAMMAD A. HASSAN, MICHAEL R. HASTINGS, RAMONA R. HASTINGS,

3  ROGER E. HATCH, DANIEL C. HATTLER, JOHN D. HAUGLAND, HEIDI L. HAWLEY,

4  ROBIN L. HAYES, ABDIWELI A. HEIBEH, JANICE L. HENDRICKSON, JOHN S. HENDRIX,

5  ROBERT C. HENDRIX, RANDALL T. HENRIZI, MATTHEW J. HENRY, JAMES K. HEPPELL,

6  FRANK A. HERNANDEZ, MANUEL S. HERNANDEZ, NESTOR HERNANDEZ, VICTOR M.

7  HERRERA, MARK S. HERRING, ROBERT W. HERZIG, LARRY R. HESSELGESSER JR.,

8  BRYAN W. HEWITT, BYRON E. HIBSHMAN, MATTHEW P. HICKS, WADE HIGH, STEVEN

9  F. HIGUERA, GARY W. HILL, RANDALL B. HILL, RENEE L. HILL, ANNE-MARIE HISKES,

10  DIANA L. HODGES, MARK S. HODGES, KENNETH P. HODGES  SR., KEN L. HOFER,

11  ANDREW T. HOFFMAN, DAVID A. HOFFMAN, CHARLES F. HOGQUIST, MIKE D.

12  HOLDEN, VANESSA HOLLAND, PAUL T. HOLMAN, WILLIAM B. HOLMES, COLIN M.

13  HOLOHAN, SCOTT R. HOLSLAG, CHRISTOPHER J. HOLT, JOEL G. HOOLIHAN, PERRY

14  L. HOOPER, ROBERT W. HOVEY, JOHN P. HOWARD, LARRY S. HOWELL, JOSEPH D.

15  HOWIE  JR., PHILLIP D. HUBBS, PAUL D. HUBKA, CHARLES M. HUDGINS, DONA

16  HUFFORD, TY L. HUFFORD, ROY B. HULBERT, JAMES C. HUNTER, SUZANNE D.

17  HUNTINGTON, DAVID J. HUSTAD, STEVEN HUTCHINSON, JOHN J. HUYS, JOHN D.

18  IAMMARINO, DAVID M. IORILLO, CRAIG E. ISBELL, PIA A. IVERSEN, BRIAN A.

19  JACKSON, CORINNE M. JACKSON, DANIELLE J. JACKSON, JANE E. JACOBSEN, TODD

20  T. JAGER, JASON S. JARRELLS, LYNDA E. JARVIS, PHILIP T.  JARVIS, GREGORY A.

21  JEBB, SCOTT E. JEDLICKA, DONNA L. JENNES, DAVID E. JENNINGS, JOHN W. JILLARD,

22  ALEJANDRA D. JIMENEZ, GRANT M. JOBE, LOUIS B. JOHNS, ANTHONY K. JOHNSON,

23  ANTONIO D. JOHNSON, BARRY E. JOHNSON, JANINE N. JOHNSON, JEFFREY M.

24  JOHNSON, KELLY J. JOHNSON, LUKE T. JOHNSON, RODNEY C. JOHNSON, TIMOTHY

25  D. JOHNSON, BUDDY L. JOHNSON II, SCOTT W. JOHNSTON, EDWARD V. JONES, JAMES

26  W. JONES, RANDAL L. JONES, JEFFREY T. JORDON, THOMAS W. JOY, ALAN B. KARSH,

27  EDWARD E. KASZYCKI, GEORGE C. KATHAN, CHARLES Q. KAYE, TODD V. KEARNS,

28  BRIAN L. KEATON, JOHNNY F. KEENE  JR., DAVID W. KEESLING, PAUL N. KEFFER,

6

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1  NICHOLAS I. KELBAUGH, CARLA A. KELLER, WILLIAM L. KELLNER, JACOB E. KERN,

2  DAVID R. KERSCH, JASON L. KESSEL, MARK L. KEYSER, STEPHEN M. KINGKADE,

3  THERESA L. KINNEY, RICHARD S. KIRCHHOFF, JAMES B. KISTNER, WILLIAM A.

4  KNIGHT, JACK K. KNISH, PHILLIP P. KONZ, THOMAS KOWALCZYK, PATRICIA R.

5  KRALL, NANCY KULINSKI, JAMES A. KURUPAS, DEMETRIOS G. KYRES, JOHN G.

6  LABO, HOWARD A. LABORE, PATRICK LACO, JOSE V. LAGUDA, DAVID Y. LAMAKU,

7  MICHAEL L. LAMBERT, DAVID L. LANDMAN, CHARLES LARA, CHRISTOPHER C.

8  LARSON, DANIEL P. LASHER, EDMUND J. LAVALLE II, SCOTT M. LAWFORD, GARY A.

9  LAWRENCE, VU A. LE, DANIEL W. LEACH, JOHN B. LEAMONSM JR, TONY C. LEE,

10 GORDON R. LEEK, SANDI F. LEHAN, LARRY W. LEIBER, RONALD W. LEMASTER, PAUL

11 R. LENNON, JORGE R. LEON, ALBERTO H. LEOS, BRIAN C. LERIBEUS, RANDON E.

12 LEVITT, KAZIMIERZ P. LEWAK, ROBERT L. LEWIS, ILEDFONSO LIMON, ANTHONY J.

13 LINARDI JR., JAMES R. LIVESEY, ROBERT LOBATO, MELVIN J. LOFFTUS, THOMAS E.

14 LOFTIN, TIMOTHY M. LONG, GABRIEL A. LOPEZ, JESSE W. LOPEZ, JOSEPH A. LOPEZ,

15 GENE C. LOUCKS, CASSIE L. LOURET, ARTURO LOVIO, JONATHAN LOWE, ALFRED

16 LOZANO, BRIAN P. LUCCHESI, MARK S. LUCCHESI, EDWARD D. LYNCH, ALBERT B.

17 MACAWILI, EDWARD A. MACCONAGHY, BERTHA MACTIERNAN, LOUIS J. MAGGI JR.,

18 GEORGE N. MAGLARAS, BRYAN W. MANNING, CORY S. MAPSTON, CHARLES D.

19 MARCINIAK, MARK A. MARCOS, PAUL B. MARINO, TERRY M. MARQUEZ, DAVID R.

20 MARSHALL, CHRISSY L. MARTINEZ, RUBEN C. MARTINEZ, ALBERT M. MASSEY,

21 CHRISTIAN W. MATHEWS, KATHLEEN M. MAUZY, ROGER W. MCCARVEL, MICHAEL

22 C. MCCOLLOUGH, MARK F. MCCULLOUGH, BENJAMIN I. MCCURRY, ROBERT R.

23 MCDONALD, ADAM L. MCELROY, GUY MCELROY, LAURA L. MCGOWAN-MINTO, ED

24 M. MCGUIRE, BILLY L. MCKINNEY, SCOTT D. MCLELLAN, STEVE L. MCMILLAN, JOEL

25 R. MCMURRIN, KEVIN D. MCNAMARA, ROBERT M. MCQUIEN, ROBERT N. MEISNER,

26 MAURA J. MEKENAS-PARGA, SKIP A. MELHORN, JOSE M. MENDEZ, LESLIE C.

27 MERRILL, LISA M. MERZWSKI, ROBERT W. METZ, DANIEL MEYER, MARK A. MICHEL,

28 CHRISTINA M. MILLER, DOUGLAS D. MILLER, JEFFREY L. MILLER, THOMAS P. MILLER

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    III, MICHAEL S. MILLER SR., CATHERINE D. MILLETT, JOHN W. MINTO III, ROBERT D.

2    MINTON, NICHOLAS R. MINX, AMEILIA L. MITCALF, DAVID L. MITCHELL, GARY E.

3    MITROVICH, MICHAEL J. MOBLEY, GARY F. MONDESIR, CHARLES M. MONTIERTH,

4    DIANN M. MOODY, ROY D. MOODY, HOLLY A. MOORE, ERIC T. MORALES, RAY A.

5    MORALES, ANTHONY R. MORASCO, VICTOR J. MOREL, MARIO MORENO, CYNTHIA M.

6    MORRISON, JACOB R. MOSTELLER, DAVID A. MOYA, KEVIN B. MOYNA, GREGORY R.

7    MRVICH, CYNTHIA L. MUNOZ, JUAN M. MUNOZ, KELENE MUNRO, GEORGE T. MUREN,

8    CLINT J. NAFEY, JEFFREY T. NAPIER, RAYMOND A. NATAL, JAMES H. NEEDHAM,

9    ADRIAN NEGRON, RICHARD B. NEHRICH, KENNETH E. NELSON, WILLIAM M. NEMEC,

10    ROBERT L. NEWQUIST, ALEXANDER NEZGODINSKY, ALAN M. NICHOLAS, JEFFREY

11    R. NICHOLS, RONALD W. NICHOLS, MICHAEL C. NIGRO, GILBERT L. NINNESS, DAVID

12    S. NISLEIT, ROBERT H. NOBBS, PATRICK D. NORRIS, TIMOTHY G. NORRIS, LEE V.

13    NORTON, REGINA Y. NORTON, AMBER G. NYGAARD, ERIC I. OBERNDORFER, THOMAS

14    K. O'CONNELL, RICHARD M. O'HANLON, GENE F. OLIVER, LOUIS J. OLIVERI, GREGORY

15    J. OLSON, SHELLY K. OLSON, JAMES F. O'NEILL, MICHAEL T. O'NEILL, THOMAS A.

16    ORDEN, DANNY A. ORDUNO, GEORGE M. O'ROURKE, MICHAEL W. OTT, TROY P.

17    OWENS SR., MICHAEL A. PACE, JAVIER PADILLA, MICHAEL L. PARGA, RICHARD C.

18    PARPART, PAUL E. PAXTON, JACK R. PEARSON, CHARLES J. PECK III, GAIL A.

19    PEMBLETON, VANTHOEUN PEN, ARTHUR A. PEREA, JESUS G. PEREA, CURTIS E.

20    PERKINS, RICHARD PERKINS, JEFFREY P. PETERSON, VERNON J. PETERSON, DUANE

21    E. PETTITT, BRADLEY L. PHELPS, BERNIE A. PICENO, SCOTT M. PICKARD, KEVIN W.

22    PIERCE, GREG A. PINARELLI, CARL P. PIRA, JOSHUA R. PITTSLEY, MARC A. PITUCCI,

23    DAN R. PLEIN, ERIC L. POLLOM, MARCELO POPULIN, LANCE E. POUND, RICKY L.

24    POWELL, JASON L. POWERS, WAYNE J. PRATT, MICHAEL L. PRIDEMORE, DUANE D.

25    PUDGIL, JESUS W. PUENTE, JOHN A. QUEEN, TASHA K. QUEST, MAY B. QUINTANILLA,

26    YESENIA P. QUINTOS, CHRIS J. RAAGAS, MICHAEL J. RABELL, RONALD W. RADDETZ,

27    JOSEPH A. RAMOS, RALPH RAMOS, MARCUS RAMSEY, KEVIN C. RAUSIS, ROY E.

28    REED, ANTHONY REESE JR., RICHARD H. REICHNER II, JOHN J. REIF, WENDY S. RENO,

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  JAMES H. RENWICK, JACOB M. RESCH, THOMAS M. RHODES, ROLANDA M. RICARDEZ,

2  RONALD L. RICE, PHILLIP H. RICE IV, BENDA T. RICHMOND, WARD A. RICKMAN,

3  DARIN J. RIES, ANDRES H. RIOS, RICARDO M. RIVAS, MARIA D. RIVERA, GARY V.

4  RIVERS, THOMAS A. RIZZO, BRYAN A. ROBERTS, TODD J. ROBERTSON, LARRY J.

5  ROBERTSON II, STEVE R. ROBINSON, JASON P. ROCHA, ANA B. RODRIGUEZ, JAIME

6  R. RODRIGUEZ, MANUEL RODRIGUEZ, GARY A. ROESINK, BOBBY D. ROLLINS, LUIS

7  A. ROMAN, MARIO I. ROMANO, FAUSTO W. ROMERO, DAVID L. ROOT, PAUL R.

8  RORRISON, STEPHANIE J. ROSE, STEVEN M. ROSENBLOOM, MATTHEW S. ROTH,

9  RICHARD W. ROTHE, RAYMOND H. ROWE JR., MICHAEL RUBIO, JEFFREY R. RUCKLE,

10  JOSEPH L. RUVIDO, JAMES W. RYAN, LYNN D. RYDALCH, IVAN A. SABLAN, MARIAM

11  SADRI, LEM SAINSANOY, ALFONSO SALVATIERRA, JORGE SANCHEZ, JUAN SANCHEZ,

12  SCOTT A. SANTAGATA, WILLIAM J. SANTARSIERO, EDWIN SANTIAGO, LAURA J.

13  SANTIAGO, TITO L. SANTOS, ALEJANDRINO C. SANTOS III, JADE R. SAWYER, CODY

14  K. SCHAAF, JACK D. SCHAEFFER, MICHAEL J. SCHALDACH, MARGARET M.

15  SCHAUFELBERGER, ROBERT M. SCHENKELBERG, CHERYL J. SCHLACK, TRISTAN T.

16  SCHMOTTLACH, PAUL W. SCHWENN, JASON A. SCOTT, ERIC P. SEITER, THOMAS G.

17  SEIVER, LLOYD A. SENTINELLA, ROBERT C. SHANDS, PATRICK J. SHANLEY,

18  CHRISTIAN T. SHARP, MARVIN L. SHAW, STEVEN M. SHAW, STEPHEN SHEBLOSKI,

19  DANIEL K. SHEPHERD, DAMON E. SHERMAN, MARK G. SHERMAN, MICHAEL S.

20  SHIRAISHI, DALE T. SHOCKLEY SR., DANIEL L. SHORE, BENJAMIN S. SHUMAKER,

21  JESSE D. SIMEROTH, ROBERT E. SIMPSON, RANDALL J. SKINN, CHARLES A. SLEEPER,

22  ALLEN T. SLUSS, GEORGE D. SMITH, JAMES F. SMITH, JOSEPH SMITH, TIMOTHY M.

23  SMITH, DANIEL J. SMYTH, SHARON M. SMYTH, ROBERT W. SNEAD, RONALD W.

24  SNOW, ANDREW SORBIE, BRANDY A. SORBIE, GINA M SPADACINI, WAYNE R. SPEES,

25  DAVID E. SPITZER, MICHAEL L. STACY, ERIC A. STAFFORD, DAVID W. STAFFORD JR.,

26  DANIEL STANLEY, PHILIP J. STANLEY, STEVEN STATON, JOHN M. STEFFEN, NEAL A.

27  STEFFEN, JEFFREY J. STERLING, WILLIAM S. STETSON, JAMES A. STEWART, ELLIOT

28  S. STIASNY, ROBERT G. STITES, NATALIE A. STONE, ROSS E. STONE, ROGER A.

9

1   STONIER JR., JERRY G. STRATTON, JOHN J. STRICKLIN, WILLIAM F. STUTZ, MARK C.

2   SULLIVAN, THOMAS A. SULLIVAN, ROBERT R. SUMMERS, COLONEL F. SURRATT,

3   DAVID M. SURWILO, ALEKSEI E. SVIRIDOV, MICHAEL J. SWANSON, WILLIAM S.

4   SWEENEY, JEFFREY D. SWETT, ESMERALDA TAGABAN, WILLIAM D. TAITANO,

5   MALACHA L. TALLMAN, LOUIS A. TAMAGNI, DANA D. TAYLOR, VICTOR J. TEJEDA,

6   KAREN-ANNE TENNEY, TOBIA J. TERRANOVA, CHRISTOPHER  M. TEWS, ALVIN

7   THACH, JOSEPH I.T. THOMAS, JOYCELYN S. THOMAS, GEORGE R. THOMAS  III,

8   FREDDIE B. THORNTON JR., LINDA H. TIBBETTS, CHRISTOPHER N. TIVANIAN, MERRIT

9   M. TOWNSEND, SCOTT A. TOWNSEND, JOHN M. TRACY, JOHN A. TRENT, JAMES F.

10  TULUMELLO, MEGHAN R. TURI, KIMBERLY K. UKUZATO-EASTO, MICHAEL D. USREY,

11  RAMON VALENTIN, WENDY J. VALENTIN, MARK A. VAN ABEL, RON W. VAN CLEAVE,

12  EDWARD F. VAN LANINGHAM, ROBERT J. VAN WULVEN, RODNEY L. VANDIVER,

13  KEVIN G. VASQUEZ, LINDA G. VASQUEZ, MICHELLE R. VELOVICH, STEVEN D.

14  VILLALOBOS, PATRICK T. VINSON, JOHN B. VIVOLI, GARY R. VOSS, GERARD M.

15  WACLAWEK, SYLVESTER WADE  JR., KEVIN L. WADHAMS, THOMAS WAGNER,

16  KRISTOPHER M. WALB, DAVID R. WALKER, DANIEL K. WALL, MITCHELL B.

17  WALLACE, DONALD E. WATKINS, VICTORIA D. WATKINS, DEAN C. WAY, SEDONIA B.

18  WEATHERSBY, ELIZABETH D. WEBER, ARTHUR L. WEISMANN, ROBERT D. WELLS,

19  DIANE WENDELL, DONNA M. WESCOTT, DANIEL B. WESTNEY, SCOTT K. WHITE,

20  MARGARET J. WIEGAND-PIERCE, ALPHONSO WILLIAMS, BRENT L. WILLIAMS, DAVID

21  W. WILLIAMS, JEFF D. WILLKOMM, DAN M. WILSON, DAVID J. WINANS, ERIC A.

22  WISEMAN, DANIEL A. WITT, ROGER K. WONG, THOMAS A. WOOD, STEVEN M.

23  WOODROW, JOHN M. WRAY, JEFFREY J. WUEHLER, GEORGE A. YOUKHANNA, PETER

24  J. ZAJDA, STEVEN S. ZASUETA, FELIX ZAVALA, JASON P. ZDUNICH, MATTHEW T.

25  ZDUNICH, ANGELA M. ZDUNICH-GOLDMAN, EVAN B. ZIEGLER, JEFFREY P. ZIEGLER,

26  SHELLEY J. ZIMMERMAN, HANS S. ZINGHEIM, JAMES A. ZIRPOLO, LAURA M. ZIZZO,

27  LOUIS M. ZIZZO, EDWARD M. ZWIBEL.  It is anticipated that the majority, if not all members

28  of the SDPOA will expressly authorize this lawsuit.  The SDPOA represents officers holding the

10

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    rank of Lieutenant or below in the San Diego Police Department. The SDPOA has standing to bring

2    this action because all of its members have suffered injury as a result of the unlawful acts of the

3    Defendants, the interests furthered by this Complaint are germane to the SDPOA's purpose as they

4    are the recognized employee organization which bargains on behalf of its members for wages, hours

5    and working conditions; and neither the claim asserted or relief requested requires individual

6    participation of its members as the unlawful acts affect the membership in general and not any

7    individual specifically and the relief requested herein does not require any inquiry into any specific

8    individual as only equitable and declaratory relief is demanded as to them.

9        6.    Defendant MICHAEL AGUIRRE, is and was at all relevant times hereto, the current

10   City Attorney for the City of San Diego. All the relevant unlawful acts alleged herein were directed,

11   dictated, demanded, adopted, endorsed, ratified, or approved of by Defendant Aguirre. At all times

12   relevant hereto, Defendant Aguirre was acting under the color of law in his official and individual

13   capacity.

14       7.    Defendant CITY OF SAN DIEGO (hereinafter "City") is a public entity organized,

15   existing, and incorporated under the Laws of the State of California. City is a "person" per the

16   provisions of 42 U.S.C. § 1983, as the injuries and deprivations alleged herein resulted from the

17   customs, policies, practices and usages of the City, and/or the regulations, rules or other mandates

18   of the City, and were adopted, allowed, observed or undertaken by persons with authority to make

19   policies within the City as set forth in the United States Supreme Court decision of <u>Monell v. New</u>

20   <u>York City Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978). The San Diego Police Officers are employed

21   by the City. Their wages, hours and working conditions are governed by a Memorandum of

22   Understanding (hereinafter "MOU"), between the City and the SDPOA. The SDPOA negotiates the

23   wages, hours and working conditions with the City on behalf of its members pursuant to California

24   Government Code §§ 3500, *et seq* which limits the scope of collective bargaining in the State of

25   California for public employees. Other state and federal laws regulate issues contained in the MOU

26   which the SDPOA also negotiates with the City. The City is the employer of all police officers

27   relevant herein. Pursuant to City of San Diego City Charter section 11.2 (hereinafter "Charter"), all

28   benefits approved for payment of employees requires a super majority of two-thirds of City Council.

11

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   Conversely, to remove such benefits a similar super majority is required as to any non-vested MOU

2   benefit.

3          8.      Defendant SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM (hereinafter

4   "SDCERS") is an entity established under Article XVI, section 17 of the California Constitution, San

5   Diego City Charter Article IX, sections 141 - 148.1 and Article X, section 1 and the San Diego

6   Municipal Code Sections 24.0100, et seq.  SDCERS operates as a trust and provides retirement,

7   health insurance, disability and death benefits to its members and their beneficiaries.  Contributions

8   by the City and its employees, which include SDPOA members, are placed in a fund for the sole

9   benefit of the members and the beneficiaries (hereinafter referred to as the "Retirement Fund").

10  Plaintiff asserts that Defendant Michael Aguirre falsely claims in his Cross-Complaint to Case No.

11  GIC841845, pg. 3, lns. 1-7, that Defendant SDCERS is not *sui juris* and cannot be sued in its

12  individual capacity even though such assertion is contrary to the interests of his current and past

13  clients and constitutes unethical and illegal conduct by an attorney under the California Rules of

14  Professional Conduct.

15         9.      Defendant SCOTT PETERS (hereinafter "Peters") is and was at all relevant times

16  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

17  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

18  policy making official of the City.  Peters was a City Council member from approximately 2000 to

19  the present.  At all times relevant hereto, Defendant Peters was acting under the color of law in his

20  official and individual capacity.  The manner in which the Defendant became a trustee fails to

21  comply with appropriate state and federal law and Defendant, as a trustee, has committed numerous

22  unlawful acts in the administration of the trust benefits and funds now being paid and/or collected

23  in lieu of social security benefits.  Said benefits are protected property interests created by contracts,

24  statutes, charter sections, and mutually explicit understandings.

25         10.     Defendant JIM MADAFFER (hereinafter "Madaffer") is and was at all relevant times

26  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

27  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

28  policy making official of the City.  Madaffer was a City Council member from approximately 2000

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1   to the present. At all times relevant hereto, Defendant Madaffer was acting under the color of law

2   in his official and individual capacity. The manner in which the Defendant became a trustee fails

3   to comply with appropriate state and federal law and Defendant, as a trustee, has committed

4   numerous unlawful acts in the administration of the trust benefits and funds now being paid and/or

5   collected in lieu of social security benefits. Said benefits are protected property interests created by

6   contracts, statutes, charter sections, and mutually explicit understandings.

7        11.    Defendant RALPH INZUNZA (hereinafter "Inzunza") is and was at all relevant times

8   hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

9   on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

10  policy making official of the City. Inzunza was a City Council member from approximately 2001

11  to 2005. At all times relevant hereto, Defendant Inzunza was acting under the color of law in his

12  official and individual capacity. Defendant Inzunza was convicted by a federal jury on July 15,

13  2005, for criminal conspiracy, extortion and fraud charges brought by the United States Attorney's

14  Office. Defendant Inzunza has since resigned from his position in the City Council. The manner

15  in which the Defendant became a trustee fails to comply with appropriate state and federal law and

16  Defendant, as a trustee, has committed numerous unlawful acts in the administration of the trust

17  benefits and funds now being paid and/or collected in lieu of social security benefits. Said benefits

18  are protected property interests created by contracts, statutes, charter sections, and mutually explicit

19  understandings.

20       12.    Defendant TONI ATKINS (hereinafter "Atkins") is and was at all relevant times

21  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

22  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

23  policy making official of the City. Atkins was a City Council member from approximately 2000 to

24  the present. At all times relevant hereto, Defendant Atkins was acting under the color of law in her

25  official and individual capacity. During Defendant's term as a member of the City Council,

26  defendant became a trustee of the retiree medical benefits trust established in 1981. The manner in

27  which the Defendant became a trustee fails to comply with appropriate state and federal law and

28  Defendant, as a trustee, has committed numerous unlawful acts in the administration of the trust

13

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    benefits and funds now being paid and/or collected in lieu of social security benefits. Said benefits

2    are protected property interests created by contracts, statutes, charter sections, and mutually explicit

3    understandings.

4        13.    Defendant TONY YOUNG (hereinafter "Young") is and was at all relevant times

5    hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

6    on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

7    policy making official of the City. Young was a City Council member from approximately 2002 to

8    the present. At all times relevant hereto, Defendant Young was acting under the color of law in his

9    official and individual capacity. The manner in which the Defendant became a trustee fails to

10   comply with appropriate state and federal law and Defendant, as a trustee, has committed numerous

11   unlawful acts in the administration of the trust benefits and funds now being paid and/or collected

12   in lieu of social security benefits. Said benefits are protected property interests created by contracts,

13   statutes, charter sections, and mutually explicit understandings.

14       14.    Defendant BRIAN MAIENSCHEIN (hereinafter "Maienschein") is and was at all

15   relevant times hereto, a trustee of the medical benefits trust and funds withheld from and/or

16   contributed to SDCERS on behalf of all San Diego Police Officers as interim trustees and is a

17   supervising, managerial, and policy making official of the City. Maienschein was a City Council

18   member from approximately 2000 to the present. At all times relevant hereto, Defendant

19   Maienschein was acting under the color of law in his official and individual capacity. The manner

20   in which the Defendant became a trustee fails to comply with appropriate state and federal law and

21   Defendant, as a trustee, has committed numerous unlawful acts in the administration of the trust

22   benefits and funds now being paid and/or collected in lieu of social security benefits. Said benefits

23   are protected property interests created by contracts, statutes, charter sections, and mutually explicit

24   understandings.

25       15.    Defendant DONNA FRYE (hereinafter "Frye") is and was at all relevant times hereto,

26   a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS on

27   behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

28   policy making official of the City. Frye was a member of the City Council from approximately 2001

14

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  to the present. At all times relevant hereto, Defendant Frye was acting under the color of law in her

2  official and individual capacity.  The manner in which the Defendant became a trustee fails to

3  comply with appropriate state and federal law and Defendant, as a trustee, has committed numerous

4  unlawful acts in the administration of the trust benefits and funds now being paid and/or collected

5  in lieu of social security benefits. Said benefits are protected property interests created by contracts,

6  statutes, charter sections, and mutually explicit understandings.

7      16.    Defendant MICHAEL ZUCCHET (hereinafter "Zucchet") is and was at all relevant

8  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

9  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

10  managerial, and policy making official of the City.  Zucchet was a City Council member from

11  approximately 2002 to 2005. At all times relevant hereto, Defendant Zucchet was acting under the

12  color of law in his official and individual capacity.  Defendant Zucchet was convicted by a federal

13  jury on July 15, 2005, for criminal conspiracy, extortion and fraud charges brought by the United

14  States Attorney's Office.  Defendant Zucchet has since resigned from his position in the City

15  Council. The manner in which the Defendant became a trustee fails to comply with appropriate state

16  and federal law and Defendant, as a trustee, has committed numerous unlawful acts in the

17  administration of the trust benefits and funds now being paid and/or collected in lieu of social

18  security benefits. Said benefits are protected property interests created by contracts, statutes, charter

19  sections, and mutually explicit understandings.

20      17.    Defendant HARRY MATHIS (hereinafter "Mathis") is and was at all relevant times

21  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

22  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

23  policy making official of the City. Mathis was a City Council member from approximately 1992 to

24  2000. At all times relevant hereto, Defendant Mathis was acting under the color of law in his official

25  and individual capacity.  The manner in which the Defendant became a trustee fails to comply with

26  appropriate state and federal law and Defendant, as a trustee, has committed numerous unlawful acts

27  in the administration of the trust benefits and funds now being paid and/or collected in lieu of social

28  security benefits. Said benefits are protected property interests created by contracts, statutes, charter

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

  
1   sections, and mutually explicit understandings.

2       18.    Defendant BYRON WEAR (hereinafter "Wear") is and was at all relevant times

3   hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

4   on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

5   policy making official of the City.  Wear was a City Council member from approximately 1995 to

6   2002. At all times relevant hereto, Defendant Wear was acting under the color of law in his official

7   and individual capacity.  The manner in which the Defendant became a trustee fails to comply with

8   appropriate state and federal law and Defendant, as a trustee, has committed numerous unlawful acts

9   in the administration of the trust benefits and funds now being paid and/or collected in lieu of social

10  security benefits. Said benefits are protected property interests created by contracts, statutes, charter

11  sections, and mutually explicit understandings.

12      19.    Defendant CHRISTINE KEHOE (hereinafter "Kehoe") is and was at all relevant

13  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

14  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

15  managerial, and policy making official of the City.  Kehoe was a City Council member from

16  approximately 1993 to 2000.  At all times relevant hereto, Defendant Kehoe was acting under the

17  color of law in his official and individual capacity.  The manner in which the Defendant became a

18  trustee fails to comply with appropriate state and federal law and Defendant, as a trustee, has

19  committed numerous unlawful acts in the administration of the trust benefits and funds now being

20  paid and/or collected in lieu of social security benefits.  Said benefits are protected property interests

21  created by contracts, statutes, charter sections, and mutually explicit understandings.

22      20.    Defendant GEORGE STEVENS (hereinafter "Stevens") is and was at all relevant

23  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

24  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

25  managerial, and policy making official of the City.  Stevens was a City Council member from

26  approximately 1991 to 2002. At all times relevant hereto, Defendant Stevens was acting under the

27  color of law in his official and individual capacity.  The manner in which the Defendant became a

28  trustee fails to comply with appropriate state and federal law and Defendant, as a trustee, has

16

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  committed numerous unlawful acts in the administration of the trust benefits and funds now being

2  paid and/or collected in lieu of social security benefits. Said benefits are protected property interests

3  created by contracts, statutes, charter sections, and mutually explicit understandings.

4        21.    Defendant BARBARA WARDEN (hereinafter "Warden") is and was at all relevant

5  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

6  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

7  managerial, and policy making official of the City. Warden was a City Council member from

8  approximately 1993 to 2000. At all times relevant hereto, Defendant Warden was acting under the

9  color of law in his official and individual capacity. The manner in which the Defendant became a

10  trustee fails to comply with appropriate state and federal law and Defendant, as a trustee, has

11  committed numerous unlawful acts in the administration of the trust benefits and funds now being

12  paid and/or collected in lieu of social security benefits. Said benefits are protected property interests

13  created by contracts, statutes, charter sections, and mutually explicit understandings.

14        22.    Defendant VALERIE STALLINGS (hereinafter "Stallings") is and was at all relevant

15  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

16  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

17  managerial, and policy making official of the City. Stallings was a City Council member from

18  approximately 1991 to 2001. At all times relevant hereto, Defendant Stallings was acting under the

19  color of law in his official and individual capacity. The manner in which the Defendant became a

20  trustee fails to comply with appropriate state and federal law and Defendant, as a trustee, has

21  committed numerous unlawful acts in the administration of the trust benefits and funds now being

22  paid and/or collected in lieu of social security benefits. Said benefits are protected property interests

23  created by contracts, statutes, charter sections, and mutually explicit understandings.

24        23.    Defendant JUDY MCCARTY (hereinafter "McCarty") is and was at all relevant

25  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

26  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

27  managerial, and policy making official of the City. McCarty was a City Council member from

28  approximately 1987 to 2000. At all times relevant hereto, Defendant McCarty was acting under the

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  color of law in his official and individual capacity. The manner in which the Defendant became a

2  trustee fails to comply with appropriate state and federal law and Defendant, as a trustee, has

3  committed numerous unlawful acts in the administration of the trust benefits and funds now being

4  paid and/or collected in lieu of social security benefits. Said benefits are protected property interests

5  created by contracts, statutes, charter sections, and mutually explicit understandings.

6      24.    Defendant JUAN VARGAS (hereinafter "Vargas") is and was at all relevant times

7  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

8  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

9  policy making official of the City. Vargas was a City Council member from approximately 1993 to

10 2000. At all times relevant hereto, Defendant Vargas was acting under the color of law in his official

11 and individual capacity. The manner in which the Defendant became a trustee fails to comply with

12 appropriate state and federal law and Defendant, as a trustee, has committed numerous unlawful acts

13 in the administration of the trust benefits and funds now being paid and/or collected in lieu of social

14 security benefits. Said benefits are protected property interests created by contracts, statutes, charter

15 sections, and mutually explicit understandings.

16     25.    All current and former City Council member defendants will collectively be referred

17 to as "City Council Member Defendants."

18     26.    Defendant LAWRENCE GRISSOM (hereinafter "Grissom") was at all relevant times

19 hereto, employed by SDCERS as the SDCERS Administrator, who manages and directs the daily

20 affairs of the SDCERS and oversees its administration. Defendant Grissom is a supervising,

21 managerial, and policy making official of SDCERS. At all times relevant hereto, Defendant Grissom

22 was acting under the color of law in his official and individual capacity. Defendant Grissom is also

23 a defendant in a criminal complaint filed by the San Diego District Attorney's Office and a defendant

24 in two civil actions filed by Defendant Michael Aguirre.

25     27.    Defendant CATHY LEXIN (hereinafter "Lexin") was at all relevant times hereto, a

26 former trustee and board member of SDCERS. Defendant Lexin was also employed as the Human

27 Resources Director for the City of San Diego and resigned in May of 2005. Defendant Lexin is a

28 supervising, managerial, and policy making official of SDCERS and the City of San Diego. At all

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    times relevant hereto, Defendant Lexin was acting under the color of law in her official and

2    individual capacity. Defendant Lexin is also a defendant in a criminal complaint filed by the San

3    Diego District Attorney's Office and a defendant in two civil actions filed by Defendant Michael

4    Aguirre.

5        28.    Defendant MARY VATTIMO (hereinafter "Vattimo") was at all relevant times

6    hereto, a former trustee and board member of SDCERS. Defendant Vattimo was also the City

7    Treasurer for the City of San Diego from 2001 to 2005. Defendant Vattimo is a supervising,

8    managerial, and policy making official of SDCERS and the City of San Diego. At all times relevant

9    hereto, Defendant Vattimo was acting under the color of law in his official and individual capacity.

10   Defendant Vattimo is also a defendant in a criminal complaint filed by the San Diego District

11   Attorney's Office and a defendant in a civil action filed by Defendant Michael Aguirre.

12       29.    Defendant TERRI WEBSTER (hereinafter "Webster") was at all relevant times

13   hereto, a former trustee and board member of SDCERS. Defendant Webster was also the Deputy

14   City Auditor for the City of San Diego. Defendant Webster is a supervising, managerial, and policy

15   making official of SDCERS and the City of San Diego. At all times relevant hereto, Defendant

16   Webster was acting under the color of law in her official and individual capacity. Defendant

17   Webster is also a defendant in a criminal complaint filed by the San Diego District Attorney's Office

18   and a defendant in two civil actions filed by Defendant Michael Aguirre.

19       30.    Defendant ED RYAN (hereinafter "Ryan") was at all relevant times hereto, a former

20   trustee and board member of SDCERS and the City's Auditor and Comptroller. Defendant Ryan

21   was a supervising, managerial, and policy making official of SDCERS and the City of San Diego.

22   At all times relevant hereto, Defendant Ryan was acting under the color of law in his official and

23   individual capacity. Ryan worked for the City as Auditor since on or about 1982 and resigned in

24   January of 2004.

25       31.    Defendant SHARON WILKINSON (hereinafter "Wilkinson") was at all relevant

26   times hereto, a former trustee and board member of SDCERS and a management analyst for the City

27   of San Diego from 1992 to 2005. Defendant Wilkinson was a supervising, managerial, and policy

28   making official of SDCERS and the City of San Diego. At all times relevant hereto, Defendant

19

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  Wilkinson was acting under the color of law in her official and individual capacity. Defendant

2  Wilkinson is also a defendant in a criminal complaint filed by the San Diego District Attorney's

3  Office and a defendant in two civil actions filed by Defendant Michael Aguirre.

4       32.    Defendant BRUCE HERRING (hereinafter "Herring") was at all relevant times

5  hereto, a former trustee and board member of SDCERS and a deputy city manager and has served

6  on the board of trustee at all times relevant to this lawsuit. Defendant Herring was a supervising,

7  managerial, and policy making official of SDCERS and the City of San Diego. At all times relevant

8  hereto, Defendant Herring was acting under the color of law in her official and individual capacity.

9       33.    All current and former SDCERS trustees named as defendants herein will collectively

10  be referred to as "SDCERS Trustees." This definition includes Lexin, Vattimo, Webster, Ryan,

11  Wilkinson and Herring.

12       34.    Defendant P. LAMONT EWELL (hereinafter "Ewell") is and was at all relevant times

13  hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to SDCERS

14  on behalf of all San Diego Police Officers as interim trustees and is a supervising, managerial, and

15  policy making official of the City and is and was at all relevant times hereto the current City

16  Manager and/or assistant City Manager for the City of San Diego. The City Manager was created

17  pursuant to City of San Diego City Charter Article V, Section 27. The City Manager is the chief

18  administrative officer of the City, elected by the City Council, with the responsibility of supervising

19  the administration of the City, including those duties, rights and responsibilities enumerated under

20  City Charter Article V, Sections 27-32.1. Defendant Ewell is a supervising, managerial, and policy

21  making official of City. At all times relevant hereto, Defendant Ewell was acting under the color

22  of law in his official and individual capacity. The manner in which the Defendant became a trustee

23  fails to comply with appropriate state and federal law and Defendant, as a trustee, has committed

24  numerous unlawful acts in the administration of the trust benefits and funds now being paid and/or

25  collected in lieu of social security benefits. Said benefits are protected property interests created by

26  contracts, statutes, charter sections, and mutually explicit understandings.

27       35.    Defendant MICHAEL UBERUAGA (hereinafter "Uberuaga") is and was at all

28  relevant times hereto, a trustee of the medical benefits trust and funds withheld from and/or

20

1   contributed to SDCERS on behalf of all San Diego Police Officers as interim trustees and is a

2   supervising, managerial, and policy making official of the City and was at all relevant times hereto,

3   the City Manager for the City of San Diego, who resigned in March of 2004. Defendant Uberuaga

4   was a supervising, managerial, and policy making official of SDCERS. At all times relevant hereto,

5   Defendant Uberuaga was acting under the color of law in his official and individual capacity. The

6   manner in which the Defendant became a trustee fails to comply with appropriate state and federal

7   law and Defendant, as a trustee, has committed numerous unlawful acts in the administration of the

8   trust benefits and funds now being paid and/or collected in lieu of social security benefits. Said

9   benefits are protected property interests created by contracts, statutes, charter sections, and mutually

10  explicit understandings.

11          36.     Defendant JACK MCGRORY (hereinafter "McGrory"), is and was at all relevant

12  times hereto, a trustee of the medical benefits trust and funds withheld from and/or contributed to

13  SDCERS on behalf of all San Diego Police Officers as interim trustees and is a supervising,

14  managerial, and policy making official of the City and was at all relevant times hereto, the former

15  City Manager for the City of San Diego. Defendant McGrory was a supervising, managerial, and

16  policy making official of SDCERS. At all times relevant hereto, Defendant McGrory was acting

17  under the color of law in his official and individual capacity. The manner in which the Defendant

18  became a trustee fails to comply with appropriate state and federal law and Defendant, as a trustee,

19  has committed numerous unlawful acts in the administration of the trust benefits and funds now

20  being paid and/or collected in lieu of social security benefits. Said benefits are protected property

21  interests created by contracts, statutes, charter sections, and mutually explicit understandings.

22          37.     Plaintiff asserts it is ignorant of the names and capacities of the individuals or entities

23  sued herein as Does 1 through 100, who may have been involved in the unlawful acts alleged herein

24  pursuant. Plaintiff alleges that each of the fictitiously named Defendants sued herein are legally

25  responsible in some manner for the events and happenings referred to herein, and that Plaintiff's

26  damages as alleged were proximately caused by their conduct. Doe defendants were responsible in

27  some manner or conspired to do the same in furtherance of this civil rights litigation.

28          38.     Defendants resided in and/or did business in the Southern and Central Districts of

21

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  California at all times relevant to this lawsuit, and each of the acts and omissions alleged herein

2  occurred in the jurisdiction of said Districts.

3      39.    Defendants have acted and will continue to act to deprive Plaintiff of its rights

4  protected by the United States Constitution, the Constitution of the State of California and the San

5  Diego City Charter, as well as Federal and California statutes and common law.

6      40.    Defendants, and each of them, except City and SDCERS, which are sued as entities,

7  are sued in their individual and official capacities. All unlawful actions by all Defendants were taken

8  under color of law.

9      41.    Unless otherwise indicated, each Defendant conspired, committed, ordered, directed,

10  supervised, allowed, planned, ratified, concealed, organized, acted in concert in, or otherwise

11  participated in one or more of the unlawful acts complained of herein.

12      42.    The acts and omissions of all Defendants were unlawful and were not taken under any

13  privilege. Defendants who are identified as employees and/or officials of the City and SDCERS,

14  were undertaken in accordance with and represent the official policies of the City and SDCERS

15  and/or were undertaken by employees whose acts and omissions may be fairly said to represent the

16  official policies of the City and SDCERS.

17      43.    The Defendants, acting on their own behalf, or their agents, attorneys and/or others

18  with authority to speak for them, have made many, if not all, of the allegations contained in this

19  complaint against each other, or others, in similar positions. Plaintiff notes that said statements

20  constitute admissions against interests by party defendants and/or their representatives and are not

21  subject to dispute and constitute confessions. The Defendants' admissions, concerning the financial

22  underfunding of the pension plan give rise to damages as admitted by various party defendants as

23  heretofore set forth in an approximate sum of $1.5 billion in unfunded liability as more fully set for

24  hereinafter.

25      44.    Since 1981, the City of San Diego has, without the knowledge or consent of its

26  employees or the SDPOA, in many ways failed, as more fully set forth herein, to pay over, fund,

27  account for, actuarially study, determine, or otherwise ascertain the nature and extent of their

28  debt/unfunded liability for lifetime medical benefits and/or disability benefits. Thus, for almost 25

22

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  years the City of San Diego has been accruing unfunded and unstated financial liabilities while

2  avoiding the payment of social security benefits for San Diego City employees.

3      45.    In approximately 1981, the employees of City of San Diego voted to eliminate Social

4  Security with the assurance that their benefits would be replaced with retiree medical benefits

5  provided by City.  Defendant City and SDCERS adopted the retiree medical benefits, in part, as an

6  alternative to paying the Social Security tax for its employees under IRS regulations.  The retiree

7  medical benefits were to be funded by contribution from the employees and the City.

8      46.    Some fifteen years after falsely committing to make financial contributions to its

9  employees in lieu of social security benefits and withholdings, the Defendants entered into a series

10  of contractual promises that have recently been discovered to be similarly underfunded or unfunded

11  by the Plaintiff and its members.  On or about January 21, 1996, SDCERS and the City entered into

12  an employer contribution deferral contract, commonly referred to as Manager's Proposal 1

13  (hereinafter "MP1").  MP1 falsely sets forth various plans and procedures relevant to the City's

14  Financial affairs.  A second contribution deferral contract was entered into in 2002 and is commonly

15  referred to as Manager's Proposal 2 (hereinafter "MP2").  In the years since MP1 to the present, the

16  citizens of the City of San Diego have been misled as to the financial affairs of the City.

17      47.    It is alleged that the City's financial status of the City is far from bankruptcy,

18  insolvency and/or the need for receivership.  The City is solvent.  The fact that it does not wish to

19  pay its bills and is a high credit risk debtor as a result of the unlawful actions is set forth hereinafter.

20  In furtherance of its unlawful activities, the City has concealed the true facts concerning its financial

21  affairs from its citizens, employees, unions and beneficiaries of its retirement plans.  It now seeks

22  through fraud and conspiracy to go back on its statutory, contractual and constitutional obligations

23  to its police officers and retired police officers as hereinafter set forth.  By virtue of the fraudulent

24  concealment of the true facts, the statute of limitations on all causes of action contained herein was

25  and are tolled from the date of implementation of MP1 up to and including the present time.

26      48.    This action involves, among other things, the unilateral implementation of wages,

27  hours and working conditions against members of the San Diego Police Officers' Association in

28  violation of state and federal laws; the underfunding, non-funding and misrepresentation of

23

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   funding of pension benefits and misleading of beneficiaries of trust benefits by the publication of

2   false financial statements concerning the solvency of the City of San Diego and SDCERS,

3   including SEC filings and related papers.  This action also addresses, among other things, the

4   City's unlawful conversion of the funds set aside for the beneficiaries of the San Diego City

5   Employees' Retirement System and use of those funds, including principal and interest, for its

6   own benefit.  This action also seeks, among other things, to restore property rights previously

7   agreed to by the City and to enjoin the City from taking any adverse action thereto.  Plaintiff also

8   seek other relief as set forth herein.

9        49.     On January 14, 2005, Defendant Aguirre, the elected City Attorney of the City of

10  San Diego, was charged with the duty of carrying out the instructions of his client, the City

11  Council of the City of San Diego, by the terms of the San Diego City Charter, Article V, Section

12  40, with apparent, ostensible, and statutory authority.  Defendant Aguirre requested a meeting

13  with all the Union leaders for the various unions representing the employees of the City of San

14  Diego.  The leaders of the various unions attended, together with the representatives of AFL/CIO,

15  via conference call.  At the time of said meeting, Defendant Aguirre, was aware of the unfunded

16  liability in excess of $1.5 billion and the potential for litigation as a result of the gross negligence

17  and/or willful misconduct of the various city officials who had, for approximately twenty-five

18  years last past, failed to provide an actuarially sound, properly funded and appropriately managed

19  pension benefit system and substitute for social security benefits.  Defendant Aguirre, as the City

20  Attorney of the City of San Diego, attempted to obtain the consent of the parties present to enter

21  into a "deal" wherein he would eliminate the potential liability by offering to engage in unlawful

22  labor practices and criminal misconduct with the parties present.  Defendant Aguirre knowing

23  that the City of San Diego has committed numerous violations of law and is deeply indebted in

24  amounts of staggering proportions due to gross neglect, attempted to bribe union officials with

25  $650 million of public funds to give up vested pension benefit rights of the parties respective

26  memberships and to go along with his unlawful plan for this political benefit.

27       50.     Defendant Aguirre, as the City Attorney of the City of San Diego, was not

28  authorized to collectively bargain on behalf of the City of San Diego according to members of

24

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  the collective bargaining team, including Defendants herein as alleged in the paragraph above.

2     51.   These matters were reported to members of City government by Plaintiff with a

3  request that appropriate actions be taken.  The failure of the City to act has become apparent.

4  The conduct of Defendant Aguirre in that regard is criminal and is in violation of the California

5  Penal Code.  A letter requesting a formal criminal investigation has been forwarded to the San

6  Diego Police Department and the San Diego District Attorney's Office.

7     52.   The SDPOA is the recognized employee organization representing the San Diego

8  Police Officers holding the rank of Lieutenant and below who are currently employed by the

9  City.  This action is not on behalf of retired officers not currently employed by the City.  The

10  SDPOA negotiates with the City for improved wages, hours and working conditions on behalf of

11  its members.

12     53.   The most recent negotiated Memorandum of Understanding (hereinafter "MOU")

13  was effective between June 1, 2003 and June 30, 2005 and a copy of this MOU is attached to this

14  complaint as Exhibit 1.  As of July 1, 2005, there is no current MOU in effect between the City

15  and SDPOA.  The MOU acts as a labor agreement and/or contract between the parties regarding

16  wages, hours and working conditions of the San Diego Police Officers.  Certain provisions of the

17  MOU remain in full force and effect even after expiration of the MOU.  The City has not

18  delineated which provisions it believes remain in force and effect and which do not.

19     54.   Prior to the expiration of the June 30, 2005 MOU, Defendant City and the

20  SDPOA entered into a series of negotiations in an attempt to renew and/or renegotiate the terms

21  of employment.  The City Council may entered into a MOU under 11.2 of the City Charter

22  whenever it feels prudent to do so. The Defendants and the SDPOA were ultimately unable to

23  reach an agreement in their negotiations.  This failure was the result of bad faith bargaining by

24  the City.  The City resorted to impasse procedures pursuant to the Meyers-Milias-Brown Act

25  California Government Code §3500, *et seq*.  Defendant City submitted its last, best and final

26  offer and thereafter unilaterally, unlawfully imposed new employment terms against SDPOA

27  which deprived, eliminated, and/or reduced retirement benefits – which included vested pension

28  benefits – owed to members of the SDPOA.

25

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    55.    Near the conclusion of those negotiations set forth in the paragraph above, the

2 SDPOA, in an effort to avoid impasse, did propose a three year agreement that included

3 compensation increases to off-set benefit reductions being proposed by the City to obtain equal

4 and corresponding benefits for the losses to be imposed.  The City negotiator stated that the

5 proposal was "interesting" and would be a concept the City would be receptive to in other

6 circumstances, but that at the present time, he considered the SDPOA's proposal "too

7 complicated" for the city council to understand.   Plaintiff alleges that at the time of the labor

8 negotiations the City council was acting to recover its losses and correct its errors of

9 approximately 25 years last past by reneging on the contractual commitments made during that

10 time period for which they have not performed.  Defendants herein with fiduciary obligations to

11 the trust beneficiaries were acting with a conflict of interest in their attempt to take away trust

12 benefits from the same trust beneficiaries that they had promised the benefits to and did so in a

13 manner proscribed by law.

14    56.    The unlawful changes and deprivations of the vested retirement benefits that were

15 implemented against the SDPOA members include, but are not limited to: requiring each

16 employee to pay a 3.2% increase in employee contributions into the San Diego City Employees'

17 Retirement System (which requires each employee to pay to City a sum of approximately $80 to

18 $100 each paycheck); (2) a corresponding 3.2% salary reduction for employees enrolled in

19 Deferred Retirement Option Plan (hereinafter "DROP") (which corresponds to a salary reduction

20 of approximately $80 to $100 each paycheck ); and (3) an attempt to unlawfully limit retiree

21 medical benefits available to current employees provided in lieu of social security benefits,

22 effectively depriving San Diego Police Officers of medical benefits equal to those of social

23 security recipients during their lifetime and contrary to the voters' mandate in 1981 as set forth

24 herein.

25    57.    Approximately 1900 officers of lieutenant or below are represented by the

26 SDPOA.  Approximately 300 of those officers are employed under the DROP program pursuant

27 to independent and individualized contracts of employment with the City which were entered

28 into pursuant to the provisions contained in the MOU.  The officers in the DROP program are

26

COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF

1    among the most experienced officers on the department and all have retired. The DROP program

2    retained their services after retirement. It is anticipated that the unlawful action of the City will

3    result in the exodus of many of these officers from the San Diego Police Department. As a result

4    of the current situation, pertaining to the conduct of the City and Defendant Aguirre in particular,

5    approximately 350 police officers of lieutenant or below are applying for employment in other

6    agencies.

7         58.    The failure of the city government to adequately fund the pension system in

8    conjunction with the activities of the other defendants as herein mentioned has led to an

9    imminent public safety crisis, warranting immediate injunctive and other equitable relief.

10   SDPOA alleges that the unlawful actions of the defendants may lead to unacceptable staffing

11   levels and has already led to unacceptable requirements that officers ignore rules and regulations

12   on proper investigations into property related crimes such as fingerprinting, witness interviewing,

13   neighborhood canvassing and other aspects of proper police procedures mandated by the

14   department's own manuals in order to have officers appease the community by providing

15   superficial responses to radio calls. This has resulted in unacceptable violations of the officers

16   safety procedures, increased endangerment of officers due to lack of adequate staffing, and the

17   inability to protect the public in matters where department policy requires sufficient staffing but

18   which are not available.

19        59.    The changes unilaterally implemented against the SDPOA affect the pension

20   rights of the members of the SDPOA. These affected pension rights as set forth herein became

21   vested for the police officers during their time of employment for the City. In unilaterally

22   implementing the changes, Defendants did not give a corresponding increase in benefit to the

23   members of the SDPOA. Any and/or all changes implemented against members of the SDPOA

24   decreasing vested pension benefits without a corresponding increase in benefits were illegal,

25   unconstitutional and invalid.

26        60.    Defendants desired and/or intended to deprive, eliminate and/or reduce retirement

27   benefits – which includes vested pension benefits – owed to members of the SDPOA during

28   those negotiations. As required in Government Code §§ 3500, *et seq.*, Defendant City never

27

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   intended to negotiate in good faith, the new terms of the wages, hours and working conditions of

2   the San Diego Police Officers. Defendants simply used the negotiations described herein as a

3   designed effort to relieve themselves of the obligations owed to members of the SDPOA.

4   Defendants had no intention of bargaining in good faith with Plaintiff.

5       61.    Defendant City was also in labor negotiations with the City's other labor unions,

6   including the Firefighters, the Municipal Employees' Association, the American Federation of

7   State, County and Municipal Employees and City Attorneys' Association at the same time

8   negotiations were occurring with the SDPOA. The other labor unions agreed to new MOUs with

9   the City while the SDPOA went to impasse. The last, best and final offer to all the unions

10  receiving a one year offer were identical. However, when the other unions agreed to new labor

11  contracts, Defendant City did not include the salary reduction for employees enrolled in the

12  Deferred Retirement Option Plan for the other unions. Defendant City included the salary

13  reduction for SDPOA members enrolled in DROP. Such action constituted retaliation against

14  the SDPOA. City unlawfully punished the SDPOA and its members for not accepting the City's

15  unilaterally mandated offer.

16      62.    Pursuant to the San Diego City Charter and the pension benefits agreed to

17  between the City and the SDPOA, SDPOA members and Defendant City were both required to

18  make financial contributions into the Retirement Fund in a biweekly manner.

19      63.    Throughout the years, the SDPOA and City engaged in negotiations for the wages,

20  hours and working conditions of the San Diego Police Officers. As part of the negotiations, the

21  City has agreed to make the employee contribution portion into the Retirement Fund as

22  concessions to wage increases. These concessions resulted in officers giving monies to the City

23  each paycheck pursuant to said agreements. These monies have not been accounted for and have

24  not been paid to SDCERS as required biweekly by California law.

25      64.    However, instead of depositing any of the required employer or employee

26  contributions into the Retirement Fund, Defendants as set forth herein have failed to fund the

27  Retirement Fund and diverted the money for their own purposes. Use of the funds, other than to

28  place them in the Retirement Fund, was not authorized by SDPOA or its beneficiaries.

28

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   Defendants have failed to account for these funds; nor have they placed the funds into the

2   Retirement Fund.

3       65.     Instead of funding the retiree medical benefits, by including the contributions into

4   a properly managed trust fund to pay for future benefits and to provide a substitute for social

5   security benefits, Defendant City, SDCERS, SDCERS Trustees and City Council Member

6   Defendants have diverted the funds for unlawful uses which are inconsistent with the best

7   interest of the beneficiaries, in breach of their fiduciary obligations and while possessed of a

8   conflict of interest prohibiting such conduct.

9       66.     Since 1981, no Defendant has conducted an actuarial study of the expense in

10  adopting and maintaining retiree medical benefits as an alternative to Social Security benefits.

11      67.     But for the election of the retiree medical benefits plan and the relevant charter

12  provisions, employees of the City of San Diego would have been entitled to Social Security

13  benefits. Defendant's statements to the United States government that they would provide

14  medical benefits plan in lieu of social security benefits, if the statement of Defendant Aguirre are

15  to be believed, were false at the time made.  Making false statements to the United States

16  government in that context would constitute a crime.  Additionally, if such statements were false

17  at time made, the City may be responsible, if the statements of Defendant Aguirre are to be

18  believed, the repayment of funds at a recalculated actuary basis, would cost the City hundreds of

19  millions of dollars in increased pension benefit costs and social security contributions for the 25

20  years last past.  Plaintiff does not believe statements of Defendant Aguirre were made in good

21  faith or with the intention of correcting a legitimate problem at the direction of the City council

22  of the City of San Diego or any other "client."  Plaintiff has attempted to determine whether or

23  not it is the position of the City of San Diego that the 90% cap on pension benefits is truly not in

24  force or that any of the other statements made by Defendant Aguirre concerning pension rights,

25  which would drastically increase pension costs, was authorized by the City Council.  Said

26  statements are inconsistent with the vested contractual rights of the Plaintiff and its members,

27  albeit made by Defendant Aguirre with ostensible authority to do so, the internal disputes within

28  the City created a case or controversy giving rise to the right to declaratory relief.

29

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1    68.    Defendant SDCERS has not obtained an accounting of the retiree medical benefits

2  and has avoided payment of hundreds of millions of dollars in Social Security benefits which

3  would have been placed in trust for the benefits of employees by the Social Security

4  administration.  The Social Security administration would be actuarially funded and accounted,

5  and even if slovenly run, it would be superior to the grossly mismanaged funds by the City of San

6  Diego.

7    69.    It is alleged by Plaintiff that Defendant City underfunded the retiree medical

8  benefits by hundreds of millions of dollars and have never determined the "unfunded" portion of

9  the medical benefits and are currently attempting to divest its employees of their benefits which

10  they exchanged for Social Security benefits.

11    70.    Defendant City was unwilling to fund the Retirement Fund and was unlawfully

12  diverting the contributions made by its employees and the contributions it was obligated to make

13  into projects unrelated to retirement benefits, with the intent of misleading Plaintiff, as well as

14  other beneficiaries and bondholders.  Defendant SDCERS, and others as herein alleged,

15  fraudulently concealed the illegal activities being carried on by the Defendant City and neglected

16  their fiduciary responsibilities owed to members of SDPOA.

17    71.    Defendant SDCERS, and others as herein alleged, unlawfully allowed and

18  conspired with Defendant City to divert trust funds for the City's own use and benefit which in

19  turn contributed to the underfunding of the pension system.

20    72.    Defendants City, SDCERS and others as herein alleged entered into agreements

21  and conspired to eliminate and/or reduce retirement benefits – which includes vested pension

22  benefits – owed to members of the SDPOA.  Defendants used the conspiracy as a vehicle by

23  which to defraud and/or deprive members of the SDPOA of their benefits.

24    73.    Out of an abundance of caution, Plaintiff timely filed a claim pursuant to

25  California Government Code 910 with the City of San Diego on July 21, 2005, although exempt

26  from doing so under California Government Code §§ 905(c), (f), and Minsky v. Los Angeles, 11

27  Cal. 3d 113 (1974) attached hereto as Exhibit 2.

28

30

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1

## CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF

3

### FOR VIOLATION OF FIRST AMENDMENT OF

4

### UNITED STATES CONSTITUTION

5

### 42 U.S.C. § 1983

6

**(Plaintiff against Defendants City of San Diego, Aguirre, and Does 1 through 100)**

7       74.    Plaintiff repeats and realleges paragraphs 1 through 73, inclusive, as though fully set

8    forth at this point and incorporated by reference herein.

9       75.    In January of 2005, Defendant Aguirre invited the leaders of the city labor unions to

10   his office in an effort to induce the labor unions to support his political agenda as heretofore set

11   forth.

12      76.    During that meeting, Defendant Aguirre specifically offered the Unions $650 million

13   that would be "left on the bargaining table" during labor negotiations between the City and the

14   Unions if they agreed to support Defendant Aguirre with respect to his political agenda. The Union

15   officials specifically rejected his offer and indicated that such conduct would be illegal.

16      77.    In retaliation for the Union's rejection of Aguirre's offer, Aguirre and the City

17   punished the SDPOA and its members by imposing wages, hours and working conditions that were

18   significantly lower than previously held.

19      78.    Members of the SDPOA were thus punished for their lawful affiliation with the

20   SDPOA and the SDPOA was itself punished for lawfully exercising its right to represent their

21   members in their employment relations with public agencies as an associational activity. Aguirre's

22   action interfered with, restrained and/or coerced members of the SDPOA in the exercise of their

23   rights to form, join or assist labor organizations, to bargain collectively through representatives of

24   their own choosing. Aguirre discouraged membership by discriminating from those represented by

25   the SDPOA and those officers not represented.

26      79.    At all times herein, Plaintiff was entitled to the rights and privileges afforded to it

27   under the United States Constitution and under the laws of the State of California and its

28   Constitution. Defendants have deprived Plaintiff's rights and privileges under the First Amendment

31

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   by chilling and impairing the First Amendment right of Freedom of Association.

2          80.    As a direct and proximate result of Defendants' actions as alleged herein, which were

3   conducted under the color of law, Plaintiff has been deprived of its rights and privileges under the

4   First Amendment of the United States Constitution and the laws of the State of California.

5          81.    The Defendants have either encouraged, assisted, ratified, shown deliberate

6   indifference and/or failed to prevent all unlawful deprivations of rights and privileges as alleged

7   herein, thereby resulting in violation of Plaintiff's rights as alleged herein.

8          82.    The SDPOA as party to the MOU is obliged by the duty of fair representation to

9   defend and maintain benefits bargained for on behalf of its members.  As a result of Defendants'

10  unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of

11  lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower

12  and to devote considerable expense in addressing the unlawful actions consequential to this claim

13  for relief.  Plaintiff seeks to recover said damages, as well as other damages, be they special,

14  consequential, nominal or otherwise.

15         83.    Equity and law requires that Defendant Aguirre be ordered to compensate Plaintiff

16  for the injuries resulting from this gross violation of civil rights, costs and attorney's fees incurred

17  in the pursuit of this claim, and punitive damages to punish and make an example of Defendant

18  Aguirre and for each additional relief as this Court deems just and proper.

19                              **SECOND CLAIM FOR RELIEF**

20                          **FOR VIOLATION OF PUBLIC POLICY**

21      **(Plaintiff against Defendants City of San Diego, Aguirre, and Does 1 through 100)**

22         84.    Plaintiff repeats and realleges paragraphs 1 through 83, inclusive, as though fully set

23  forth at this point and incorporated by reference herein.

24         85.    Public policy of the State of California prohibits retaliation for the exercise of the

25  right of refusal to participate in criminal conduct. The Defendant Aguirre's offer of the $650 million

26  dollars constituted criminal conduct.  Similarly, refusal to participate in unlawful conduct is

27  protected by public policy of the State of California.

28         86.    Under California Law, whenever an employer has agreed with any employee to

                                        32
           **COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1  make payments to a health or welfare fund, pension fund or vacation plan, or other such plan for the

2  benefit of the employees, or a negotiated industrial promotion fund, or has entered in to a collective

3  bargaining agreement providing for such payments, it shall be unlawful for such an employer to

4  willfully or with intent to defraud to fail to make the payments required by the terms of any such

5  agreement.

6      87.    By virtue of his office, Aguirre was aware that City was committing multiple felonies

7  biweekly by failing to make payments "to a health or welfare fund, pension fund or vacation plan,

8  or any other such plan for the benefit of employees..." as set forth in California Labor code § 227.

9  Aguirre failed to prosecute the misdemeanor violations on failure to pay the sum of less than $500

10  or to declare a conflict of interest and refer them to a different prosecutorial office, such as the

11  District Attorney's Office.

12      88.    Pursuant to City of San Diego City Charter Article VIII, section 137, that this Court

13  declare Defendant Aguirre forfeit his office as City Attorney and find that he has violated the Civil

14  Service Rules of the City of San Diego by using his influence in seeking to trade a thing of value as

15  defined in City of San Diego City Charter Article VIII, section 135. Furthermore, Defendant sought

16  a thing of value from the employees of the City of San Diego. The conduct alleged herein is also a

17  misdemeanor.

18      89.    Equity and law requires that Defendant Aguirre be ordered to compensate Plaintiff

19  for the injuries resulting from this gross violation of civil rights, costs and attorney's fees incurred

20  in the pursuit of this claim, and punitive damages to punish and make an example of Defendant

21  Aguirre and for each additional relief as this Court deems just and proper.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

33
**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

**THIRD CLAIM FOR RELIEF**

**FOR VIOLATION OF THE CONTRACTS CLAUSE,**

**U.S. CONSTITUTION, ART. I, § 10**

**42 U.S.C. § 1983**

**(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City Council Member Defendants, SDCERS, SDCERS Trustees, Grissom and Does 1 through 100)**

90.    Plaintiff repeats and realleges paragraphs 1 through 89, inclusive, as though fully set forth at this point and incorporated by reference herein.

91.    Members of the SDPOA, in exchange for their services for the City, were promised certain pension benefits as set forth in the San Diego City Charter, ordinances, municipal codes, in various versions of the MOU between the City and the SDPOA, and employment agreements. The City negotiates the MOU based on section 11.2 of the City of San Diego City Charter. The most recently agreed to version of the MOU was effective between June 1, 2003 and June 30, 2005 (hereinafter "June 1, 2003 MOU"). Contained within the MOU are certain promises and/or obligations agreed to between the City and SDPOA with respect to pension benefits and/or rights. SDPOA members employed prior to July 1, 2005 have vested pension benefits and/or rights as herein alleged. These retirement benefits are set forth, among other places, in Article 44 of the June 1, 2003 MOU. This claim for relief does not seek to adjudicate any rights to pension benefits for retired employees who are not serving on active duty.

92.    Any attempt to take away or diminish vested pension rights owed to members of the SDPOA constitutes an unconstitutional impairment of contracts under Federal constitutional laws, which includes, but is not limited to, the contracts clause in the U.S. Constitution, Art. I, § 10.

93.    Pursuant to the San Diego City Charter and the MOU agreed to between the City and SDPOA, SDPOA members and Defendant City were required to make contributions into the Retirement Fund as herein alleged and did so. The Defendants, except Aguirre, SDCERS, SDCERS Trustees and Grissom, are "employers" as defined under state and federal law.

94.    Defendant City has failed to fund the Retirement Fund as previously promised in

34

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  violation of numerous state and federal laws and such conduct is criminal pursuant to California

2  Labor Code § 227. Instead of funding the Retirement Fund, the City, and all those acting on its

3  behalf as herein alleged, and SDCERS, and all those acting on its behalf as herein alleged, have

4  failed to fund the Retirement Fund as has been promised to the beneficiaries of the Retirement Fund

5  and others.

6      95.    By unlawfully depriving, eliminating and/or reducing retirement benefits – which

7  includes vested pension benefits – previously promised to members of the SDPOA as herein alleged,

8  Defendants have deprived Plaintiff of its privileges, rights and immunities secured by the United

9  States Constitution, including but not limited to those protected under the contracts clause of the

10  U.S. Constitution, Art. I, § 10.

11     96.    By failing to fund the Retirement Fund as previously promised to members of the

12  SDPOA as herein alleged, Defendants have deprived Plaintiff of its privileges, rights and immunities

13  secured by the United States Constitution, including but not limited to those protected under the

14  contracts clause of the U.S. Constitution, Art. I, § 10. Said failure to pay over funds also violates

15  California Labor Code § 222.

16     97.    The SDPOA, as party to the MOU, is obliged by the duty of fair representation to

17  defend and maintain benefits bargained for on behalf of its members. As a result of defendants'

18  unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of

19  lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower

20  and to devote considerable expense in addressing the unlawful actions consequential to this claim

21  for relief. Plaintiff seeks to recover said damages, as well as other damages, be they special,

22  consequential, nominal or otherwise.

23     98.    In acting as alleged in this complaint, Defendants acted knowingly, willfully, and

24  maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling

25  plaintiff to punitive damages, save and except against the City and SDCERS, so long as they remain

26  legally immune thereof.

27  ///

28  ///

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

**FOURTH CLAIM FOR RELIEF**

**FOR VIOLATION OF THE TAKINGS CLAUSE – 42 U.S.C. § 1983**

**(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City**

**Council Member Defendants, SDCERS, SDCERS Trustees, Grissom and Does 1 through**

**100)**

99.     Plaintiff repeats and realleges paragraphs 1 through 98, inclusive, as though fully set forth at this point and incorporated by reference herein.

100.    Pursuant to the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983, property cannot be taken for public use without just compensation.

101.    By unlawfully depriving, eliminating and/or reducing retirement benefits – which includes vested pension benefits – previously promised to members of the SDPOA, Defendants have deprived Plaintiff of its privileges, rights and immunities secured by the United States Constitution, including, but not limited to those protected under the Due Process Clause of the Fourteenth Amendment, by taking Plaintiff's private property for public use without just compensation.

102.    By failing to fund the Retirement Fund as previously promised to members of the SDPOA as herein alleged, Defendants have deprived Plaintiff of its privileges, rights and immunities secured by the United States Constitution, including, but not limited to those protected under the Due Process Clause of the Fourteenth Amendment, by taking Plaintiff's private property for public use without just compensation.

103.    The SDPOA as party to the MOU is obliged by the duty of fair representation to defend and maintain benefits bargained for on behalf of its members.  As a result of defendants' unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower and to devote considerable expense in addressing the unlawful actions consequential to this claim for relief.  Plaintiff seeks to recover said damages, as well as other damages, be they special, consequential, nominal or otherwise.

104.    In acting as alleged in this complaint, Defendants acted knowingly, willfully, and

36

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1  maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling

2  plaintiff to punitive damages, save and except against the City and SDCERS, so long as legally

3  exempt.

**FIFTH CLAIM FOR RELIEF**

**FOR VIOLATION OF CALIFORNIA CONSTITUTION**

**ART. I, §7 (DUE PROCESS)**

**(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City**

**Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through**

**100)**

10  105.  Plaintiff repeats and realleges paragraphs 1 through 104, inclusive, as though fully

11  set forth at this point and incorporated by reference herein.

12  106.  Plaintiff have the right, under the California Constitution not to be deprived of their

13  property without due process of law or by governmental actions that are unrelated to any legitimate

14  governmental interest which are arbitrary or capricious.  The deprivation of these rights is in

15  violation of California Civil Code § 52.1.

16  107.  By unlawfully depriving, eliminating and/or reducing retirement benefits – which

17  includes vested pension benefits – previously promised to members of the SDPOA, Defendants have

18  deprived Plaintiff of its privileges, rights and immunities secured by Article I, § 7 of the California

19  Constitution and California Civil Code § 52.1.

20  108.  By failing to fund the Retirement Fund as previously promised to members of the

21  SDPOA as herein alleged, Defendants have deprived Plaintiff of its privileges, rights and immunities

22  secured by Article I, § 7 of the California Constitution and California Civil Code § 52.1.

23  109.  The SDPOA as party to the MOU is obliged by the duty of fair representation to

24  defend and maintain benefits bargained for on behalf of its members.  As a result of Defendants'

25  unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of

26  lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower

27  and to devote considerable expense in addressing the unlawful actions consequential to this claim

28  for relief.  Plaintiff seeks to recover said damages, as well as other damages, be they special,

37

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    consequential, nominal or otherwise.

2         110.    In acting as alleged in this complaint, Defendants acted knowingly, willfully, and

3    maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling

4    plaintiff to punitive damages, save and except against the City and SDCERS, so long as legally

5    exempt.

6                            **SIXTH CLAIM FOR RELIEF**

7                            **FOR BREACH OF CONTRACT**

8    **(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City**

9    **Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through**

10                                 **100)**

11        111.    Plaintiff repeats and realleges paragraphs 1 through 110, inclusive, as though fully

12    set forth at this point and incorporated by reference herein.

13        112.    Members of the SDPOA, in exchange for their services for the City, were promised

14    certain pension benefits as set forth in the San Diego City Charter, ordinances, municipal codes, in

15    various versions of the MOU between the City and the SDPOA, and employment agreements. The

16    most recently agreed to version of the MOU was effective between June 1, 2003 and June 30, 2005.

17    Contained within the MOU are certain promises and/or obligations agreed to between the City and

18    SDPOA with respect to pension benefits and/or rights. SDPOA members employed prior to July 1,

19    2005 have vested pension benefits and/or rights as herein alleged. These retirement benefits are set

20    forth, among other places, in Article 44 of the June 1, 2003 MOU.

21        113.    Pursuant to the San Diego City Charter and the MOU agreed to between the City and

22    SDPOA, SDPOA members and Defendant City were required to make contributions into the

23    Retirement Fund as herein alleged.

24        114.    The City has failed to fund the Retirement Fund as previously promised. Instead of

25    funding the retirement fund, the City, and all those acting on its behalf as herein alleged, and

26    SDCERS, and all those acting on its behalf as herein alleged, have failed to fund the Retirement

27    Fund as has been promised to the beneficiaries of the Retirement Fund and others.

28        115.    Defendants' actions of unlawfully depriving, eliminating and/or reducing retirement

                                        38

1  benefits – which includes vested pension benefits – previously promised to members of the SDPOA

2  constitute a breach of contract.

3       116.    Defendants actions of failing to fund the Retirement Fund as previously promised to

4  members of the SDPOA as herein alleged constitute a breach of contract.

5       117.    The SDPOA as party to the MOU is obliged by the duty of fair representation to

6  defend and maintain benefits bargained for on behalf of its members.  As a result of defendants'

7  unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of

8  lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower

9  and to devote considerable expense in addressing the unlawful actions consequential to this claim

10  for relief.  Plaintiff seeks to recover said damages, as well as other damages, be they special,

11  consequential, nominal or otherwise as well as specific performance of the contract.

12  **SEVENTH CLAIM FOR RELIEF**

13  **FOR CONVERSION**

14  **(Plaintiff against Defendant City of San Diego, Aguirre and Does 1 through 100)**

15       118.    Plaintiff repeats and realleges paragraphs 1 through 117, inclusive, as though fully

16  set forth at this point and incorporated by reference herein.

17       119.    Pursuant to the San Diego City Charter and the pension benefits agreed to between

18  the City, SDCERS and the SDPOA, SDPOA members and Defendant City were required to make

19  pension benefit contributions and retiree medical benefit contributions into the SDCERS, as

20  heretofore set forth, failure to do so constitutes criminal conduct.

21       120.    However, instead of depositing any of the required employer or employee

22  contributions into SDCERS, Defendant City failed to deposit the funds and, instead diverted the

23  money for their own purposes.  Use of the funds, other than to place them in SDCERS, was not

24  authorized by the SDPOA or its members.  Defendant City has failed to account for these funds nor

25  have they placed the funds into SDCERS.

26       121.    Defendants unlawfully and intentionally took and converted retirement benefit

27  contributions for their own use and benefit.  When the conversion took place, each member of the

28  SDPOA was entitled to possession of the retirements benefits unlawfully taken away from them.

39

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   122.    Plaintiff requests an accounting of all funds and an appropriate Order from this Court

2   directing payment of said funds in accordance with the agreements entered into between the parties

3   as herein alleged upon a finding of conversion.

4   123.    Plaintiff requests the Court to enjoin Defendant Aguirre from diverting retirement

5   benefit contributions as herein alleged.

6                              **EIGHTH CLAIM FOR RELIEF**

7                                     **FOR FRAUD**

8   **(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City**

9   **Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through**

10                                        **100)**

11  124.    Plaintiff repeats and realleges paragraphs 1 through 123, inclusive, as though fully

12  set forth at this point and incorporated by reference herein.

13  125.    Defendants entered into the negotiations with SDPOA knowing that the City would

14  be unable and/or unwilling to fund SDCERS as set forth in previous versions of the MOU. In fact,

15  the funds earmarked for SDCERS were being used by the City to fund its other financial obligations.

16  126.    Knowing that funds in SDCERS were being used to pay off other obligations,

17  Defendants entered into the negotiations with Plaintiff with the desire and/or intent to deprive,

18  eliminate and/or reduce retirement benefits – which includes vested pension benefits – owed to

19  members of the SDPOA. Defendants used the negotiations as a designed effort to relieve themselves

20  of the obligations owed to members of the SDPOA and had no intention of bargaining in good faith

21  with Plaintiff.

22  127.    Plaintiff alleges that Defendants engaged in fraud and/or deceit against Plaintiff.

23  Defendants knew that the City would be unable and/or unwilling to fund the Retirement Fund, knew

24  that money which was required to fund the retirement system was being used to fund the City's other

25  obligations, and Defendants never intended to provide benefits previously promised to Plaintiff.

26  128.    Despite having this knowledge, Defendants suppressed the facts and did not disclose

27  them to Plaintiff. Defendants represented to Plaintiff that the negotiations between Defendants and

28  Plaintiff would be in good faith as required by law.

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

129. Plaintiff reasonably believed and relied upon Defendants' assertions that the negotiations would be conducted in good faith.

130. In reliance on the assertions and to the detriment and prejudice of the Plaintiff, entered into negotiations with Defendant.

131. When the negotiations collapsed, Defendants fraudulently imposed its last, best and final offer that unlawfully and unconstitutionally deprives Plaintiff and members of the SDPOA of retirement benefits – which includes vested pension benefits – previously promised to members of the SDPOA.

132. Pursuant to the San Diego City Charter and the MOU agreed to between the City and SDPOA, SDPOA members and Defendant City were required to make contributions into the Retirement Fund as herein alleged.

133. The City has failed to fund the Retirement Fund as previously promised. Instead of funding the Retirement Fund, the City, and all those acting on its behalf as herein alleged, and SDCERS, and all those acting on its behalf as herein alleged, have failed to fund the Retirement Fund as has been promised to the beneficiaries of the Retirement Fund and others.

134. It is alleged by Plaintiff that Defendant City underfunded the retiree medical benefits by hundreds of millions of dollars and have never determined the "unfunded" portion of the medical benefits and are currently attempting to divest its employees of their benefits which they exchanged for Social Security benefits.

135. Defendant City was unwilling to fund the Retirement Fund and was unlawfully diverting the contributions made by its employees and the contributions it was obligated to make into projects unrelated to retirement benefits, with the intent of misleading Plaintiff, as well as other beneficiaries and bondholders. Defendant SDCERS, and others as herein alleged, fraudulently concealed the illegal activities being carried on by the Defendant City and neglected their fiduciary responsibilities owed to members of SDPOA.

136. In acting as alleged in this complaint, Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling plaintiff to punitive damages, save and excepting against the City and SDCERS, so long as legally

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  exempt.

2  ### NINTH CLAIM FOR RELIEF

3  ### FOR VIOLATION OF MEYERS-MILIAS-BROWN ACT

4  ### CALIFORNIA GOVERNMENT CODE § 3500 ET SEQ.

5  **(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, City Council Member**

6  **Defendants and Does 1 through 100)**

7       137.    Plaintiff repeats and realleges paragraphs 1 through 136, inclusive, as though fully

8  set forth at this point and incorporated by reference herein.

9       138.    Defendants' actions described above evidence their desire and/or intent to deprive,

10 eliminate and/or reduce retirement benefits – which includes vested pension benefits – owed to

11 members of the SDPOA.

12      139.    Defendants desired and/or intended to deprive, eliminate and/or reduce retirement

13 benefits – which includes vested pension benefits – owed to members of the SDPOA during those

14 negotiations.  As required in Government Code § 3500, *et seq*, Defendant City never intended to

15 negotiate in good faith, the new terms of the wages, hours and working conditions of the San Diego

16 Police Officers.  Defendants simply used the negotiations described herein as a designed effort to

17 relieve themselves of the obligations owed to members of the SDPOA.  Defendants had no intention

18 of bargaining in good faith with Plaintiff.

19      140.    Defendant City was also in labor negotiations with the City's other labor unions,

20 including the Firefighters, the Municipal Employees' Association, the American Federation of State,

21 County and Municipal Employees and City Attorneys' Association at the same time negotiations

22 were occurring with the SDPOA.  The other labor unions agreed to new MOUs with the City while

23 the SDPOA went to impasse.  The last, best and final offer to all the unions receiving a one year

24 offer were identical.  However, when the other unions agreed to new labor contracts, Defendant City

25 did not include the salary reduction for employees enrolled in the Deferred Retirement Option Plan

26 (hereinafter "DROP") for the other unions.  Defendant City included the salary reduction for SDPOA

27 members enrolled in DROP.  Such action constituted retaliation against the SDPOA.  City

28 unlawfully punished the SDPOA for not accepting the City's unilaterally mandated offer.

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

141.    City has unlawfully discriminated against SDPOA by denying benefits to its members as a result of the SDPOA's decision to use impasse procedures in violation of California Government Code §§ 3502, 3506. By implementing wages, hours and working conditions that were worse than those offered to other labor unions that agreed to a new contract, Defendant City discourages membership to Plaintiff SDPOA in present or future labor relations.  The motivation behind the City's action was to punish the SDPOA for not agreeing to a new contract and utilizing an impasse procedure.  The other labor unions were rewarded for settling their dispute with the City, agreeing to a new contract and not utilizing the impasse procedures.

142.    As a result of Defendants' discrimination for union activities in violation of the provisions in the MMBA, all changes to the pension benefits plan unilaterally implemented on July 1, 2005 by Defendants against Plaintiff are void and/or unlawful.

## TENTH CLAIM FOR RELIEF

## FOR BREACH OF FIDUCIARY DUTY

**(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through 100)**

143.    Plaintiff repeats and realleges paragraphs 1 through 142, inclusive, as though fully set forth at this point and incorporated by reference herein.

144.    Pursuant to California Constitution Article XVI, Section 17, the retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system.  The assets of a public pension or retirement system are to be held in trust for the benefit of the retirement system's participants and their beneficiaries.  Furthermore, a retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.

145.    San Diego City Charter echoes the California Constitutional provision by stating that all moneys contributed by employees are to be placed in the City Employees' Retirement Fund held in trust and used only for retirement benefit purposes.  City of San Diego City Charter Article IV, Section 145.

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

146.    Pursuant to City of San Diego City Charter Article IV, Section 145, no payments shall be made therefrom except upon the order of the Board of Administration. The funds may not be merged with other funds of the City as has been done here.

147.    Plaintiff allege that the funds were merged on a biweekly basis and not segregated. The Defendants improperly maintained control of the corpus of the funds paying only interest earned after the illegal diversion. City has not set forth in any financial statements relevant to the issuance of bonds, a complete and accurate accounting of its liabilities to the retirement fund and its failures to pay thereto.

148.    Defendants SDCERS, SDCERS Trustees and Grissom have a fiduciary obligation to its members and beneficiaries over the assets of the pension system.

149.    In the course of the duties as trustee for the SDCERS, the SDCERS Trustees and Grissom breached their fiduciary duty by allowing the City to divert funds for unlawful uses which are inconsistent with the best interest of the beneficiaries which in turn contributed to the underfunding of the pension system.

150.    Defendant City, City Council Member Defendants, Uberuaga and Aguirre also have a fiduciary obligation over the assets of the pension system, to enact any and all ordinances to carry out the purposes of the SDCERS.

151.    Defendant City, City Council Member Defendants, Uberuaga and Aguirre breached their fiduciary duty by diverting trust funds for their own use and benefit which in turn contributed to the underfunding of the pension system.

152.    As a direct and proximate result of the Defendants' actions, Plaintiff have suffered substantial loss and injury in an amount according to proof at trial.

### ELEVENTH CLAIM FOR RELIEF

### FOR BREACH OF TRUST

**(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through 100)**

153.    Plaintiff repeats and realleges paragraphs 1 through 152, inclusive, as though fully

44

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1   set forth at this point and incorporated by reference herein.

2        154.    Pursuant to City of San Diego City Charter Article IV, Section 145, no payments shall

3   be made therefrom except upon the order of the Board of Administration.  The funds may not be

4   merged with other funds of the City.

5        155.    Plaintiff allege that the funds were merged on a biweekly basis and not segregated.

6   The Defendants improperly maintained control of the corpus of the funds paying only interest earned

7   after the illegal diversion.  City has not set forth in any financial statements relevant to the issuance

8   of bonds, a complete and accurate accounting of its liabilities to the retirement fund and its failures

9   to pay thereto.

10       156.    SDCERS, SDCERS Trustees and Grissom have a fiduciary obligation to its members

11  and beneficiaries over the assets of the pension system.

12       157.    In the course of the duties as trustee for the SDCERS, the SDCERS Trustee and

13  Grissom breached their fiduciary duty by allowing the City to divert funds for unlawful uses which

14  are inconsistent with the best interest of the beneficiaries which in turn contributed to the

15  underfunding of the pension system.

16       158.    Defendant City, City Council Member Defendants, Uberuaga and Aguirre also have

17  a fiduciary obligation over the assets of the pension system.

18       159.    Defendant City, City Council Member Defendants, Uberuaga and Aguirre breached

19  its fiduciary duty by diverting trust funds for its own use and benefit which in turn contributed to the

20  underfunding of the pension system.

21       160.    As a direct and proximate result of the Defendants' actions, Plaintiff has suffered

22  substantial loss and injury in an amount according to proof at trial.

23                         **TWELFTH CLAIM FOR RELIEF**

24                         **FOR CONVERSION OF TRUST**

25  **(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, Uberuaga, McGrory, City**

26  **Council Member Defendants, SDCERS, SDCERS Trustees, Grissom, and Does 1 through**

27                                **100)**

28       161.    Plaintiff repeats and realleges paragraphs 1 through 160, inclusive, as though fully

45

**COMPLAINT FOR DAMAGES, DECLARATORY  AND INJUNCTIVE RELIEF**

1    set forth at this point and incorporated by reference herein.

2        162.    SDCERS is an entity established under Article XVI, section 17 of the California

3    Constitution, San Diego City Charter Article IX, sections 141 - 148.1 and Article X, section 1 and

4    the San Diego Municipal Code Sections 24.0100, et seq. SDCERS operates as a trust and provides

5    retirement, health insurance, disability and death benefits to its members and their beneficiaries.

6        163.    SDCERS, SDCERS Trustees and Grissom have a fiduciary obligation to its members

7    and beneficiaries over the assets of the pension system.

8        164.    In the course of the duties as trustee for the SDCERS, SDCERS Trustees and

9    Grissom breached their fiduciary duty by allowing the City to divert funds for unlawful uses which

10   are inconsistent with the best interest of the beneficiaries which in turn contributed to the

11   underfunding of the pension system.

12       165.    Defendant City, City Council Member Defendants, Uberuaga, and Aguirre also have

13   a fiduciary obligation over the assets of the pension system.

14       166.    Defendant City, City Council Member Defendants, Uberuaga, and Aguirre breached

15   its fiduciary duty by diverting trust funds for its own use and benefit which in turn contributed to the

16   underfunding of the pension system.

17       167.    In breaching its fiduciary duties, Defendants unlawfully and intentionally took and

18   converted trust fund property for their own use.

19       168.    Plaintiff and members of the SDPOA have been injured by this conversion and are

20   entitled to all benefits converted by Defendants with interest thereon; any and all profits, whether

21   direct or indirect, the Defendants acquired by their conversion.

22       169.    As a direct and proximate result of the Defendants' actions, Plaintiff has suffered

23   substantial loss and injury in an amount according to proof at trial.

24   ///

25   ///

26   ///

27   ///

28   ///

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

THIRTEENTH CLAIM FOR RELIEF

FOR VIOLATION OF FIRST AMENDMENT OF

UNITED STATES CONSTITUTION

42 U.S.C. § 1983

(Plaintiff against Defendants City of San Diego, Aguirre, Ewell, City Council Member

Defendants and Does 1 through 100)

170.    Plaintiff repeats and realleges paragraphs 1 through 169, inclusive, as though fully set forth at this point and incorporated by reference herein.

171.    At all times herein, Plaintiff was entitled to the rights and privileges afforded to it under the United States Constitution and under the laws of the State of California and its constitution. Defendants have deprived Plaintiff's rights and privileges under the First Amendment by chilling and impairing the First Amendment right of freedom of association.

172.    As alleged herein, Defendants' actions evidence their desire and/or intent to deprive, eliminate and/or reduce retirement benefits – which includes vested pension benefits – owed to members of the SDPOA.

173.    As set forth herein, labor negotiations took place between the SDPOA and the City in trying to renegotiate a new MOU. They failed to reach and agreement and impasse procedures were utilized by the City.

174.    Defendant City was also in labor negotiations with the City's other labor unions, including the Firefighters, the Municipal Employees' Association, the American Federation of State, County and Municipal Employees and City Attorneys' Association at the same time negotiations were occurring with the SDPOA. The other labor unions agreed to new MOUs with the City while the SDPOA went to impasse. The last, best and final offer to all the unions receiving a one year offer were identical. However, when the other unions agreed to new labor contracts, Defendant City did not include the salary reduction for employees enrolled in the Deferred Retirement Option Plan (hereinafter "DROP") for the other unions. Defendant City included the salary reduction for SDPOA members enrolled in DROP. Such action constituted retaliation against the SDPOA. City unlawfully punished the SDPOA for not accepting the City's unilaterally mandated offer.

47

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1    175.    Members of the SDPOA were thus punished for their lawful affiliation with the

2    SDPOA and the SDPOA was itself punished for lawfully exercising its right to represent their

3    members in their employment relations with public agencies. The City's action interfered with,

4    restrained and/or coerced members of the SDPOA in the exercise of their rights to form, join or

5    assist labor organizations, to bargain collectively through representatives of their own choosing. The

6    City discouraged membership by discriminating against those represented by the SDPOA and those

7    not represented by the SDPOA.

8    176.    The City discouraged membership by taking away vested pension benefits for those

9    individuals represented by the SDPOA.

10    177.    Defendants have deprived Plaintiff's rights and privileges under the First Amendment

11    by chilling and impairing the First Amendment right of freedom of association when they took away

12    SDPOA members' vested pension benefits as well as when they discriminated against the SDPOA

13    during and/or after its labor negotiations as herein alleged.

14    178.    As a direct and proximate result of Defendants' actions as alleged herein, which were

15    conducted under the color of law, Plaintiff has been deprived of its right and privileges under the

16    First Amendment of the United States Constitution and the laws of the State of California.

17    179.    City has either encouraged, assisted, ratified, shown deliberate indifference and/or

18    failed to prevent all unlawful deprivations of rights and privileges as alleged herein, thereby resulting

19    in violation of Plaintiff's federal civil rights as alleged herein.

20    180.    The SDPOA as party to the MOU is obliged by the duty of fair representation to

21    defend and maintain benefits bargained for on behalf of its members. As a result of defendants'

22    unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of

23    lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower

24    and to devote considerable expense in addressing the unlawful actions consequential to this claim

25    for relief. Plaintiff seeks to recover said damages, as well as other damages, be they special,

26    consequential, nominal or otherwise.

27    181.    In acting as alleged in this complaint, Defendants acted knowingly, willfully, and

28    maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling

48

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  plaintiff to punitive damages, save and except against the City and SDCERS, so long as legally

2  exempt.

### FOURTEENTH CLAIM FOR RELIEF

### FOR CONSPIRACY TO VIOLATE CIVIL RIGHTS

### 42 U.S.C. § 1983

### (Plaintiff against all Defendants)

7      182.    Plaintiff repeats and realleges paragraphs 1 through 181, inclusive, as though fully

8  set forth at this point and incorporated by reference herein.

9      183.    Defendant City has failed and refused to contribute the amount to SDCERS as

10  required by City Charter article IX, section 143.  The City has used the money earmarked to be

11  contributed to the Retirement fund to fund its other financial obligations.

12      184.    SDCERS has known or reasonably should have known of the City's failure and

13  refusal to contribute all money owed to SDCERS since approximately July 1, 1996.  SDCERS has

14  known or reasonably should have known that the City was using Retirement Fund money to fund

15  its other obligations.

16      185.    The City and SDCERS hid and/or failed to disclose violations of the provisions of

17  the City Charter by concealing the fact that the Retirement Fund was being underfunded by the City

18  and that the money required to be contributed to the Retirement Fund was being used to fund the

19  City's other financial obligations.

20      186.    On or about July 1, 2005, the City and all Defendants acting on its behalf, unlawfully

21  and unconstitutionally deprived, eliminated and/or reduced retirement benefits – which includes

22  vested pension benefits – previously promised to members of the SDPOA, in violation of federal and

23  state laws as previously alleged in this complaint, SDCERS and all Defendants acting on its behalf,

24  knew or reasonably should have known about the unlawful and unconstitutional acts being

25  committed by the City and its officials.

26      187.    Defendant SDCERS and Defendant Board Members as fiduciaries of the

27  beneficiaries, should have taken actions to protect the assets of the public pension or retirement

28  system on behalf of their beneficiaries.

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

188.   Instead, SDCERS and all Defendants acting on its behalf, willingly aided, encouraged, ratified, and or adopted City's unlawful and unconstitutional deprivation, elimination, and/or reduction of retirement benefits.

189.   The City, and all Defendants acting on its behalf, and SDCERS, and all Defendants acting on its behalf, conspired with each other and agreed among themselves to unlawfully and unconstitutionally deprive, eliminate and/or reduce retirement benefits – which includes vested pension benefits – owed to members of the SDPOA.  Defendants Ewell, Uberuaga, McGrory furthered the conspiracy by representing Defendant City in the labor negotiations that ultimately led to an impasse between the City and SDPOA.  Defendant Aguirre furthered the conspiracy by adopting and/or endorsing the actions of Defendant City in depriving Plaintiff of their vested retirement benefits.

190.   Such conspiracy took place, and continues to take place, among other reasons, in order for the Defendants City and SDCERS to cover up past wrongdoings, reduce and/or eliminate pension benefits owed to members of SDPOA and thus mitigate against any potential liability arising from the City's decision to underfund the Retirement Fund, use that money to fund its other obligations, for the economic gain of the City and its employees and mitigate against any potential liability arising from its breach of fiduciary duty when it allowed the City to underfund the Retirement Fund.

191.   The SDPOA as party to the MOU is obliged by the duty of fair representation to defend and maintain benefits bargained for on behalf of its members.  As a result of defendants' unlawful action as stated herein, SDPOA has been and/or will be required to retain the services of lawyers, accountants, actuaries, investigators, and others, expending hundreds of hours of manpower and to devote considerable expense in addressing the unlawful actions consequential to this claim for relief.  Plaintiff seeks to recover said damages, as well as other damages, be they special, consequential, nominal or otherwise.

192.   In acting as alleged in this complaint, Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Plaintiff's protected rights thus entitling plaintiff to punitive damages, save and except against the City and SDCERS, so long as legally

50

1    exempt.

2                          **FIFTEENTH CLAIM FOR RELIEF**

3                          **FOR DECLARATORY RELIEF**

4                          **(Plaintiff against all Defendants)**

5          193.    Plaintiff repeats and realleges paragraphs 1 through 192, inclusive, as though fully

6    set forth at this point and incorporated by reference herein.

7          194.    Any attempt to take away or diminish vested pension rights owed to members of the

8    SDPOA constitutes an unconstitutional impairment of contracts under State and Federal

9    constitutional laws, which includes, but is not limited to, the contracts clause in the U.S.

10   Constitution, Art. I, § 10 and California Constitution, Art. I, § 9.

11         195.    Any attempt to take away or diminish vested pension rights owed to members of the

12   SDPOA constitutes an unconstitutional takings and/or violation of due process rights under both

13   State and Federal constitutional laws, which includes, but is not limited to, all provisions under the

14   Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth

15   Amendment to the United States Constitution, Article I, § 7 of the California Constitution and

16   California Civil Code § 52.1.

17         196.    Any attempt to take away or diminish vested pension rights owed to members of the

18   SDPOA constitutes violations of all statutory and common laws set forth herein.

19         197.    Plaintiff desires a judicial determination of its rights, and a declaration as to whether

20   the City acted unlawfully in depriving, eliminating and/or reducing retirement benefits – which

21   includes vested pension benefits – previously promised to members of the SDPOA.

22         198.    Plaintiff desires a judicial determination of its rights, and a declaration as to whether

23   any Defendant breached its fiduciary duty owed to Plaintiff by allowing – and/or actually diverting

24   to itself – trust funds for the City's own use and benefit which in turn contributed to the

25   underfunding the pension system.

26         199.    Plaintiff desires declaratory relief directing Defendants to immediately restore all

27   benefits owed to members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the

28   last, best and final offer unilaterally imposed against Plaintiff;

                                        51

200.     Plaintiff desires declaratory relief directing Defendants to fully fund the Retirement Fund;

201.     Plaintiff desires declaratory relief directing Defendants for an accounting of all funds that should have been included for retiree medical benefits;

202.     Plaintiff desires a declaration that the City failed to negotiate in good faith with SDPOA as required by the MMBA;

203.     Plaintiff desires a declaration that City discriminated against SDPOA for its union activities in violation of the MMBA;

204.     Plaintiff desires declaratory relief directing Defendants SDCERS to collect moneys illegally diverted by Defendant City to fund the retiree medical benefits and to take actions to enforce the beneficiaries rights;

205.     Plaintiff desires a declaration that Defendants breached its fiduciary duty owed to Plaintiff by allowing – and/or actually diverting itself – trust funds which in turn contributed to the underfunding the pension system;

206.     A judicial declaration is necessary and appropriate at this time under the circumstances so that Plaintiff may ascertain whether the changes unilaterally implemented by the City were illegal, unconstitutional and invalid.

207.     A judicial declaration is necessary and appropriate at this time under the circumstances so that Plaintiff may ascertain whether fiduciary duties were breached by Defendants in allowing – and/or actually diverting itself – trust funds for the City's own use and benefit which in turn contributed to the underfunding the pension system.

**JURY DEMAND**

208.     Plaintiff demand a jury for the trial of this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, and all of them pray judgment against Defendants, and all of them as follows:

As to the First Claim for Relief

1.     For a declaration that the City acted unlawfully in depriving Plaintiff of its rights and

52

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  privileges under the First Amendment of the United States Constitution and the laws of the State of

2  California;

3         2.      Declaratory relief directing Defendants to immediately restore all benefits owed to

4  members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and final

5  offer unilaterally imposed against Plaintiff;

6         3.      Preliminary and permanent injunctions enjoining and restraining the enforcement

7  and/or application of said amendments to the benefits plan complained of above;

8         4.      Issuance of a preliminary and permanent injunction prohibiting Defendants from

9  committing ongoing violations of the laws and reinstating all retirement benefits for Plaintiff in

10  accord with the provisions contained in the June 1, 2003 MOU as set forth above;

11         5.      Preliminary and permanent injunctive relief directing Defendants to immediately

12  reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

13         6.      For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

14  expert witness fees incurred herein;

15         7.      For an award of interest, including prejudgment and/or postjudgment interest at the

16  legal rate, and costs;

17         8.      Punitive damages against Defendant Aguirre and make an example of Defendant

18  Aguirre as this Court deems just and proper;

19         9.      Such other relief, including equitable and declaratory relief, as the Court may deem

20  just and proper;

21         As to the Second Claim for Relief

22         1.      Declaratory relief directing Defendants to immediately restore all benefits owed to

23  members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and final

24  offer unilaterally imposed against Plaintiff;

25         2.      Declaratory relief directing Defendant Aguirre to forfeit his office as City Attorney

26  and find that he has violated the Civil Service Rules of the City of San Diego by using his influence

27  in seeking to trade a thing of value as defined in City of San Diego City Charter Article VIII.

28         3.      Declaratory relief for an order that Defendants have violated public policy including,

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1 | but not limited to violation of California Labor Code § 227;

2 | 4. Preliminary and permanent injunctions enjoining and restraining the enforcement

3 | and/or application of said amendments to the benefits plan complained of above;

4 | 5. Issuance of a preliminary and permanent injunction prohibiting Defendants from

5 | committing ongoing violations of the laws and reinstating all retirement benefits for Plaintiff in

6 | accord with the provisions contained in the June 1, 2003 MOU as set forth above;

7 | 6. Preliminary and permanent injunctive relief directing Defendants to immediately

8 | reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

9 | 7. Declaratory relief directing Defendants to immediately make payments into the

10 | Retirement Fund as previously agreed;

11 | 8. For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

12 | expert witness fees incurred herein;

13 | 9. For an award of interest, including prejudgment and/or postjudgment interest at the

14 | legal rate, and costs;

15 | 10. Punitive damages against Defendant Aguirre to punish and make an example of the

16 | Defendant Aguirre as this Court deems just and proper;

17 | 11. Such other relief, including equitable and declaratory relief, as the Court may deem

18 | just and proper;

19 | <u>As to the Third, Fourth, and Fifth Claims for Relief</u>

20 | 1. Declaratory relief directing Defendants to immediately reimburse members of

21 | SDPOA for any unlawful deprivation of pension benefits, with interest;

22 | 2. Declaratory relief directing Defendants to immediately restore all benefits owed to

23 | members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and final

24 | offer unilaterally imposed against Plaintiff;

25 | 3. Declaratory relief directing Defendants to fully fund the Retirement Fund;

26 | 4. Declaratory relief directing Defendants for an accounting of all funds that should have

27 | been included for retiree medical benefits;

28 | 5. Preliminary and permanent injunctions enjoining and restraining the enforcement

54

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   and/or application of said amendments to the benefits plan complained of above;

2       6.      Preliminary and permanent injunctive relief directing Defendants to immediately

3   reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

4       7.      Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

5   fund the Retirement Fund;

6       8.      For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

7   expert witness fees incurred herein;

8       9.      For an award of interest, including prejudgment and/or postjudgment interest at the

9   legal rate, and costs;

10      10.     Punitive damages against all Defendants save and except Defendants City and

11  SDCERS so long as they remain legally immune thereof and to make an example of Defendants as

12  this Court deems just and proper;

13      11.     Such other relief, including equitable and declaratory relief, as the Court may deem

14  just and proper;

15  As to the Sixth Claim for Relief

16      1.      Declaratory relief directing Defendants to immediately reimburse members of

17  SDPOA for any unlawful deprivation of pension benefits, with interest;

18      2.      Declaratory relief directing Defendants to immediately restore all benefits owed to

19  members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and final

20  offer unilaterally imposed against Plaintiff;

21      3.      Declaratory relief directing Defendants to fully fund the Retirement Fund;

22      4.      Declaratory relief directing Defendants for an accounting of all funds that should have

23  been included for retiree medical benefits;

24      5.      Preliminary and permanent injunctions enjoining and restraining the enforcement

25  and/or application of said amendments to the benefits plan complained of above;

26      6.      Preliminary and permanent injunctive relief directing Defendants to immediately

27  reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

28      7.      Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

55
**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   fund the Retirement Fund;

2        8.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

3   expert witness fees incurred herein;

4        9.    For an award of interest, including prejudgment and/or postjudgment interest at the

5   legal rate, and costs;

6        10.   Such other relief, including equitable and declaratory relief, as the Court may deem

7   just and proper;

8        As to the Seventh Claim for Relief

9        1.    Declaratory relief directing Defendants to fully fund the Retirement Fund;

10       2.    Declaratory relief directing Defendants for an accounting of all funds that should have

11  been included for retiree medical benefits;

12       3.    Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

13  fund the Retirement Fund;

14       4.    Issuance of a preliminary and permanent injunction for this Court to enjoin

15  Defendants from diverting retirement benefit contributions;

16       5.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

17  expert witness fees incurred herein;

18       6.    For an award of interest, including prejudgment and/or postjudgment interest at the

19  legal rate, and costs;

20       7.    Such other relief, including equitable and declaratory relief, as the Court may deem

21  just and proper;

22       As to the Eighth Claim for Relief

23       1.    Declaratory relief directing Defendants to immediately reimburse members of

24  SDPOA for any unlawful deprivation of pension benefits, with interest;

25       2.    Declaratory relief directing City Defendants to immediately restore all benefits owed

26  to members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and

27  final offer unilaterally imposed against Plaintiff;

28       3.    Declaratory relief directing Defendant City to fully fund the Retirement Fund;

56

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    4.    Declaratory relief directing Defendants for an accounting of all funds that should have

2    been included for retiree medical benefits;

3    5.    Declaratory relief directing Defendants SDCERS to collect moneys illegally diverted

4    by Defendant City to fund the retiree medical benefits and to take actions to enforce the beneficiaries

5    rights;

6    6.    Preliminary and permanent injunctions enjoining and restraining the enforcement

7    and/or application of said amendments to the benefits plan complained of above;

8    7.    Preliminary and permanent injunctive relief directing Defendants to immediately

9    reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

10    8.    Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

11    fund the Retirement Fund;

12    9.    Issuance of a preliminary and permanent injunction enjoining Defendant SDCERS

13    to collect moneys illegally diverted by Defendant City and to take action to enforce the beneficiaries

14    rights;

15    10.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

16    expert witness fees incurred herein;

17    11.    For an award of interest, including prejudgment and/or postjudgment interest at the

18    legal rate, and costs;

19    12.    Punitive damages against all Defendants save and except the City and SDCERS to

20    punish and make an example of the Defendants as this Court deems just and proper;

21    13.    Such other relief, including equitable and declaratory relief, as the Court may deem

22    just and proper;

23    As to the Ninth Claim for Relief

24    1.    Declaratory relief directing Defendants to immediately reimburse members of

25    SDPOA for any unlawful deprivation of pension benefits, with interest;

26    2.    For a declaration that the City failed to negotiate in good faith with SDPOA as

27    required by the MMBA;

28    3.    For a declaration that City discriminated against SDPOA for its union activities in

57

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1  violation of the MMBA;

2      4.    Declaratory relief directing Defendants to immediately restore all benefits owed to

3  members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the benefits plan

4  unilaterally imposed against Plaintiff;

5      5.    Preliminary and permanent injunctions enjoining and restraining the enforcement

6  and/or application of said amendments to the benefits plan complained of above;

7      6.    Issuance of a preliminary and permanent injunction prohibiting Defendants from

8  committing ongoing violations of the laws and reinstating all retirement benefits for Plaintiff in

9  accord with the provisions contained in the June 1, 2003 MOU as set forth above;

10      7.    Preliminary and permanent injunctive relief directing Defendants to immediately

11  reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

12      8.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

13  expert witness fees incurred herein;

14      9.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

15  expert witness fees incurred herein;

16      10.    For an award of interest, including prejudgment and/or postjudgment interest at the

17  legal rate, and costs;

18      <u>As to the Tenth, Eleventh and Twelfth Claims for Relief</u>

19      1.    For a declaration that Defendants breached its fiduciary duty owed to Plaintiff by

20  allowing – and/or actually diverting itself – trust funds which in turn contributed to the underfunding

21  the pension system;

22      2.    Declaratory relief that Defendant SDCERS is an independent body from Defendant

23  City;

24      3.    Declaratory relief directing Defendant City to fully fund the Retirement Fund;

25  Declaratory relief directing Defendants for an accounting of all funds that should have been included

26  for retiree medical benefits;

27      4.    Declaratory relief directing Defendants SDCERS to collect moneys illegally diverted

28  by Defendant City to fund the retiree medical benefits and to take actions to enforce the beneficiaries

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    rights;

2        5.    Declaratory relief directing Defendants for an accounting of all funds that should have

3    been included for retiree medical benefits;

4        6.    Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

5    fund the Retirement Fund;

6        7.    Issuance of a preliminary and permanent injunction enjoining Defendant SDCERS

7    to collect moneys illegally diverted by Defendant City and to take action to enforce the beneficiaries

8    rights;

9        8.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

10   expert witness fees incurred herein;

11       9.    For an award of interest, including prejudgment and/or postjudgment interest at the

12   legal rate, and costs;

13       As to the Thirteenth Claim for Relief

14       1.    Declaratory relief directing Defendants to immediately reimburse members of

15   SDPOA for any unlawful deprivation of pension benefits, with interest;

16       2.    For a declaration that City discriminated against SDPOA for its union activities in

17   violation of the First Amendment of the United States Constitution;

18       4.    Declaratory relief directing Defendants to immediately restore all benefits owed to

19   members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the benefits plan

20   unilaterally imposed against Plaintiff;

21       5.    Preliminary and permanent injunctions enjoining and restraining the enforcement

22   and/or application of said amendments to the benefits plan complained of above;

23       6.    Issuance of a preliminary and permanent injunction prohibiting Defendants from

24   committing ongoing violations of the laws and reinstating all retirement benefits for Plaintiff in

25   accord with the provisions contained in the June 1, 2003 MOU as set forth above;

26       7.    Preliminary and permanent injunctive relief directing Defendants to immediately

27   reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

28       8.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

59

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1   expert witness fees incurred herein;

2        9.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

3   expert witness fees incurred herein available under 42 U.S.C. § 1988;

4        10.   Punitive damages against all Defendants save and except the City and to punish and

5   make an example of the Defendants as this Court deems just and proper;

6        11.   For an award of interest, including prejudgment and/or postjudgment interest at the

7   legal rate, and costs;

8        <u>As to the Fourteenth Claim for Relief</u>

9        1.    Declaratory relief directing City Defendants to immediately reimburse members of

10  SDPOA for any unlawful deprivation of pension benefits, with interest;

11       2.    Declaratory relief directing City Defendants to immediately restore all benefits owed

12  to members of SDPOA as set forth in the June 1, 2003 MOU, thus invalidating the last, best and

13  final offer unilaterally imposed against Plaintiff;

14       3.    Declaratory relief directing Defendant City to fully fund the Retirement Fund;

15       4.    Declaratory relief directing Defendants for an accounting of all funds that should have

16  been included for retiree medical benefits;

17       5.    Declaratory relief directing Defendants SDCERS to collect moneys illegally diverted

18  by Defendant City to fund the retiree medical benefits and to take actions to enforce the beneficiaries

19  rights;

20       6.    Preliminary and permanent injunctions enjoining and restraining the enforcement

21  and/or application of said amendments to the benefits plan complained of above;

22       7.    Preliminary and permanent injunctive relief directing Defendants to immediately

23  reimburse members of SDPOA for any unlawful deprivation of pension benefits, with interest;

24       8.    Issuance of a preliminary and permanent injunction enjoining Defendant City to fully

25  fund the Retirement Fund;

26       9.    Issuance of a preliminary and permanent injunction enjoining Defendant SDCERS

27  to collect moneys illegally diverted by Defendant City and to take action to enforce the beneficiaries

28  rights;

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1    10.    For all costs of suit incurred herein, including, attorneys' fees, investigation fees, and

2    expert witness fees incurred herein available under 42 U.S.C. § 1988;

3    11.    For an award of interest, including prejudgment and/or postjudgment interest at the

4    legal rate, and costs;

5    12.    Punitive damages against Defendants save and except the City and SDCERS to

6    punish and make an example of the Defendants as this Court deems just and proper;

7    13.    Such other relief, including equitable and declaratory relief, as the Court may deem

8    just and proper.

9                                    Respectfully Submitted,

10                                   **CASTLE, PETERSEN & KRAUSE LLP**
                                     Attorneys At Law
11

12   DATED: August 9, 2005          By: _____
                                         Gregory G. Petersen, Esq.,
13                                       Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    61
**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

Recycled Stock #EX-5-B

# EXHIBIT 1

 

# MEMORANDUM

# OF

# UNDERSTANDING

This MEMORANDUM OF UNDERSTANDING made and
entered into this 1st day of July, 2003.

| | |
|---|---|
| By and Between | The City of San Diego |
| And | San Diego Police Officers Association |

0062

## TABLE OF CONTENTS

Article  1 – Parties to Agreement ............................................................... 1
Article  2 – Recognition ............................................................................ 1
Article  3 – Implementation........................................................................ 1
Article  4 – Term of Agreement ................................................................ 2
Article  5 – Renegotiation .......................................................................... 2
Article  6 – Scope of Representation ......................................................... 2
Article  7 – Constitutionality ..................................................................... 3
Article  8 – Holidays.................................................................................. 3
Article  9 – Management's Rights Reserved .............................................. 4
Article 10 – No Discrimination Policy....................................................... 4
Article 11 – Exchange of Days Off Between Employees ........................... 5
Article 12 – Information on New Employees ............................................. 5
Article 13 – Flexible Benefits Plan............................................................ 5
Article 14 – Industrial Leave ..................................................................... 7
Article 15 – Educational Incentive ........................................................... 18
Article 16 – Bilingual Pay ........................................................................ 18
Article 17 – Flat Badges ........................................................................... 19
Article 18 – Annual Leave........................................................................ 20
Article 19 – Sick Leave and Annual Leave Reimbursement .................... 22
Article 20 – Board of Directors................................................................. 22
Article 21 – Formal Representation .......................................................... 23
Article 22 – P.O.A. Access ...................................................................... 25
Article 23 – Out-of-Class Assignments ................................................... 26
Article 24 – Grievance Procedure ............................................................ 28
Article 25 – Salaries ................................................................................. 33
Article 26 – Uniforms and Safety Equipment .......................................... 33
Article 27 – Personnel Rules and Regulations ......................................... 37
Article 28 – Field Training Officer Pay ................................................... 39
Article 29 – Call Back Pay ....................................................................... 40
Article 30 – Court Pay .............................................................................. 40
Article 31 – Court Stand-By...................................................................... 41
Article 32 – Overtime................................................................................ 41
Article 33 – Work Schedules .................................................................... 43
Article 34 – Starting Salary ...................................................................... 44
Article 35 – P.O.A. Representation ........................................................... 44
Article 36 – Payroll Deduction.................................................................. 44
Article 37 – Employee Representation ...................................................... 44
Article 38 – Departmental Procedures - Advance Notice ......................... 45
Article 39 – Tuition Refund Plan .............................................................. 46
Article 40 – Flight Pay .............................................................................. 49
Article 41 – Officer Rights ....................................................................... 49
Article 42 – Copies of the Agreement....................................................... 54
Article 43 – Seniority ............................................................................... 54
Article 44 – Retirement Contribution ....................................................... 55
Article 45 – Long Term Disability Plan .................................................... 61
Article 46 – Continuation of Wages, Hours, and Fringe Benefits ............ 63

Article 47 – Probation Period ............................................................. 64
Article 48 – Detectives ...................................................................... 64
Article 49 – Transportation Incentives ............................................... 64
Article 50 – Preferred Shift Selection ................................................. 65
Article 51 – Motorcycle Pay .............................................................. 65
Article 52 – Reasonable Notice .......................................................... 66
Article 53 – Police Officer III ............................................................ 66
Article 54 – Conduct of Elections ...................................................... 67
Article 55 – SWAT Pay ..................................................................... 67
Article 56 – Core Instructor Pay ........................................................ 67
Article 57 – Drug and Alcohol Testing Program ................................. 67
Article 58 – Catastrophic Leave Plan ................................................. 72
Article 59 – Side Letters.................................................................... 74
Article 60 – F.I.T. Program ................................................................ 74
Article 61 – Special Pay for Administrative Assignments .................... 77
Article 62 – Shift Differential ............................................................ 77
Article 63 – Premium Pays................................................................ 77
Article 64 – Public Safety Officers Procedural Bill of Rights ............... 78
Article 65 – Presidential Leave .......................................................... 86

POLICE OFFICERS ASSOCIATION

0064

## SUBJECT INDEX

Annual Leave (Article 18) .................................................................. 20
Advanced Post Pay (Article 15) ........................................................ 18
Bilingual Pay (Article 16) ................................................................. 18
Board of Directors (Article 20) ......................................................... 22
Call Back Pay (Article 29) ................................................................ 40
Catastrophic Leave Plan (Article 58) ............................................... 72
Conduct of Elections (Article 54)...................................................... 67
Constitutionality (Article 7) ............................................................... 3
Continuation of Wages, Hours, and Fringe Benefits (Article 46) ........... 63
Copies of the Agreement (Article 42) ............................................... 54
Core Instructor Pay (Article 56) ....................................................... 67
Court Pay (Article 30) ....................................................................... 40
Court Stand-By (Article 31) .............................................................. 41
Departmental Procedures - Advance Notice (Article 38) ................... 45
Detectives (Article 48) ...................................................................... 64
Drug and Alcohol Testing Program (Article 57) ............................... 67
Educational Incentive (Article 15) .................................................... 18
Employee Representation (Article 37) ............................................... 44
Exchange Of Days Off Between Employees (Article 11) ...................... 5
Field Training Officer Pay (Article 28) ............................................. 39
F.I.T. Program (Article 60) ............................................................... 74
Flat Badges (Article 17) .................................................................... 19
Flexible Benefits Plan (Article 13) ..................................................... 5
Flight Pay (Article 40) ...................................................................... 49
Formal Representation (Article 21) ................................................... 23
4/10 Plan (Article 33) ....................................................................... 43
Grievance Procedure (Article 24) ..................................................... 28
Holidays (Article 8) ............................................................................ 3
Implementation (Article 3) ................................................................. 1
Industrial Leave (Article 14) .............................................................. 7
Information on New Employees (Article 12) ....................................... 5
Intermediate P.O.S.T. Pay (Article 15) ............................................. 18
Long Term Disability Plan (Article 45) ............................................. 61
Management's Rights Reserved (Article 9) .......................................... 4
Motorcycle Pay (Article 51) ............................................................. 65
No Discrimination Policy (Article 10) ................................................. 4
Officer Rights (Article 41) ................................................................ 49
Out-Of-Class Assignments (Article 23)............................................. 26
Overtime (Article 32) ........................................................................ 41
Parties to Agreement (Article 1) ......................................................... 1
Payroll Deduction (Article 36) .......................................................... 44
Personnel Rules and Regulations (Article 27) ................................... 37
P.O.A. Access (Article 22) ............................................................... 25
P.O.A. Representation (Article 35) ................................................... 44
Police Officer III (Article 53) ........................................................... 66
P.O.S.T. Incentive Pay (Article 15) .................................................. 18
Preferred Shift Selection (Article 50) ............................................... 65

0065

Premium Pays (Article 63) ................................................................. 77
Presidential Leave (Article 65)............................................................ 86
Probation Period (Article 47) ............................................................. 64
Public Safety Officer Procedural Bill of Rights (Article 64)....................... 78
Reasonable Notice (Article 52) .......................................................... 66
Recognition (Article 2) .......................................................................... 1
Renegotiation (Article 5) ...................................................................... 2
Retirement Contribution (Article 44) ................................................... 55
Salaries (Article 25) ........................................................................... 33
Scope of Representation (Article 6) ...................................................... 2
Seniority (Article 43) .......................................................................... 54
Shift Differential (Article 62) ............................................................. 77
Sick Leave and Annual Leave Reimbursement (Article 19) ...................... 22
Side Letters (Article 59) ...................................................................... 74
Special Pay for Administrative Assignments (Article 61) ......................... 77
Starting Salary (Article 34) ................................................................. 44
SWAT Pay (Article 55) ........................................................................ 67
Term of Agreement (Article 4) ............................................................... 2
Transportation Incentives (Article 49) .................................................. 64
Tuition Refund Plan (Article 39) .......................................................... 46
Uniforms and Safety Equipment (Article 26) ........................................ 33
Work Schedules (Article 33) ............................................................... 43

Premium Pays (Article 63) ......................................................................... 77
Presidential Leave (Article 65)................................................................. 86
Probation Period (Article 47) ................................................................... 64
Public Safety Officer Procedural Bill of Rights (Article 64).................... 78
Reasonable Notice (Article 52) ................................................................ 66
Recognition (Article 2) ............................................................................... 1
Renegotiation (Article 5) ............................................................................. 2
Retirement Contribution (Article 44) ...................................................... 55
Salaries (Article 25) ................................................................................. 33
Scope of Representation (Article 6) ........................................................... 2
Seniority (Article 43) ............................................................................... 54
Shift Differential (Article 62) .................................................................. 77
Sick Leave and Annual Leave Reimbursement (Article 19) .................... 22
Side Letters (Article 59) ........................................................................... 74
Special Pay for Administrative Assignments (Article 61) ........................ 77
Starting Salary (Article 34) ...................................................................... 44
SWAT Pay (Article 55) ............................................................................ 67
Term of Agreement (Article 4) ................................................................... 2
Transportation Incentives (Article 49) .................................................... 64
Tuition Refund Plan (Article 39) ............................................................. 46
Uniforms and Safety Equipment (Article 26) .......................................... 33
Work Schedules (Article 33) .................................................................... 43

# ARTICLE 1

## PARTIES TO AGREEMENT

This Agreement is made and entered into this 1st day of July, 2003, by and between Authorized Management Representatives (hereinafter referred to as "Management"), of the City of San Diego (hereinafter referred to as the "City"), and the Board of Directors of the San Diego Police Officers Association Incorporated (hereinafter referred to as "P.O.A." or the "Association").

# ARTICLE 2

## RECOGNITION

Management formally recognizes the P.O.A. as the exclusive representative for all employees in the Police Unit. This Memorandum applies to all classifications listed below except as the units may be amended in accordance with the City's Employer-Employee Relations Policy.

Police Recruit
Police Officer I
Police Officer II
Police Agent
Police Sergeant
Police Lieutenant
Community Relations Assistant to the Police Chief

During the term of this agreement, the City and the POA agree to jointly support a request to the Civil Service Commission for the creation of the following new classes:

Police Officer III
Police Detective

# ARTICLE 3

## IMPLEMENTATION

This Agreement constitutes a mutual recommendation by the parties hereto to the City Council and/or the Civil Service Commission. This Agreement shall be of no force or effect until ratified and approved as appropriate by the City Council and/or Civil Service Commission.

0068

## ARTICLE 4

### TERM OF AGREEMENT

The term of this Memorandum of Understanding shall commence at 12:01 a.m., on July 1, 2003. This Memorandum of Understanding shall expire and otherwise be fully terminated at 12:00 a.m. (midnight), on June 30, 2005.

## ARTICLE 5

### RENEGOTIATION

Section 1.

In the event P.O.A. desires to meet and confer in good faith on the provisions of the successor agreement, it shall serve upon the City not later than February 2, 2005, its written request to commence meeting and conferring in good faith, as well as full and entire written proposals for such successor agreements with the exception of salary proposals which shall be presented no later than February 23, 2005. Upon receipt of such written notice and proposals, meet and confer shall begin no later than April 1, 2005.

Section 2.

The City will notify P.O.A. by March 8, 2005, of its proposal for a successor agreement except in the matter of salaries or other economic provisions. Upon receipt of such notice of proposals, meet and confer shall begin no later than April 1, 2005. Notwithstanding the above, if federal or state governments take action that has direct effect upon the areas which fall within meet and confer, the City may submit proposals concerning these areas at later dates.

Section 3.

Nothing herein shall prevent either party from requesting that this procedure begin in January, 2005.

## ARTICLE 6

### SCOPE OF REPRESENTATION

The scope of representation of the Police Officer's Association shall include all matters relating to employment conditions and employer/employee relations including (but not limited to) wages, hours, and other terms and conditions of employment as provided for and defined by the Meyers-Milias-Brown Act, Section 3500, et seq, California Government Code.

# ARTICLE 7

## CONSTITUTIONALITY

If any section, subsection, subdivision, sentence, clause or phrase of this Agreement is for any reason held by a court of competent jurisdiction to be illegal or unconstitutional, such decision shall not affect the validity of the remaining portion of the Agreement.

# ARTICLE 8

## HOLIDAYS

A. Fixed Holidays will be:

1. January 1;
2. Third Monday in January, known as "Dr. Martin Luther King Jr.'s Birthday";
3. Third Monday in February, known as "Washington's Birthday";
4. March 31st, known as "Cesar Chavez Day"
5. Last Monday in May, known as "Memorial Day";
6. July 4;
7. First Monday in September known as "Labor Day";
8. November 11, known as "Veteran's Day";
9. Fourth Thursday in November, known as "Thanksgiving Day";
10. December 25; and
11. Every day appointed by the City Council for a public fast, Thanksgiving or holiday.

If January 1st, March 31st, July 4th, November 11th, or December 25th falls upon a Sunday, the Monday following is the City-observed holiday, and if they fall on a Saturday, the preceding Friday is the City-observed holiday. An employee who is eligible for overtime compensation pursuant to FLSA, shall receive overtime compensation for all hours worked on the actual holiday when the employee performs required work on that day. In such instances, holiday overtime will not be paid on the day the holiday is observed by the City.

B. Floating Holiday

In each fiscal year covered by the term of this Memorandum of Understanding, each eligible employee available for a duty assignment on July 1, (as defined in Personnel Regulation H-2) shall accrue credit for ten (10) hours of holiday time. Each employee accruing such time shall comply with the following conditions:

A. Employee must schedule prior to June 1;

0070

B. It must be a one time absence and it must be used before the last day of the last full pay period in June; and

C. At a time convenient to the employee's appointing authority.

C. Working on a Fixed City Holiday

Employees who are scheduled to or work a ten (10) or more hour shift (excluding overtime), on a fixed City holiday shall be credited with two (2) additional hours of holiday time, in addition to the eight (8) standard holiday hours pay plus overtime for all hours of the regular shift (e.g. 10 or 12 hours of premium time depending upon their regular shift) for working the holiday.

## ARTICLE 9

## MANAGEMENT'S RIGHTS RESERVED

The rights of the City include but are not limited to the exclusive right to determine the mission of its constituent departments, commissions, and boards; set standards of service; determine procedures and standards of selection for employment and promotion; direct its employees, take disciplinary action for just cause; relieve its employees from duty because of lack of work or for other legitimate reasons; maintain the efficiency of government operations; determine the methods, means, technology and personnel by which government operations are to be conducted; determine the content of job classifications; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and technology of performing its work. The exercise of such rights shall not preclude employees or their representatives from meeting and conferring or meeting and consulting as required by law with Management representatives about the practical consequences that decisions on these matters may have on wages, hours, and other terms and conditions of employment.

## ARTICLE 10

## NO DISCRIMINATION POLICY

It is agreed that neither the City nor the Association shall discriminate against any employee because of race, national origin, age, sex, handicap or Association membership or activity. It is further agreed that no employee will be discriminated against because of exercising his/her rights specified in the Employer-Employee Relations Policy. The Association and Management agree that they support the current policies of the City of San Diego as to affirmative action and Equal Employment Opportunity, and the City further agrees to meet and confer as required by State law on any changes in these policies.

4

0071

## ARTICLE 11

### EXCHANGE OF DAYS OFF BETWEEN EMPLOYEES

It shall be the policy of the San Diego Police Department to allow employees of the same rank to exchange days off under the following conditions:

1. Both parties to the exchange must be willing to take the exchange and must have the approval of the immediate supervisors concerned.

2. Generally speaking, exchanges of days off will be kept within the division, section, watch, and/or detail unless, on an individual basis the commands of the parties to the exchange otherwise agree.

3. When practical, requests for exchange of days off shall be made in writing at least five days prior to the first day of exchange.

4. An officer must report for the exchanged days off and with the exception of illness, the officer who otherwise fails to report shall be carried absent without leave.

5. To avoid administrative problems, exchange of days off must be made within the same payroll period by both parties.

6. These exchanges must be made in accordance with the Fair Labor Standards Act, when applicable.

## ARTICLE 12

### INFORMATION ON NEW EMPLOYEES

Whenever the City hires a Police Recruit or sworn Police Officer as a new employee, it will inform the Association in writing of such employment, giving the name, date of hire and job classification of the new employee.

The City agrees to use its best efforts to inform the Association in all instances when an employee represented by the Association retires from the City, giving the name, job classification and date of retirement.

## ARTICLE 13

### FLEXIBLE BENEFITS PLAN

An IRS qualified cafeteria-style benefits program is offered to all eligible employees called Flexible Benefits Plan (FBP). This plan provides a variety of tax-free benefit options. Eligible employee means any employee in a one-half, three quarter, or full-time status. Eligible employee excludes all employees in an hourly status. Eligible employees must have no less than 40 hours of compensated time during each pay period in order to receive City paid benefits. If an eligible

employee has less than 40 hours of compensated time during a pay period, the eligible employee will have the right to continue their benefits by paying the City the full cost to continue any or all of the employee's benefits during that period. In the case of FMLA approved absences, the City will continue to pay for the employee's health, life, dental, vision and cancer/intensive care protection insurance for up to 12 weeks per year in accordance with FMLA requirements.

The City's contribution to the Flexible Benefits Plan ,effective July 1, 2003, will increase by $400 for a total of $5,125. Effective July 1, 2004, the City's contribution to the Flexible Benefits Plan will increase by $450 for a total of $5,575.

On or about April 1, 2004, and on or about April 1, 2005, or earlier if mutually agreed, the parties will exchange plan changes and rates for the parties' respective plan offerings.

Notes:

1.  It is the intent of the parties that all plans offered in the Flexible Benefits Plan comply with all applicable State and federal laws, including IRS Regulations, as interpreted by the City Attorney. All disputes over interpretation of the above shall be submitted to the appropriate agencies for interpretation.

2.  The employee must select a life insurance and health insurance (unless covered under another comprehensive health plan). An employee may opt out of City health insurance if he/she has other comprehensive health insurance by selecting the "waiver" option.

3.  With the remaining FBP monies, eligible employees may select from other optional benefits including dental, vision, cancer/intensive care protection, 401(k), Dental/Medical/Vision and Dependent Care reimbursement and/or cash payment. All eligible employees will be eligible for the City's dental and vision plans. Eligible employees that are members of the POA will also be eligible to select a dental and/or vision plan offered by POA.

4.  After selecting required health and life insurance coverages, employees who are unable to enroll in their desired dental plan may purchase such benefit by making an "out-of-pocket" payment for the cost difference. Only dental coverage may be obtained in this manner. Such "out-of-pocket" contribution must be made at the time of Open Enrollment and is nonrefundable.

5.  In addition to designating flexible benefit monies to pay for Dental/Medical/ Vision or Dependent Care reimbursements, employees may designate a specific amount of pre-tax money (some restrictions may apply) to be withheld from their paychecks to reimburse eligible out-of-pocket medical, dental, vision or dependent care expenses. These payroll deductions must be designated during the open enrollment period, are irrevocable, and monies are forfeited if not used within the fiscal year.

POLICE OFFICERS ASSOCIATION          0073

6. Eligible employees are required to enroll for their benefits each year during the designated open enrollment period. If an employee fails to complete enrollment within the open enrollment period, the employee's current options for health (or comparable plan if unavailable), including dependent health offset, and life, will be automatically continued at the same level for the next year as if the employee had elected to keep them. All other benefit options will be cancelled. Any monies remaining from the FBP allotment will be paid out as taxable cash. All payroll deductions, including DMV and Dependent Care reimbursement, will continue and may not be eligible to be stopped until the following open enrollment period.

7. The City agrees that it will not arbitrarily or unreasonably deny POA the opportunity to offer insurance plans to employees. Such coverage must include coverage at an equal or better level than that offered through the City's health plans. POA agrees to inform Employee Assistance Program (EAP) of any changes to the mental health coverage and/or provider in order for EAP to give input on the proposed changes to ensure that City employees are receiving adequate mental health coverage through their selected health plan. POA agrees to indemnify the City against any and all claims arising out of POA administration of POA plans.

8. Both parties agree to begin discussions regarding the implementation of a joint management/labor benefits committee in an effort to mutually agree upon the benefit plans to be offered to active/retired employees thus eliminating the separate POA plans. Until such time, Management and the POA agree to meet and confer without impasse and with mutual consent on the nature and scope of the committee.

## ARTICLE 14

### INDUSTRIAL LEAVE

For a claim filed based on a work related illness or injury occurring on or after July 1, 1994, the City will implement the following changes to the Industrial Leave Policy. The actual policy [A.R. 63.00 attached] should be consulted for detailed language.

- Industrial Leave payments will not be granted for any injury which occurs as a result of a motor vehicle accident where the injured employee did not have available safety restraints in use, with the exception of Police Officers if such failure is consistent with prudent police practices, training, and department policies.

- Industrial Leave benefits will be terminated when an employee misses a medical appointment designed to determine the employees work status, upon the determination that the failure to attend the appointment was not excusable.

0074

A.R. 63.00

1. PURPOSE

To establish regulations and guidelines regarding the City of San Diego's Industrial Leave Program.

2. SCOPE

This regulation applies to all City of San Diego employees, including those represented by bargaining agents. If a conflict occurs between this regulation and an existing Memorandum of Understanding for represented employees, the Memorandum of Understanding shall prevail.

3. DEFINITIONS:

3.1 Disability - the inability to perform the usual duties of one's classification.

3.2 Emergency - a sudden unexpected happening; an unforeseen occurrence or condition; specifically, perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; a pressing necessity.

3.3 Gross Negligence - the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of oneself or another; such a gross want of care and regard for one's own well-being or the rights of others as to justify the presumption of willfulness and wantonness.

3.4 Hospitalization - the status of being admitted to a hospital institution on an inpatient basis.

3.5 Light Duty - work status with limitations as provided in the City's Light Duty Program.

3.6 Physician - as defined under 3209.3 of the California Labor Code.

4. POLICY:

4.1 General:

City-wide safety program exists to prevent accidents and resulting injuries involving employees. Continuing efforts are made to eliminate, guard against, or protect employees from physical hazards in the work environment. Several types of benefits are available to employees who sustain disabilities arising out of their employment. The specific benefits available depend on the circumstances in each case.

This A.R. sets forth only the eligibility requirements and benefits for industrial leave. Procedures are set forth for industrial leave and in part

8                                    POLICE OFFICERS ASSOCIATION               0075

for other programs available for injured employees. Employees may be eligible for benefits under the Workers' Compensation Act or the City's Annual Leave or Sick Leave Programs. Eligibility and benefits under the Workers' Compensation Act are established in State law (Division 4 of the California Labor Code). Eligibility and benefits under the City's Annual Leave and Sick Leave Programs are set forth in the Personnel Regulations, Index Code I-2 and I-3.

Nothing herein contained shall be deemed to affect the employee's entitlement to medical, surgical and hospital treatment as provided in Division 4 of the California Labor Code nor be deemed to affect the employee's entitlement to receive such temporary disability payments as also provided in Division 4. These rules define the granting of industrial leave only. Industrial leave is not within the jurisdiction of the California Labor Code nor the adjudication of the Workers' Compensation Appeals Board.

4.2 Eligibility for Industrial Leave:

Employees shall be eligible for industrial leave benefits subject to the following provisions:

a. The employee is unable to perform his or her assigned duties and is entitled to Worker's Compensation Temporary Disability under the provisions of Division 4 of the California Labor Code.

b. The employee reported the injury or illness to his or her supervisor within 24 hours of the incident, except under extenuating circumstances. Extenuating circumstances under which an employee may report an injury beyond the 24 hour limit shall include but not be limited to a report at the time the employee realizes the injury is disabling and the medical evidence is consistent with the claim.

c. Medical treatment is provided and maintained by a licensed physician acceptable to the City's Worker's Compensation Administration.

d. The employee is medically incapacitated from the performance of light duty, or light duty is not available.

e. Except in circumstances of obvious emergency, the disability did not result from the failure to:

   1. Wear prescribed safety or personal protective clothing or equipment.

   2. Use provided safeguards or safety equipment.

   3. Follow safety rules and regulations, or other departmental work rules.

    4.   Wear available safety restraints, i.e., lap and shoulder restraints, when involved in a vehicular accident, with the exception of Police Officers if such failure to use restraints is consistent with prudent police practices, training, and department policy.

f.   The disability did not result from an aggravation or recurrence of:

    1.   A pre-employment, non-service-connected medical condition or disability (either physical and/or mental), even if such condition is aggravated by on-the-job experience. It is the intent that industrial leave will not be approved when competent medical authority determines the disability to be a result of aggravation of, or caused by, a pre-employment or non-industrial medical condition.

    2.   A medical condition for which the employee has received a Compromise and Release settlement pursuant to Division 4 of the Labor Code.

    3.   An injury or illness previously denied industrial leave.

g.   The employee's gross negligence or willful misconduct was not the proximate cause of the disability.

h.   The request for industrial leave is submitted in form and detail as prescribed by Risk Management, is recommended for approval by the appointing authority, and is approved by the City's Worker's Compensation Administration.

i.   The employee fulfills his or her responsibility as outlined in this Administrative Regulation.

## 4.3   Industrial Leave Benefits

a.   The Industrial Leave Benefit shall be the employee's normal compensation, less current deductions for state and federal tax withholdings. The injured employee shall be prohibited from amending his or her claim of deductions from the date of injury until after they have returned to work and industrial leave benefits have discontinued.

    1.   The term "normal compensation" includes extra compensation for night or unusual schedule work shifts, motorcycle pay, emergency ordnance disposal pay, and educational incentive pay, which the employee was receiving at the time of the injury, but does not include overtime, standby, or out-of-class pay.

POLICE OFFICERS ASSOCIATION

0077

    2.  Employees may receive normal merit increases while on industrial leave if they are otherwise eligible as provided in Personnel Manual Index Code H-8.

b.  Industrial leave is granted in lieu of Workers' Compensation Temporary Disability.

c.  An employee cannot supplement industrial leave payments with accrued sick leave, annual leave, or compensatory time off.

d.  Employees shall earn annual leave credits while on industrial leave as if they were working. Employees shall be eligible to accrue and utilize annual and sick leave in accordance with the rules governing the accrual and usage of annual and sick leave respectively. (See Personnel Manual I-2 and I-3.)

e.  The City shall continue to make the contribution towards the employee's health and life insurance coverage as if the employee was working.

f.  Duration of Industrial Leave:

    1.  An employee's maximum industrial leave benefit shall be the number of hours equivalent to the employee's scheduled work year.

    2.  Industrial leave shall commence on the first workday following the injury or illness for which the employee is medically disabled from working. EXCEPTION: As applied to employees in the Fire Fighter Unit, industrial leave shall commence on the first work period after that on which the employee is medically disabled from working.

    3.  An injury shall be deemed to continue through any recurrence or aggravation to the original injury. Claimed recurrences, aggravations, or sequelae of any injury approved for industrial leave shall be charged to the balance, if any, of the maximum allowance of such leave for the original injury.

    4.  Industrial leave will terminate when one of the following occurs:

        a.  The employee fails to follow the advice of the treating physician and pursue a course of treatment which will lead to recovery in as short a period of time as possible.

        b.  The employee's condition becomes medically permanent and stationary.

0078

    c.   It is medically determined that the employee will never be capable of performing the duties of his or her classification.

    d.   The employee no longer qualifies for industrial leave.

    e.   The employee is engaged in outside employment which would medically impede recovery and prolong his/her return to work.

    f.   The employee uses the maximum benefits available.

    g.   Employee, without an acceptable excuse, fails to appear at a medical examination scheduled by the Workers' Compensation Division of Risk Management to determine the employee's ability to return to work.

5.   If industrial leave is terminated upon the basis of medical evidence and at a later date, the City relies on further medical evidence which is inconsistent with the earlier medical evidence, the employee shall receive industrial leave benefits which are consistent with the subsequent report relied on by the City.

6.   Industrial leave provides only the benefits enumerated herein.

7.   Return to Duty:

    a.   The employee shall return to duty when ordered by the department head, based upon medical reports and other reliable information.

    b.   Determination of the proper time for the employee's return to duty will be based on reliable medical advice.

    c.   In cases of suspected malingering, when it appears that the employee and/or the employee's personal physician are not cooperating toward return to limited or full duty within a reasonable period of recovery, the department head or the Workers' Compensation Administration will order an investigation and take proper action.

    d.   If further remedial action is indicated, the employee must follow a course of treatment which will enable return to full employment at the earliest possible time. This does not mean that the employee should be carried on industrial leave until completely able to perform every duty of the position. All reasonable efforts shall be made to return the employee to work, even in a light-duty status, as soon as, based upon authoritative medical advice, it is safe to do so.

12                                POLICE OFFICERS ASSOCIATION

    e.  Prior to soliciting information from an employee's treating
physician concerning that employee's ability to return
from industrial leave to a selective placement position, the
treating physician shall be furnished with a written statement
describing the duties of such selective placement position.
The City will allow the treating physician five (5) days to
respond in writing. If the treating physician fails to respond
in writing within five (5) days, the City may receive informa-
tion from the treating physician orally. The City may extend
the time for response for good and sufficient reason.

## 5. PROCEDURE

<u>Responsibilities</u>   <u>Action</u>

<u>Employee</u>

5.1  Each employee is responsible for reporting the job related injury or
illness to his or her supervisor within 24 hours of the incident, except
under extenuating circumstances. The initial report should be made
to the employee's immediate supervisor, or if unavailable, to the next
supervisor in the chain of command. The initial report may be made
verbally, but must be followed by completion as soon as possible of
the necessary forms outlined below.

5.2  For injuries which result in absence from work at any time following
the day of the injury, the employee must complete Form CS-14-25B,
Request for Leave of Absence for on-the-job disability, within 24
hours of the disability and have the attending physician complete the
appropriate portion of the form. If, because of injuries, the employee
is physically unable to comply with this requirement, it shall be the
supervisor's responsibility to complete and submit the form for the
employee.

5.3  The employee must complete Form ES-1531A, Employee-Employer
Report of Occupational Injury or Illness.

5.4  The employee and others concerned, shall provide the department
head, City Manager or his representative with any additional evidence
necessary to elaborate on or substantiate injury and medical reports.

5.5  When necessary, the employee must report as soon as possible to a
licensed physician.

    a.  In doubtful and/or controversial cases, the employee shall
be required to report to a physician who is acceptable to the
Workers' Compensation Administration.

0080

    b.   The employee, if dissatisfied with the treatment received from the first approved physician, has the right to ask for a change of physicians; however, the physician selected must always be acceptable to the Workers' Compensation Administration.

5.6    The employee must obtain a medical diagnosis and prognosis for light duty with all applicable work restrictions, since industrial leave cannot be granted if light duty is available and can be performed.

5.7    The employee must follow a course of treatment which will lead to recovery in as short a period of time as possible.

5.8    If requested during prolonged disability, a fully completed set of Form CS-14-25B, including the physician's certification, shall be provided by the employee for each pay period in order to obtain up-to-date medical information.

5.9    Each employee is responsible to cooperate with Risk Management in their function of determining eligibility and returning the employee to work.

## Operating Department Supervisor

5.10    Each supervisor concerned must thoroughly investigate each accident within 24 hours after it is reported and complete the applicable "Employee Injury Investigation Report". The supervisor must also fill out the supervisor's portion of the Employee-Employer Report of Occupational Injury or Illness, and make sure the employee completes the employee portion of both that form and the Request for Leave of Absence form. All required forms must be promptly forwarded to the appointing authority for processing.

## Operating Department - Appointing Authority

5.11    To make sure that the injury is promptly and thoroughly investigated, shall recommend whether or not industrial leave should be granted, shall determine the availability of light duty, and shall forward all required forms to the Workers' Compensation Administration within one workday of receipt from the supervisor.

5.12    To promptly notify the Workers' Compensation Administration of any potentially controversial case, and all instances of suspected malingering, or where the cause of injury is doubtful.

5.13    To cooperate in determining eligibility and returning the employee to duty.

POLICE OFFICERS ASSOCIATION

0081

**Operating Department - Payroll**

5.14    The day of injury is to be reported on time sheets as a day of work. *Necessary leave due to disability shall start with the first part or full scheduled workday of required absence after the day of injury.*

5.15    Necessary leave for medical treatment or granted because of recurrence, aggravation, or sequelae of an injury previously approved for industrial leave shall be charged to the balance, if any, of the one-year maximum allowance of such leave for said original injury.

5.16    Any holiday falling during a period of industrial leave shall be charged as industrial leave and not be paid as a holiday. Industrial leave will be charged rather than holiday if industrial leave is paid the scheduled workday before or after the holiday. If an employee is scheduled to work on a holiday and is injured, the holiday credit will be granted.

5.17    In those cases where the appointing authority recommends industrial leave, the employee's absence will be charged to industrial leave pending a determination of eligibility by the Workers' Compensation Administration. If the employee is later determined to be ineligible by the Workers' Compensation Administration, the employee will be required to reimburse the City for the number of industrial leave hours used. Reimbursement will be made by charging the employee's accumulated sick leave, annual leave and/or compensatory time credits. If sufficient leave credits are unavailable, the employee will be required to make a direct monetary reimbursement to the City.

5.18    In those cases where the appointing authority does not recommend industrial leave, the employee's absence shall be deemed sick leave to the extent the employee has sick leave credits pending a determination of eligibility by the Workers' Compensation Administration. However, the employee may decline to use sick leave and, with the approval of the appointing authority, may instead take other leave or compensatory time off to which the employee may be entitled. In the event paid leave is not utilized, the employee may receive Workers' Compensation temporary disability to the extent he or she may be entitled under Division 4 of the California Labor Code.

If it is subsequently determined that the employee is eligible for industrial leave, the industrial leave shall be deemed to commence pursuant to Section 4.3(f)(2) of this Regulation, and any sick leave, compensatory time off or other leave credits expended shall be restored to the employee's balance. In the event temporary disability has been paid, the employee shall be paid the difference between temporary disability and the industrial leave amount.



5.19    The use of sick leave or annual leave credits may be requested if the
requirements for industrial leave are not met, or in cases where the
employee has exhausted the maximum industrial leave credits. The
employee's sick leave or annual leave credits will not be charged for
the amount of temporary disability payments made under Workers'
Compensation Act provisions.

An employee shall not receive payment in excess of full salary
through a combination of Workers' Compensation temporary dis-
ability payments and paid sick leave or annual leave or compensatory
time off.

5.20    When sick leave is used for an on-the-job injury, the employee's sick
leave account will be reimbursed in hours, by the equivalent amount
due from temporary disability payments.

5.21    If a disabled employee is receiving Workers' Compensation tempo-
rary disability benefits, but is not receiving payment for industrial
leave, or annual leave, the appropriate payroll symbol is "green C".
It is unnecessary for an employee in this status to request a leave of
absence from the Civil Service Commission since the City has a legal
obligation under Workers' Compensation laws to return the employee
to gainful employment.

5.22    Leave without pay (payroll symbol "red A") may be used if the
employee is not receiving Workers' Compensation benefits, annual
leave, sick leave, industrial leave, or compensatory time credits.
Employees in this status must request a leave of absence from the
Civil Service Commission if their absence extends for more than 30
calendar days.

5.23    When sick leave, annual leave or leave without pay is used under these
circumstances, a set of Form CS-14-25B shall be completed, routed
and processed in the same manner as for industrial leave.

Workers' Compensation Administration

5.24    All requests for industrial leave will be reviewed by the Workers'
Compensation Administration for a decision on whether the circum-
stances qualify the employee for industrial leave, under the require-
ments of this Administrative Regulation.

5.25    Workers' Compensation Administration shall inform the employee
and the department as to the employee's eligibility for industrial leave.

5.26    Denial of industrial leave shall be in writing, shall contain informa-
tion as to the specific reason for the denial, and shall clearly indicate
the appeal procedure.

POLICE OFFICERS ASSOCIATION

5.27    Workers' Compensation Administration shall inform each applicant for industrial leave of his/her responsibilities under the Industrial Leave Program and of the right to appeal the denial of industrial leave.

5.28    When it appears from competent medical advice that a disability is permanent, and precludes the employee from returning to his or her regular job classification, the Workers' Compensation Administration will refer the employee to its Rehabilitation Unit for consideration of vocational rehabilitation. All officials concerned will cooperate actively to assist the employee in rehabilitation consistent with proper position classification and compensation. The Rehabilitation Unit, in addition to providing vocational evaluation, training, and other assistance to the eligible employee, will initiate with the Personnel Department and appointing authority, consideration of class transfer, voluntary demotion and other appropriate personnel actions as alternatives to employee termination or disability retirement.

6.  APPEAL PROCEDURE

Responsibilities    Action

Employee

6.1    An employee may appeal the denial of industrial leave by the Workers' Compensation Administration. The appeal shall be in writing, submitted to the City Manager within ten (10) working days of receipt of the notice of denial and shall state the specific reasons for the employee's appeal and the issues upon which the appeal is based.

City Manager

6.2    The City Manager or his designee shall review the entire case and announce an intended decision indicating his rationale. In the event of an intended denial, the City Manager or his designee shall arrange a meeting in which the affected employee may present his or her appeal. The employee shall have the opportunity to confront the information relied on by the City Manager or his designee and submit additional information as desired for consideration by the City Manager or his designee. Such meeting shall be as informal as is compatible with justice.

6.3    The City Manager or his designee shall render a decision which shall be final and shall include the reasons for the decision.

6.4    The City Manager may grant the employee an extension of time beyond the appropriate appeal period if it is determined that the employee is so disabled as to be physically unable to perfect the appeal within the allocated time.

0084

## ARTICLE 15

## EDUCATIONAL INCENTIVE

The City agrees to continue the existing Educational Incentive Program as described in Police Department Procedure No. 5.13 except as set out below.

Effective December 20, 2003, the benefit for the Advanced POST Certificate shall be 6.0% of employee's base rate and 3.5% of employee's base rate, for the Intermediate POST Certificate. Effective April 30, 2005, the benefit for Advanced POST Certificate shall be 7.5% of employee's base rate; the benefit for the Intermediate POST Certificate shall be 5% of employee's base rate.

For the purpose of this Article only, those sworn officers in the classifications of the Police Officer I and Police Officer II ("A", "C" and "D" steps only) and who possess an Advanced POST Certificate shall receive $1.81 per hour; and shall receive $1.06 per hour for possession of an Intermediate POST Certificate. Effective April 30, 2005, the hourly rate for an Advanced POST Certificate for these classifications shall be $2.42 cents per hour; and the hourly rate for an Intermediate POST Certificate for these classifications shall be $1.62 per hour.

Employees possessing the Advanced POST Certificate who have completed at least 60 college semester units or 15 years of service as a sworn officer with the City will not be required to re-qualify to be eligible for the Educational Incentive Payment. Employees who have completed less than 60 college units or 15 years of service will be required to re-qualify in accordance with Police Department Procedure No. 5.13. Employees with an Intermediate POST Certificate with fifteen years of service as a sworn officer or who meet applicable educational requirement shall not be required to re-qualify.

The Police Officers Association agrees to establish and actively support a community service program.

## ARTICLE 16

## BILINGUAL PAY

Ongoing Bilingual Services

The City agrees to continue a program which will provide ongoing extra compensation for employees whose job assignment requires ability to communicate orally in Spanish, Tagalog, Somali, Korean, American Sign Language, Chinese or Indochinese languages as well as English. Participants in this program, who are certified by their appointing authority, and who are otherwise eligible, shall receive 3.5% of employee's base rate while in the job assignment requiring this additional skill. A claim by an individual of arbitrary denial of bilingual pay is grievable.

18                                          POLICE OFFICERS ASSOCIATION

Incidental Bilingual Services

Management agrees to provide bilingual compensation for the entire pay period for those eligible individuals who are requested or directed by a supervisor, manager or communications to provide translator services in a non-English language other than a language eligible for ongoing Bilingual compensation [Spanish, Tagalog, Somali, Korean, American Sign Language, Chinese, Indochinese languages].

A statement attached to the PCN from a supervisor will serve as certification for bilingual pay for the pay period.

For the purpose of defining incidental bilingual services rendered, any language other than English may qualify for incidental bilingual compensation.

Notes:

The City reserves the right to establish criteria which will enable candidates in this program to qualify for the extra compensation.

SDPOA's request for management to consider expanding the number of languages recognized as eligible for continuing bilingual pay will be referred to the Multilingual Task Force for study and recommendations.

## ARTICLE 17

## BADGES

1. **FLAT BADGES**
   City agrees to provide flat badges for sale by department to employees. The flat badge remains the property of the City of San Diego and at the time of employee termination, the badge must be returned to the department, without reimbursement to the employee. However, if the employee is retiring and eligible for a retired badge, the department will exchange the flat badge for a retired flat badge.

2. **RETIRED BADGES**
   Upon a service or disability retirement, an eligible officer has the following options:

   A. If the officer has only a breast badge, the City will have the officer's name tag and original breast badge encased in acrylic at no cost to the officer. In lieu of having the badge encased, the officer can have the breast badge transformed into or exchanged for a breast badge with a retired scroll in place of the badge number.

   B. If the officer has both a breast and flat badge, the officer has the following choices:

1.  the City will have the officer's name tag and original breast badge encased in acrylic at no cost to the officer and have his/her flat badge exchanged for or transformed into a retirement badge.

2.  the City will have the officer's name tag and original flat badge encased in acrylic at no cost to the officer and have his/her breast badge exchanged for or transformed into a retired badge.

3.  the City will have both the breast and flat badge exchanged for or transformed into a retired badge.

Officers who do not have a flat badge for exchange or encasement have the option to purchase a retired flat badge.

C.  In addition to paragraph 2, A & B directly above, the City will provide to the POA, at no cost, a flat badge of appropriate rank, to the POA for purposes of ceremonial presentation to the individual, by the POA, upon retirement.

## ARTICLE 18

### ANNUAL LEAVE

1.  Employees covered by this agreement shall accumulate annual leave time as follows:

    A.  1-5 years of employment          5.24 hours per pay period

    B.  6-15 years of employment         6.77 hours per pay period

    C.  16 or more years                 8.31 hours per pay period

2.  Appointing authorities are responsible for arranging annual leave so that adequate personnel are available to carry on necessary City Work.

3.  Insofar as is practicable, employees should be permitted to schedule annual leave at times most acceptable to the employee. Scheduled annual leave shall be selected by employees within each division, watch, bureau, section, or unit, as is applicable, based upon their seniority by rank within the Department. Employees who are transferred at their request, or promoted, may be required to modify their scheduled annual leave.

4.  Employees should be encouraged to take regular annual leave but they shall not be required to take time off against their will. Any leave days in excess of the authorized number earned for that year may be taken only at the convenience of the Department.

5.  A. The maximum accumulation of annual leave for employees hired before
    7/1/94 with less than 15 years of service is 600 hours. Annual leave credits
    may be accumulated over the 600 hours limit until an employee's annual
    "accrual date" (which is normally the day and month when originally hired).
    The maximum accumulation of annual leave for employees with 15 or more
    years of service is 700 hours.

    B.  For employees hired on or after July 1, 1994, the maximum accumulation
    of annual leave is 350 hours.

    C.  Effective July 1, 1997, if, on their anniversary date, an employee's leave
    balance exceeds the applicable cap, accrual of additional annual leave
    will cease. However, once an employee's annual leave balance falls below
    the applicable cap, accrual of annual leave will resume. Employees shall
    be provided reasonable opportunity to take time off. In unique situations
    when workload does not permit time off, Management will have discretion
    to grant a ninety day extension to use excess leave before cease to accrue
    will be implemented.

6.  Department annual leave periods will be divided into one-week increments.
    Annual leave schedules shall be comprised of 52 one-week increments for each
    separate rank per division, watch, bureau, section or unit, providing, however,
    that the Department may establish an equitable formula relative to Lieutenants
    and above to accommodate command staffing when a conflict exists in annual
    leave scheduling. Employees may elect to take annual leave in increments
    of one day or longer. Employees will annually be required to select a vaca-
    tion period in advance on the basis of seniority within their division, watch,
    bureau, section or unit. The initial selection of leave shall be the full regular
    annual leave or the first segment thereof. After the initial selection has been
    completed by all employees, those seeking to take more than one segment of
    leave shall select their second segment from those periods remaining. Those
    employees desiring a third leave segment shall select their third choice after
    those choosing a second segment have completed their selection, etc. Each
    Departmental unit will establish an equitable formula to predetermine the limit
    or the number of officers that will be allowed to use annual leave credit during
    each leave period. The limit may be lowered for the few selected periods of
    anticipated heavy police work load; i.e., July 4, Labor Day weekend.

7.  All employees, upon separation, shall be entitled to receive pay for unused
    annual leave credits.

8.  Leave provisions included under item 9 and 10 below will be accounted for
    separately.

9.  Pre-approved annual leave, sick leave or compensatory time off properly used
    for personal, family or dependent illnesses should not be subject to disciplinary
    action.

0088

10. Approved unscheduled annual or sick leave properly used for family, dependent or significant other co-tenant illnesses shall be considered as a separate category when reviewing employee performance with regard to attendance and/or absenteeism issues. Should the City, for good and sufficient reasons, determine that an employee is abusing this leave provision, the City may request a bona fide doctor's statement from the employee to substantiate illness.

11. Each fiscal year, employees may receive a maximum payment-in-lieu of annual leave of 125 hours.

12. Benefits while on Special Leave Without Pay [SLWOP]

   A. All benefits while on SLWOP will be coordinated and/or offset by benefits the employee receives under any other City program, including but not limited to Long Term Disability, and Family Medical Leave.

   B. After one year on SLWOP, the City may charge the employer 2% administrative fee and/or offer continuation of benefits under COBRA.

   C. Employees will not be eligible to purchase City sponsored Supplemental Life Insurance while on SLWOP.

## ARTICLE 19

### SICK LEAVE AND ANNUAL LEAVE REIMBURSEMENT

An eligible employee, upon retirement, or upon termination (other than death or discharge, including termination with eligibility for a deferred retirement), may request that payment for sick leave and annual leave reimbursement be paid in either (a) one full payment; or (b) one full payment at a specified date within 365 days; or (c) three annual payments over a three year period; or (d) five annual payments over a five year period. Consistent with current requirements of the Internal Revenue Code, the total amount of the payment regardless of the option chosen is taxable in the year the employee retires or terminates.

## ARTICLE 20

### BOARD OF DIRECTORS

Section 1. Board of Directors

The P.O.A. Board of Directors may represent employees in the processing of grievances subject to the rules and procedures outlined in Section 2. P.O.A. shall, within thirty (30) days of the effective date of this Agreement, furnish the Management Team with a written list identifying by name and assigned work areas and including shift assignments all members of the Board and the list shall be kept current by P.O.A.

0089

Section 2. Handling Grievances

A.  When requested by an employee, a Board member, with permission of his or
    her supervisor, may investigate any grievance in his or her assigned work area
    and assist in its preparation and presentation. If no Board member is assigned
    to the employee's work area or if the Board member so assigned is not avail-
    able at the time the grievant makes his/her request, another Board member
    may investigate the grievance.

B.  After notifying and receiving approval of the immediate supervisor, a Board
    member shall be allowed reasonable time off during working hours, without
    loss of time or pay to investigate, prepare and present such grievances. The
    immediate supervisor will authorize the Board member to leave his or her
    work unless compelling circumstances require refusal of such permission, in
    which case the immediate supervisor shall inform the Board member of the
    reasons for the denial and establish an alternate time when the Board member
    can reasonably be expected to be released from his or her work assignment.

C.  When a Board member desires to contact an employee at his or her work
    location, the Board member shall first contact the immediate supervisor of that
    employee, advise of the nature of the business, and obtain the permission of
    the supervisor to meet with the employee. The immediate supervisor will make
    the employee available promptly unless compelling circumstances prohibit
    the employee's availability, in which case the supervisor will notify the Board
    member when he or she can reasonably expect to contact the employee.

D.  A Board member's interview or discussions with an employee on City time
    will be handled expeditiously.

E.  A Board member shall not be transferred, or changed to a different work shift
    without prior notice to P.O.A. A prior notice to P.O.A. shall not be construed as
    limiting Management in its prerogatives to transfer or change the work shift of
    a Board member.

Section 3. Board of Directors Meetings

Members of the Board shall be permitted to attend, while on duty, meetings of the
Board of Directors.

## ARTICLE 21

## FORMAL REPRESENTATION

I.  The P.O.A may select three representatives to attend scheduled meetings with
    the Management Team or other Management officials on subjects within the
    scope of representation during regular work hours without loss of compensa-
    tion, except for annual meet and confer sessions concerning economic matters,
    when seven P.O.A. representatives may be released from the on-duty work
    schedules.

0090

In addition, the P.O.A. may also select a representative to attend City Council, Council Committees and Civil Service Commission hearings, during regular work hours, without loss of compensation, where subjects within the scope of representation are being discussed.

Normally, requests for such release shall be made of the Chief of Police at least two working days in advance of such meetings; provided further, that:

1.  Names of all such representatives shall be given to the Chief of Police at the time the request is made.

2.  No representative shall leave the duty station or assignment without specific approval of the Chief of Police.

3.  That any such meeting is subject to scheduling by the City in a manner consistent with operating needs and work schedules.

II.  The Police Officers Association maintains an Employee Representative Program. The purpose of the program is to provide sworn employees with appropriate representation and assistance during the disciplinary actions and in matters which may lead to discipline. The members of the program are personnel from throughout the Department who have volunteered to serve, and have been trained in the duties of employee representatives. Employee representatives may appear with employees during:

1.  Any investigatory, fact-finding, or appeal meeting which may result in suspension (except emergency suspension), discharge, demotion, or disciplinary transfer; or

2.  The required discussion or the appeal of any document, including an "Unacceptable" or "Below Standard" performance evaluation, written warning, or reprimand which may be made part of the employee's permanent record, and/or which may be used as a basis for subsequent discipline.

Employee representatives may also assist employees in preparing written reports, including Department reports, where information contained in them may be used as a basis for punitive or disciplinary action against an employee. The Department and the P.O.A. have agreed that the employee representatives will notify their supervisors each time they are assigned a matter for representation. Representatives are allowed two hours of on-duty time to prepare for participation in interviews, interrogations, and appeal hearings for each case to which they are assigned. This preparation time is in addition to any on-duty time actually spent in the interview, interrogation or appeal meeting. All supervisors should note that the two-hour authorized preparation time is provided to the employee representatives only, not to the employees being represented.

The Department fully supports the Employee Representative Program. Therefore, supervisors are encouraged to cooperate as much as possible with the representatives in scheduling employee interviews, counseling sessions, and hearings of any

0091

appeals of disciplinary actions. In addition, supervisors should provide representatives with all the information they request to which they are entitled by law and by Department Policy and Procedure which they need to perform their duties. All such information obtained by the representatives during the course of their duties will be maintained in the strictest confidence. Because they are acting as agents of the P.O.A.'s attorneys while representing employees, the information gained by the representatives is protected by the attorney/client privilege and its disclosure is prohibited.

The P.O.A. may designate up to 40 Employee Representatives and shall provide the Assistant Chief in charge of personnel service with a current list of representatives.

### ARTICLE 22

### P.O.A. ACCESS

Authorized P.O.A. representatives who are not City employees (such as business agents or attorneys) may be granted access to work locations in which employees covered hereby are employed, for the purpose of conducting grievance investigations and observing working conditions.

Authorized P.O.A. representatives desiring such access to such work locations shall first request entrance from the appropriate Management representative, at which time the authorized representative shall inform said Management representative of the purpose of the visit. Said Management representative may deny access to work location if, in his or her judgment, it is deemed that a visit will unduly interfere with the operations of the department or facility thereof, in which event said Management representative will recommend an alternative time for the visit.

P.O.A. shall, within thirty (30) days of the effective date of this Memorandum, give to Management a written list of all authorized representatives, which list shall thereafter be kept current by P.O.A. Access to work locations hereunder will be granted only to representatives on the current list.

Authorized P.O.A. representatives shall be given access to non-security work locations during working hours to conduct grievance investigations and observe working conditions on the condition that P.O.A. representatives will comply with the regulations established in this Article, and the P.O.A. representatives shall not interfere with work operations of any Department of the City. Representatives have the right to meet with employees during coffee, rest or lunch break at City facilities as may be available.

0092

## ARTICLE 23

## OUT-OF-CLASS ASSIGNMENTS

I.  AUTHORITY:

   A.  City Charter Section 123. LIMITATION ON APPOINTMENTS AND
       TRANSFERS.

   B.  Municipal Code Section 22.1001. ACTING OFFICERS: whenever any
       office or position in the administrative service under his control is vacant,
       or whenever the incumbent of any such office or position is unable to
       perform the duties thereof, by reason of absence or disability, the City
       Manager, except as otherwise provided by ordinance, may designate
       some other officer or employee to perform the duties thereof in an acting
       capacity. But when such designation is made by reason of a vacancy in
       the Classified Service, it shall be subject to the same time limitations as
       applies to temporary appointments.

II.  POLICY: The following applies to all out-of-class assignments:

   A.  The term "out-of-class assignment" shall mean the temporary transfer of
       an employee to a vacant position or to a position where the incumbent of
       the position is unable to perform the duties thereof by reason of absence
       or disability. This position must be officially allocated by the Civil
       Service Commission to a class other than the one presently occupied by
       the employee. The class may be at a higher, lower, or the same pay rate as
       the class the employee presently occupies. However, the employee shall
       continue at the same pay rate.

   B.  Acceptable reasons for out-of-class assignments are:

       1.  Non-availability of properly classified employees to fill a temporary
           vacancy to which the regular incumbent is expected to return.

       2.  Assignment to light duty when required by the City's examining
           physician or a doctor designated by the Workers' Compensation unit.

       3.  The temporary filling of a vacant position, for which there is no
           permanent incumbent, pending certification of eligibles. For purposes
           of this regulation, a vacancy will be deemed to exist upon reclassifica-
           tion of an existing position.

       4.  The temporary filling of a vacant position for in-service training, or
           in connection with a formalized training program for the purpose
           of improving opportunities for promotion. Training assignments
           must be approved by the Personnel Director regardless of duration.
           Appointments made in accordance with the City's career advancement
           program, as outlined in Personnel Manual Index Code D-3, are not
           out-of-class assignments and are not eligible for extra compensation.

26                                              POLICE OFFICERS ASSOCIATION

C. An out-of-class assignment may be made, if in the opinion of the appointing authority, such action is necessary for the proper functioning of the department. However, after filling a vacancy by an out-of-class assignment, the appointing authority is not required to fill the vacancy caused by such assignment.

    1. Appointing authorities may select any employee in non-represented classes and in classifications in the Police, Administrative Support and Field Service, Professional, Supervisory, and Technical representation units to fill an out-of-class assignment, using eligible lists, availability, training, seniority, and other relevant factors as guidelines.

    2. Out-of-class assignments shall not exceed sixty consecutive calendar days nor shall a series of out-of-class assignments to any one vacant position exceed sixty calendar days without approval by the Personnel Director. Out-of-class assignments shall not be made for the purpose of avoiding filling a position by a limited or permanent appointment.

## III. ELIGIBILITY FOR ADDITIONAL COMPENSATION:

Employees shall receive compensation for Out-of-Class assignments to higher classes only when the assignment has been continuous for 30 days. Compensation begins on the 31st continuous day and from that day forward. The 1st through 30th day are paid at the employee's regular rate of pay.

Alternately, employees shall be compensated for out of class assignments at the rate of the higher paid class after 30 cumulative days. Compensation would begin on the 31st day assigned. To calculate when this standard has been met for employees on alternate work schedules, 30 cumulative days is equal to 176 regular (non-overtime) hours worked out-of-class in a single classification. Out-of-class assignments will accrue on a fiscal year basis and shall not be carried forward into the next fiscal year.

## IV. PROCEDURE:

A. The appointing authority shall forward Form CS-71 (OUT-OF-CLASS ASSIGNMENT) to the Personnel Director, no later than the first day of each out-of-class assignment for which additional compensation will be paid.

B. The payroll procedure for determining an employee's pay for an out-of-class assignment shall be the same as that used when an employee is promoted to the same class from an eligible list established by a promotional examination.

## ARTICLE 24

### GRIEVANCE PROCEDURE

The purpose of this grievance procedure is to provide employees covered by this agreement the broadest possible opportunity to resolve work related problems through an effective administrative procedure. The Association and the City recognize a mutual obligation to faithfully uphold the spirit and purpose of the grievance procedure.

I. Policy

    A.  Employees have the right to use this grievance procedure without fear of reprisal. No negative employment action will be taken against any employee as a result of the use of this grievance procedure.

    B.  Employees may represent themselves or select whomever they wish to represent them at any or all steps in the grievance procedure.

        1.  The employee has the right to the assistance of a P.O.A representative in the investigation, preparation, and presentation of a written grievance.

        2.  Employees may have no more than one City employee and one non-City employee as representatives for grievance hearings.

        3.  Notwithstanding any other provision of this agreement, an employee may not select a supervisor in the direct chain of command, as a representative, except that a supervisor may select another supervisor as a representative.

    C.  Grievances may be initiated by the employee, or by a formally recognized employee organization, on the employee's behalf or by the recognized employee organization for this unit on its own behalf, on matters that directly involve the interpretation or application of the specific terms or provisions of this Memorandum of Understanding. If an employee chooses to have representation on any formal grievance concerning a matter that directly involves the interpretation or application of the specific terms and provisions of this Memorandum of Understanding, such representation must come from P.O.A.

    D.  The employee's or employee organization's first contact regarding job and working conditions is with the immediate supervisor and supervisors shall attempt to settle grievances informally at this level.

    E.  A grievance will normally be presented and processed on City time, and a grievant attending a grievance meeting in his/her own behalf on City time will not lose pay. In scheduling the time, place and duration of any grievance meeting, the employee, a P.O.A. Representative and Management

28                                      **POLICE OFFICERS ASSOCIATION**

will give due consideration to all the participant's responsibilities in the essential operations of the department. Management has the unequivocal right to schedule hearings as convenient. Hearings may or may not be held during an employee's normal shift. No overtime pay will be given to the grievant. Representatives, witnesses, or other participants will receive overtime pay if ordered to be present by the appointing authority.

F.    Waivers and Time Limits.

1.    Failure by Management to reply to the employee's grievance within the time limits specified automatically processes the grievance to the next level.

2.    Any level of review, or any time limits established in this procedure, may be waived or extended for good cause and only by mutual agreement confirmed in writing.

3.    If an employee fails to appeal from one level to the next level, within the time limits established in this grievance procedure, the grievance shall be considered settled on the basis of the last decision and the grievance shall not be subject to further appeal or reconsideration.

4.    By mutual agreement, the grievance may revert to a prior level for reconsideration.

5.    If a grievant fails to appear for a scheduled grievance meeting, such failure without excuse approved by the appointing authority shall entitle Management to decide on the grievance without the presence of the grievant, or to schedule another meeting at the level (in which case the time requirements for hearing and decision are automatically waived). Failure to appear at two meetings on the same grievance without an approved excuse automatically terminates that grievance and it is deemed denied. The grievance shall then not be subject to further appeal or reconsideration.

6.    When a grievant is on approved leave the time limits established in this procedure shall be suspended for the period of the leave.

7.    No grievance shall be finally dismissed for an unexcused failure to appear at a scheduled hearing unless the grievant had been given 24 hours notice of the hearing.

G.    P.O.A. agrees to pursue all claims of violation of this MOU through the grievance procedure. Resort to other remedies shall not be pursued until all steps of the grievance procedure have been exhausted. If P.O.A. reasonably feels that an employee has suffered immediate and irreparable harm, the City and P.O.A. agree that the Association may directly contact the City Manager's Office to seek a resolution prior to pursuing remedies outside the City. Such contact will be considered to exhaust the grievance procedure in these cases.

II. Definitions

A. A grievance is a claim or charge of misunderstanding, or difference in interpretation, or violation of provisions of the Civil Service Rules, the Personnel Manual, this Memorandum of Understanding, or management policy or regulations including but not limited to Administrative and Departmental Regulations, which affect wages, hours or other terms and conditions of employment.

B. Actions which are covered in the City Rights Article of this Memorandum are not grievable, but this shall not preclude employees or their representatives from consulting with Management about the practical consequences such actions may have on wages, hours, and other terms and conditions of employment. In addition, actions covered by another appeals process as described in the Civil Service Rules, Personnel Manual, or this Memorandum are not grievable and shall not be processed through this Grievance Procedure.

C. If the grievance system is abused by an unreasonable number of submittals by one individual or group obviously designed to thwart orderly processing or if the grievances are patently irrelevant, or incomprehensible, they shall be rejected as "nongrievable" and returned to the grievant.

D. Wherever applicable, the term "working days" means the actual work days of the individual on whom the time limits are imposed.

III. Procedures

A. General

1. Management of the department has the responsibility to inform an employee of any limitation of a given level of Management's authority to fully resolve the grievance. In this regard, Management shall:

   a. Supply the employee with the necessary information to process the grievance to the proper agency or authority.

   b. Advise an employee when any matter under submission is determined by Management as not grievable according to the definitions in Section II above. The "grievance" paperwork submitted by the employee shall be returned to the employee along with a memorandum explaining why the matter is not grievable and what alternative procedures, if any, the employee may follow to process his/her complaint.

2. When a group of identical grievances develop, only one grievance form shall be submitted. The grievants may select not more than two (2) spokespersons who thereafter will be their representative "grievants." The acceptance of the decision by the spokespersons at any step (or final decision if the grievance moves to the fifth step) will be binding on all parties.

3. A grievance shall be recognized if it is brought to the attention of the immediate supervisor either formally or informally within ten (10) working days of the incident's occurrence.

4. If the grievance is between the employee and the immediate supervisor, or where an upper level supervisor has made a decision on the subject of the dispute, the initial step may be to the level above the level making the decision. The upper level supervisor shall have the discretion to remand the grievance to a lower level supervisor as the initial grievance step. Such remand shall be in writing.

5. To be recognized, a grievance must state the nature of the problem and the remedy sought by the employee or P.O.A. In the event that the grievance is rejected for failure to clearly identify the problem or remedy, it may be amended by the grievant or P.O.A.

B. Steps.

Step 1: At the employee's or employee organization's sole option, grievances may be presented to the supervisor either orally or in writing. If the complaint is presented orally, the procedure is informal and may be settled by an oral answer given within five (5) working days. If the grievance is presented in writing, the procedure is formal and the answer must be given in writing within five (5) working days after submission. The written grievance must be clearly and precisely detailed including the specific grounds for the grievance, a listing of MOU articles or other City procedures that were allegedly violated, and the remedies sought. Grievances that fail to meet these requirements shall not be disqualified, but shall be returned to the grievant for compliance with the foregoing requirements. In such cases, the written answer must be given within five (5) working days after resubmission of the grievance.

Step 2: If the problem cannot be solved at Step 1, the employee or employee organization may present the complaint in writing to the second level supervisor (if not done at Step 1) within five (5) working days. Within ten (10) working days of the receipt of the grievance, a hearing shall be held and the Management representative shall give a written decision to the employee and the P.O.A. representative.

0098

Step 3:  If the problem is not resolved at Step 2, the employee or employee
organization may submit the grievance to the division head within
five (5) working days. Within ten (10) working days of the receipt
of the grievance, a hearing shall be held and the division head
shall give written decision to the employee or P.O.A. representa-
tive. In smaller departments, this step is deleted.

Step 4:  If the problem cannot be solved in Step 3, the employee or
employee organization may present the grievance to the
Department Head within five (5) working days. Within ten (10)
working days of the receipt of the grievance, a hearing shall be
held and the Department Head or his/her designee shall give a
written decision to the employee or P.O.A. representative. In non-
managerial departments this shall constitute the final resolution of
a grievance involving management policy or regulations.

Step 5:  Final Resolution of Grievance: If the grievance is still in dispute
after Step 4, the employee or employee organization may request
a further hearing, which at the discretion of the Management
Team will take place before the Civil Service Commission, on
matters over which the Commission has authority, or before
the City Manager or his designee, by submitting the grievance
within five (5) working days. (If it is determined that the hearing
should be held before the Civil Service Commission, a fact-
finding hearing to define the issues in the grievance will be held
by the Personnel Director with the employee and/or employee
organization, prior to the date set for the Commission hearing.
The grievance may be settled during such fact-finding hearing,
if a mutually acceptable solution is developed.) The decision of
the Commission shall be issued at its next regularly scheduled
meeting following the hearing by the Personnel Director. In
grievances answered by the Manager, a hearing shall be held and
a written response given within forty five (45) days from the date
of receipt of the appeal from the fourth step. If the City Manager's
office does not render a decision within forty five (45) days, and if
there is no waiver of the time limits, the grievance will be decided
in favor of the grievant. The employee or employee organization
may only request a hearing before the Civil Service Commission
in matters solely involving Civil Service Rules or the Personnel
Manual.

Step 6:  Grievances arising out of the disagreement on interpretation or
application of this Memorandum shall follow the City-wide griev-
ance procedure. The P.O.A. may formally request to continue the
grievance, not later than ten (10) days following receipt of the
answer at the final step of the grievance procedure (provided it
was heard by the City Manager), by serving written notice upon
the Management Team. The Management Team will refer the
grievance to the City Council for hearing and decision.

32                                    POLICE OFFICERS ASSOCIATION

0099

# ARTICLE 25

## SALARIES

A.  It is agreed that the salaries of the employees in the unit represented by P.O.A. will be increased for Fiscal Years 2004 and 2005 as follows:

| | |
|---|---|
| July 1, 2003: | 2% |
| December 20, 2003 | 2% |
| July 1, 2004: | 4% |
| December 18, 2004: | 3% |

B.  In the salary schedules for new employees, B step will be eliminated for new hires beginning 7/1/94. Employees hired on or after 7/1/94 will move from "A" step to "C" step after one [1] year for initial appointments as well as subsequent promotions, transfers, or other appointments. This represents an increase of approximately 10%. Current employees will continue with the present five step salary schedule.

C.  Police Lieutenant

1.  The base pay of this class will be increased in an amount equal to the current value of all premiums currently paid to all members of this class divided by the number of current positions. This will be effective July 1, 1998 and will include the July 1998 increases to Detective and FTO pay.

2.  FLSA Exempt Classes - Pursuant to the provisions of the Fair Labor Standards Act (FLSA) the classification of Police Lieutenant is ineligible for premium overtime and shall not be subject to the overtime provisions of this MOU.

# ARTICLE 26

## UNIFORMS AND SAFETY EQUIPMENT

I.  Department Issued Equipment.

A.  The City shall issue to each sworn officer:

1.  Handgun and Ammunition
2.  Safety Helmet and Face Shield
3.  Baton and Baton Holder
4.  Badge
5.  Protective vest and Cover
6.  Mace and Mace Holder

0100

7.  Flashlight
8.  Department Identification Card
9.  Name Tag
10. OPN's and Holder
11. Whistle
12. Raincoat and Rain Boots
13. Handcuffs and Case

B.  The City shall issue to each sworn officer assigned to the motorcycle squad:

    1.  Department of Transportation approved safety helmet every two (2) years or sooner should there be a defect or damage to the helmet.

    2.  The City shall issue to each motor officer, on an as needed basis, the following equipment:

        a.  Protective Gloves
        b.  Protective Goggles
        c.  Face/Dust mask

    Each officer issued equipment in accordance with paragraphs A and B, shall be responsible for that equipment and shall surrender such equipment to the City upon demand.

II. Police Officer's Uniform and Equipment

A.  Initial Requirement. Each Employee in this bargaining unit shall be required to obtain and maintain and in a manner acceptable to the City the following items:

    Items Required
        Pants
        Tie
        Belt
        Shirt, Short or Long Sleeve
        Belt and Holster
        Ammunition Pouch or Speed-loaders and Pouch
        Pistol Belt Keepers (4)

B.  Maintenance and Upkeep. The City shall also pay those sworn members of the Police Department who have completed 12 months as a Police Officer I as of September 1, and who are available for duty assignments on September 1, the sum of $900.00 for the maintenance and replacement of the uniforms and equipment described in Paragraph A. Sworn officers of the Police Department who have completed 12 months as a Police Officer I as of September 1, but who are on leaves of absence, including injury leave, shall be eligible for this payment upon their return to duty. Police

34

Officers who complete 12 months as a Police Officer I after September 1, shall receive the sum of $900.00 as of the day they complete 12 months as a Police Officer I. No Police Officer shall receive more than $900.00 during the Fiscal Year for "maintenance and upkeep" of the uniforms and equipment described in Paragraph A.

C.  In addition to the uniform and equipment allowance set out in II. B. above, officers assigned to the mounted horse patrol shall receive reimbursement of $840.00 for the reimbursement of the initial purchase of uniforms and equipment so authorized by the Department upon assignment. The City shall also pay those sworn officers assigned to the mounted horse patrol the sum of $425.00 on the regular paycheck on or before September 1, for the maintenance and replacement of said equipment in subsequent years. Employees receiving the initial reimbursement shall not receive the maintenance allowance in the same fiscal year.

D.  In addition to the uniform and equipment allowance set out in II. B. above, officers assigned to SWAT duty shall receive the sum of $400.00 for the reimbursement of the initial purchase of uniforms and equipment so authorized by the department upon assignment. The City shall also pay those sworn officers assigned to SWAT duty the sum of $300.00 on the regular paycheck on or before September 1, for the maintenance and replacement of said uniforms and equipment. Employees receiving the initial reimbursement shall not receive the maintenance allowance in the same fiscal year.

E.  In addition to the uniform and equipment allowance set out in II. B. above, officers assigned to the Harbor Patrol and permanent members of the Beach Enforcement Team shall receive reimbursement of $350.00 for the initial purchase of uniforms and equipment so authorized by the Department upon assignment. The City shall also pay those sworn officers assigned to the Harbor Patrol and permanent members of the Beach Enforcement Team the sum of $150.00 on the regular paycheck on or before September 1, for the maintenance and replacement of said equipment. Employees receiving the initial reimbursement shall not receive the maintenance allowance in the same year.

F.  In addition to the uniform and equipment allowance set out in II. B. above, members of the Canine Unit shall receive an additional $300 on the regular paycheck on or before September 1, for the replacement and maintenance of their uniforms.

G.  In addition to the uniform and equipment allowance set out in 26.II.B above, members of the Bike Patrol shall receive $200 reimbursement for the initial purchase of uniform and equipment. Officers who have already received this reimbursement shall not be eligible for an additional reimbursement. The City shall also pay those sworn officers permanently assigned to the dedicated Bike Patrol Unit on September 1, the sum of $150 for the maintenance and replacement of said equipment.

H. Effective July 1, 2003, Core Instructors assigned to the Regional Academy, as determined by the Chief of Police, shall receive an additional initial uniform allowance of $200, and an additional $100, on or before September 1, for the replacement and maintenance of their uniforms. This allowance is in addition to the uniform and equipment allowance set out in II.B above.

III. Motorcycle Officers

A. Each sworn officer of the Police Department who is assigned to the motorcycle squad shall provide and use the following items:

1. Motorcycle boots
2. Motorcycle breeches
3. Gloves - riding
4. Gloves - gauntlet
5. Leather jacket
6. Safety glasses - clear
7. Safety glasses - sun

B. The City shall pay those sworn officers of the Police Department who are assigned to the motorcycle squad on September 1, the sum of $425 for the maintenance and replacement of the equipment described in Paragraph A.

C. Upon initial assignment to the motorcycle squad, each officer so assigned will receive the sum of $750.00 for the initial purchase of equipment described in Paragraph A. Employees receiving this initial reimbursement shall not receive the benefits in III.B. above in the same fiscal year.

IV. Administration

A. Sworn officers reporting for duty are expected to have uniforms and equipment as described in Sections I, II and III (Section III applies only to sworn officers assigned to the motorcycle squad). Failure to have and/or use any of these items may result in discipline of the employee.

B. The Police Officers Association agrees that the City of San Diego has discharged the City's obligation pursuant to Section 6401 of the Labor Code to provide the safety equipment for police officers as set forth in Sections 50081.1 of the Government Code.

V. The parties hereto agree that if, during the term of this agreement, a change is proposed in the basic uniform, the parties will meet and confer on the effects of such a change.

# ARTICLE 27

## PERSONNEL RULES AND REGULATIONS

The following information is provided as a resource summarizing elements of Civil Service Rule X, Leaves of Absence Section 3.4.

ANNUAL LEAVE - WORKERS' COMPENSATION: Those employees who are absent from duty because of a temporary disability which is defined as industrial under the Workers' Compensation Act, but who are not granted industrial leave may use annual leave credits; provided however, that any such employee who receives a temporary disability allowance, as provided by the Workers' Compensation Law, must reimburse the City Auditor and Comptroller in the amount of the authorized compensation, in which case, only that amount of the employee's accumulated annual leave credits as when added to said disability allowance will result in a payment of not more than the employee's full salary or wages shall be charged against said accumulated annual leave credits.

Section 4. SICK AND EMERGENCY LEAVES:

[1] SICK LEAVE INTENT, DEFINITION, PROVISIONS: The intent of this section is to allow continued use of sick leave credits accrued prior to September 4, 1981, for those employees who are unable on account of illness or injury to perform the duties of their positions or who would expose fellow workers or the public to contagious disease and are thereby forced to be absent from employment, and to provide necessary time off from work for medical and dental care, subject to administrative regulations designed to prevent malingering or abuse of these privileges.

  (a) SICK LEAVE DEFINITION: Sick leave is defined as the necessary absence from duty of an employee on account of illness, injury, or exposure to contagious disease suffered by the employee, or the serious disability of the employee while on a scheduled leave, or absence authorized for medical or dental care.

  (b) SICK LEAVE - WORKERS' COMPENSATION: Those employees who are absent from duty because of a temporary disability which is defined as industrial under the Workers' Compensation Act, but who are not granted industrial leave may use sick leave credit; provided however, that any such employee who receives a temporary disability allowance, as provided under the Workers/ Compensation Law, must reimburse the City Auditor and Comptroller in the amount of the authorized compensation; in which case, only that amount of the employee's accumulated sick leave credits as when added to said disability allowance will result in a payment of not more than the employee's full salary or wages shall be charged against said accumulated sick leave credits.

0104

[2] EMERGENCY LEAVE INTENT, DEFINITION, PROVISIONS: The intent of this Section is to allow continued use on a limited basis, of sick leave credits accrued prior to September 4, 1981, by an employee who is confronted with serious emergency illness, injury, or death in the employee's immediate family.

    (a) Emergency leave is defined as the necessary absence from duty of an employee because of emergency illness of a member of the employee's immediate family requiring the attendance of the employee upon said member until professional or other attendance can be obtained, or he absence from duty of an employee because of the death of an immediate family member.

    (b) An eligible employee may be granted emergency leave with pay chargeable to accumulated sick leave credits not to exceed a total of five workdays for each instance of emergency illness or death in the employee's immediate family. In the case of illness followed by death, an employee may he granted a maximum of ten consecutive workdays of emergency leave chargeable to sick leave credits.

Section 7. MILITARY LEAVE: In addition to the leaves of absence provided in this rule, City officers or employees who are also members of the armed services or militia or organized reserves of this State or Nation, shall be entitled to the leaves of absence and the employment rights and privileges provided by the Military and Veterans' Code of the State of California. City officers or employees who have had not less than one year of regular City employment immediately prior to the beginning of requested military leave, shall receive their City compensation during the military leave, not to exceed a period of 30 days in any fiscal year. Effective July 1, 2003, it is agreed that the City and POA will provide flexibility in the interpretation of Military Compensation for any employee who is on temporary military leave of absence and who has not been in the service of the public agency from which the leave is taken for a period of not less than one year immediately prior to the day upon which the leave begins, shall be entitled to receive his or her salary or compensation as such public employee for the first 30 calendar days or 174 hours of any such absence. Pay for such purposes shall not exceed 30 days or 174 hours in any one fiscal year. For the purposes of this section, in determining the one year of public agency service, all service of said public employee in the recognized military service shall be counted as public agency service. No policies governing Military Leave (Personnel Manual Section I-10) shall be changed to accommodate for this salary flexibility.

Section 8. COMPULSORY LEAVE: If, in the opinion of the department head, an employee is incapacitated for work on account of illness or injury, such employee may be required, for a period not to exceed two workdays, to absent himself from duty. If said incapacity may reasonably be expected to extend beyond two workdays, the department head shall require the employee to undergo an examination by a physician designated or approved by the commission. If the report of the physician shows the employee to be in an unfit condition to work, the appointing authority shall have the right, subject to Commission approval, to compel such employee to take sufficient leave of absence, not to exceed one year of leave without pay, so as to become fit for the proper performance of assigned duties.

     POLICE OFFICERS ASSOCIATION     0105

Section 9. SPECIAL LEAVE WITHOUT PAY: An employee whose work record has been satisfactory and who, for any reason considered good by the appointing authority and the Commission, desires to secure leave from regular duties, may be granted special leave of absence without pay for a period not exceeding one year. For good cause, such leave may be extended, upon approval of the appointing authority and the Commission. When such leave is granted to enable an employee to take a position in the Unclassified Service, the Commission, may upon request, grant a leave of absence for the period of actual service of the employee in such Unclassified position. An employee asking for special leave without pay shall submit a request on prescribed forms with a transmittal letter, stating the reasons for the request. The appointing authority who endorses such request shall recommend and the Commission shall determine whether the employee shall be entitled to the same position upon return from such leave or whether the employee's name shall be placed on the eligible list for the class or classes as determined by the Commission. If appropriate, the employee's return shall be subject to passing the prescribed City medical examination.

Section 10. COURT LEAVE: An employee, other than one paid on an hourly basis, who is required by court order to serve as a juror, or as a witness who is not a party to a court action, shall be granted leave for such purpose upon presentation of proof of the period of his required attendance to the appointing authority and the Personnel Director. The employee shall receive full pay for the time he serves on court duty, provided the money which he receives as a juror or witness is deposited with the City Auditor for credit to the proper fund. Request for such leave shall be made upon leave of absence forms.

Section 11. SPECIAL MEETINGS: Officers and employees may be granted special permission, without loss of pay, to attend professional or technical institutes or conferences, or other meetings as may contribute to the effectiveness of their service to the City. Such special permission is subject to the approval of the appointing authority or the City Council, whichever is applicable. Evidence of such special permission to attend said conferences or meetings shall be furnished promptly by the department head to the Personnel Director. Officers and employees granted said special permission shall be considered to be in duty status.

## ARTICLE 28

### FIELD TRAINING OFFICER PAY

The City agrees to continue a program which will provide extra compensation for employees whose job assignment involves full-time Field Training Officer duties (including Sergeants), as defined by the Chief, relative to the Police Academy trainees. Effective July 1, 2003, participants in this program shall receive 5% of employee's base rate while designated as a Field Training Officer capacity.

0106

## ARTICLE 29

### CALL-BACK PAY

A.  An employee who has been released from work and has left the work premises shall, if called back to duty from home or any other non-work location, be paid for the reasonable estimate of the time required to travel from and to his/her residence and the work areas and for the time actually worked. The total time of call-back pay, including travel time, shall not be less than four (4) hours.

B.  This provision does not apply to instances when an employee is already present at the work station and is required by a supervisor to start work early or to continue work following the end of shift. This provision also does not apply to a meeting scheduled after the employee's shift, and which is contiguous with the shift. In such instances, the employee will receive compensation only for the time actually worked or spent in the meeting after his/her shift.

## ARTICLE 30

### COURT PAY

Employees eligible for premium overtime that are required, as a result of their employment responsibilities, to make court appearances during otherwise off-duty hours, shall be treated as follows:

A.  The employee shall receive compensation at the rate of time and one-half of his/her regular base rate for all time actually spent in court (minimum of four hours), excluding court recess time.

B.  If an employee is scheduled to appear in court up to two hours prior to the beginning of his/her shift, the employee's schedule may be adjusted to correspond with the court appearance. The intent of this change is to align the beginning of the shift with Court appearances and minimize the incidence of Court pay for hours not actually spent on Court duty. If an employee is ordered by his/her immediate supervisor, duty lieutenant or Communications to work beyond the regular number of hours per day on the adjusted shift, the four hour minimum would apply, plus relevant overtime for the shift extension. However, the four hour minimum would not apply in situations in which an employee was directed to work beyond the adjusted shift as a result of a self-initiated action, i.e. a vehicle or person stopped and detained, an arrest, etc.

C.  Eligibility restrictions described in Article 29, Section B, shall also apply to the minimum requirements described in Section A above.

D.  If the employee makes a court appearance during the morning session and at least part of the afternoon session, after he/she has just completed working a night shift, and if the employee is scheduled to work the next succeeding night shift, the employee shall have the option of receiving time and one-half compensation for the actual court appearance time or having the succeeding

scheduled night shift off as compensatory time. If an employee is scheduled
off on his/her next shift following such court appearance, he/she may not
exercise the second option.

E.   Compensatory overtime shall begin at the time indicated on the subpoena
     unless the officer is otherwise notified by a superior.

F.   During FY 1995, the Police Department, in cooperation with local Court
     administrators, may implement procedures to minimize the scheduling of
     Court appearances on Police officers' days off.

### ARTICLE 31

### COURT STAND-BY

When an employee is under subpoena to appear in court during his/her non-duty
hours, the employee shall go to the court and stand by until called by the court and
shall receive pay at a premium rate of one and one-half times the basic rate for such
stand-by time, or, with the concurrence of the subpoenaing party, remain standing
by at another location where he/she may be reached by the court by telephone. If an
employee stands by at another location, no pay shall be received for such stand-by
time. No employee shall be required to stand-by without compensation without
his/her consent.

The parties agree to maintain current practices regarding standby hours and associ-
ated discretionary time off.

### ARTICLE 32

### OVERTIME

It is agreed that premium compensation at the rate of one and one-half times the
base rate shall be paid to employees in the classifications of Police Recruit, Police
Officer I, Police Officer II, Police Agent, Community Relations Assistant to the
Police Chief, and Police Sergeant, under the following conditions:

1.   When an employee is called back to work from a non-duty status, he/she shall
     receive premium pay for all such call-back time worked, with a four (4) hour
     minimum of compensation in each such instance, notwithstanding the usual
     starting time of the work shift.

     An employee's work shift refers to the hours of work during the normally
     scheduled work day, and may be permanently adjusted with at least 72 hours
     notice without the necessity of paying premium pay as described above,
     provided that the employee does not work a total number of hours greater than
     the normally scheduled hours. An employee's days off cannot be changed
     solely to avoid paying overtime. Management may, by providing at least five
     [5] days notice to affected employee, change an employee's permanent days
     off. When unforeseen special events or emergencies arise necessitating they

be required to work their scheduled days off, they will be paid overtime, or, at their election, be assigned other days off as a substitution. As a general policy officers will not be required to work more than seven consecutive days unless it is an emergency. "Special Events or Emergencies" will be defined as unforeseen crime problems, natural or man-made disasters, special events of which the department had little or no knowledge, e.g., presidential visits, and events requiring unusually large numbers of personnel.

Not withstanding the terms of the F.L.S.A., an employee's hours and/or days off may be changed on a temporary basis with or without 72 hours or five days notice, when the employee voluntarily waives those requirements. Voluntary is defined as acting freely without any coercion, stated or implied. (Management may request that the employee sign a form denoting such schedule alternations).

The terms "Permanent" or "permanently" shall mean a change no more than once within the span of a shift.

2.  When an employee is required under subpoena to appear in court during non-duty hours, he/she shall receive premium pay for all such court time with a four (4) hour minimum of compensation in each such instance. Employees will not receive a second four (4) hour minimum of premium pay for subpoenas requiring appearances within four (4) hours of a first subpoena appearance time (e.g., a 10:30 a.m. subpoena following an 8:15 a.m. subpoena on the same date). Only actual time above the first four (4) hour minimum will be compensated with premium pay in such cases. However, pursuant to Article 30, B, an employee's schedule may be adjusted to correspond to a Court appearance, eliminating the need for overtime pay. When an employee is directed to telephone a specific court or agency at a designated time during non-duty hours for the purpose of a telephonic hearing, and he/she does not have to place the call from a designated location, he/she shall receive premium pay for such time with a thirty (30) minute minimum of compensation for each such instance.

3.  Eligibility restrictions described in Article 29, Section B, shall also apply to the minimum requirements described in above sections 1 and 2.

4.  When an employee's shift is extended beyond its normal ending time, he/she shall receive premium pay for the time of the shift extension.

5.  If an employee is scheduled or directed by the Department to work on a designated City holiday he/she shall receive pay at premium compensation for the time worked and shall also receive ten (10) hours of compensating time for the holiday. An employee scheduled to be off work on a City holiday and who is called back to work on that day shall receive premium pay for the time worked, if otherwise eligible, and also eight (8) hours of compensating time for the holiday.

POLICE OFFICERS ASSOCIATION

6. For all overtime earned, the members of the unit shall receive either compensatory time off or pay, at the discretion of the Police Chief. Employees shall be allowed to accrue 80 hours of compensatory time off. By the end of the fiscal year, however, compensatory time balances must not be in excess of 45 hours.

7. Motor Unit and Canine Unit

The City agrees to pay employees assigned to the Motorcycle Unit two additional hours of compensation each 40-hour work week at premium rate overtime to compensate for time spent cleaning, preparing, and maintaining their equipment. Employees assigned to the Canine Unit will be paid 3.5 additional hours of compensation each 40-hour work week at premium rate overtime for similar activities. The parties agree that this is a reasonable amount of time for such activities. If an employee, due to extraordinary circumstances, spends more than the agreed to time on these activities, the employee may request additional overtime. This must be pre-approved. Effective July 1, 2000, Lieutenants are ineligible to receive the Motor Unit and Canine Unit pays described above.

## ARTICLE 33

### WORK SCHEDULES

The City and the Police Officers Association agree that the work schedules of those Police Officers assigned in the Patrol and Traffic Divisions assigned in the five day work week schedule will be as follows:

A. All officers on a five-day work schedule will report to work at the scheduled start of their assigned shift. Officers who are scheduled to work at the hour daylight savings time either begins or ends will not have their hours adjusted to avoid working overtime. Officers will report at their scheduled time and work a regular, full ten-hour shift.

B. All officers may receive thirty minutes during their assigned shift as a meal break during which time they may report as Code 7. This period is unpaid.

C. An officer's conduct while on Code 7 for a meal break shall be governed by Department Instruction 6.32.

D. During this thirty minute break, officers will be available to respond to emergency calls.

E. If an officer's break is interrupted by an emergency call, the break will be resumed after the call is completed.

F. In the case that an officer is unable to take a total of thirty minutes for a meal break during the assigned shift, the officer will be paid premium rate overtime for this thirty minute period. This request for overtime will be submitted through the normal procedures.

0110

G.  Effective July 1, 2003, the 4/10 plan applied to patrol and traffic assignments will be applied to all sworn positions below the rank of Captain. Said 4/10 plan shall include a thirty (30) minute paid lunch break.

## ARTICLE 34

## STARTING SALARY

The parties incorporate Personnel Manual Section H-9, "Starting Salary Upon Appointment" in this agreement, except that employees promoted from the class of Police Officer I to Police Officer II shall receive at least the base salary of "C" step of the Police Officer II class.

## ARTICLE 35

## P.O.A. REPRESENTATION

City Management will support a request to the Civil Service Commission for a Leave of Absence without pay for two (2) P.O.A. members for the same period of time, unless there is compelling reason to not support a "job to be saved" type leave. In the latter case, the City will meet and confer with the Association in advance of any such objection.

## ARTICLE 36

## PAYROLL DEDUCTION

1.  It is mutually agreed that the City will, during the term of this agreement, deduct P.O.A. dues from the salary of each employee covered hereby who files with the City a written Employee Payroll Deduction Authorization requesting that such deduction be made. Remittance of the aggregate amount of all such dues shall be made to the P.O.A. by Management as soon as possible after the dues have been deducted from the salaries of employees.

    All employees will be required to provide authorization to the City Auditor to electronically deposit their paychecks to a financial institution of their choice (subject to electronic compatibility). Employees shall not have to change financial institutions if their financial institution is not compatible with the wire transfer. The effective date of this requirement will be determined by the City during the term of this agreement.

## ARTICLE 37

## EMPLOYEE REPRESENTATION

A.  An employee may request a representative, not to exceed one City employee and one non- City employee, to be present: (1) at any investigatory or fact-finding meeting which may result in suspension, discharge, demotion, or transfer for purposes of punishment, except in cases requiring immediate

removal or suspension as defined in Civil Service Rule XI, Sections 4 and 6, and Personnel Manual Section L-2; (2) during the required discussion of any document, including an "Unsatisfactory," "Improvement Needed" Performance Evaluation or written reprimand, which is to be made part of the employee's permanent record and/or which may be used as a basis for subsequent discipline with the following provisions:

1. An employee shall not select a "City employee representative" who is subject to the same investigation or fact finding including any employee who is a witness to the event which is the subject of the investigation or fact finding.

2. An employee may not select an employee in direct chain of command as their "City employee representative."

B. In all other instances, Management has the right to counsel employees as it deems appropriate without employee representation being present.

C. It is the intention of the parties that this article shall be interpreted consistent with the Peace Officer's Bill of Rights. (Sec. 3300, et seq., Cal. Gov. Code.)

D. An officer subject to interrogation by a single departmental representative may have a sole representative. If the interrogation is conducted by more than one departmental representative, an officer may be represented as provided for in paragraph A.

## ARTICLE 38

## DEPARTMENTAL PROCEDURES - ADVANCE NOTICE

It is recognized that from time to time the department may in its discretion issue departmental procedures in writing which pertain to matters not within the scope of representation. In order, however, to promote communications between the department and the Association, the department agrees to direct a copy of proposed written departmental procedures to the Association prior to official publication. Nothing in this article is intended to require or obligate, directly or indirectly, the department to meet and confer on any subject contained as proposed departmental procedures which is not within the scope of representation. It is understood that the purpose of this article is to enable the Association to review any proposed written departmental procedure in advance of publication and render comments as may be appropriate. Further, nothing in this article shall limit or otherwise restrict the department from immediately publishing departmental procedures which in the determination of the department are of an emergency nature.

## ARTICLE 39

## TUITION REFUND PLAN

### A. PURPOSE

1. To encourage and financially assist employees to continue their education so as to improve job knowledge, skills and capabilities on their present job and to prepare for advancement within City employment.

2. To assist the City, through employee development, in achieving maximum use of human resources in attaining departmental objectives including Equal Opportunity goals.

### B. ELIGIBILITY RULES

1. Eligible employees will be reimbursed 100% of tuition and fees for textbooks and supplies under certain conditions, up to a limit of $900 per fiscal year. Reimbursement will be made for professional and technical courses offered by accredited colleges, universities, business, trade or correspondence schools, as part of an educational plan which has been approved by the Police Chief or his/her designee.

   a. Taxation of reimbursements will be made based on Internal Revenue Service (IRS) regulations.

   b. The Auditor and Comptroller will be responsible for determining which reimbursements are taxable income in accordance with IRS regulations.

2. Tuition Reimbursement is an employee benefit, whereas attendance at training is available at management's discretion. Tuition Reimbursement will not be available for related employee travel expenses. Tuition Reimbursement course attendance must occur on the employee's personal time, not on City time. Travel costs are potentially reimbursable when related to attendance at training. Training may be attended on City time.

3. One day seminars are considered training and are ineligible for Tuition Reimbursement. A semester course can be paid for by Tuition Reimbursement.

4. Conditions under which reimbursement may be approved are as follows:

   a. The course work must relate to the applicant's present position or must be beneficial to the employee's City related professional development, or must enhance career advancement potential within the City of San Diego, as follows:

(1) An improvement in skills or knowledge required by the present position;

(2) Preparing the employee for significant technological changes occurring in his/her City related career field;

(3) Preparing the employee for changes in duties due to the different use of a position or class;

(4) Preparing the employee for the assumption of new and different duties as a result of a recent promotional appointment;

(5) Preparing the employee for promotional opportunities within the employee's present career series with the City, supported by a logical educational plan of accomplishment approved by the Police Chief or his/her designee.

(6) Preparing the employee for career-enhancing promotional opportunities or transfer opportunities into a different City career series.

h.  An educational plan must be approved by the Police Chief or his/her designee prior to course enrollment. This plan must include:

(1) Intended degree to be achieved or continuing professional education requirements to be satisfied.

(2) Major area of study.

(3) Core courses and number of electives required by the educational institution.

(4) Additional information as required by the Police Chief or his/her designee.

c.  Reimbursement will be made for all core courses and for electives taken to fulfill degree requirements. Core courses should take priority, and the majority of them should be completed prior to enrolling in elective courses.

d.  Reimbursement will be made for courses taken to satisfy professional continuing education certificate and/or licensing requirements. These courses must directly relate to the employee's City career.

e.  Individual semester classes directly related to the employee's current position with the City are potentially reimbursable.

f.  Requests for reimbursements must be approved by the Police Chief or his/her designee before enrollment in the Course.

0114

g.   Reimbursement will be made for tuition fees and/or required textbooks and a reasonable amount of supplies (as determined by the Police Chief or his/her designee) verified by receipts upon completion of the course with a grade of at least "C", "Satisfactory", "Pass" (for Pass/Fail courses), or the equivalent.

h.   The employee must have completed six months of City service in a budgeted City position prior to starting the course. Tuition Reimbursement is not available for hourly employees.

i.   The minimum amount of tuition reimbursement which will be approved for any employee is $5 per course.

j.   The employee must not be receiving funds for the same course from any other source, such as Veteran's benefits, scholarships, etc.

k.   Tuition fees for City sponsored courses for which academic credit is granted by an accredited college or university shall be reimbursable under this program, subject to the limits described above.

C.   REQUESTS AND REIMBURSEMENT - PROCEDURE

1.   Employee meeting the eligibility rules fills out the Form PEA- 1523, "Request for Approval of Tuition Reimbursement", in four copies, prior to enrollment in the class. The form is available from In-Service Training Section. A central supply is maintained in City Operations Building - Store No. 4.

2.   The completed form is presented to the employee's Police Chief or his/her designee.

3.   Upon approval, the original is forwarded to the Financial Management Department - Organization Effectiveness Program for statistical analysis. One copy is returned to the employee, and two copies are retained by the employee's In-Service Training Section.

4.   Upon completing the course, the employee will furnish the In Service Training Section with receipts of payments made and evidence of satisfactory completion.

5.   The In-Service Training Section will then process a "Request for Direct Payment" Form AC-468 (rev. 8/74) to provide for reimbursement to the employee. Original receipts, proof of passing grades, approved education plan and two copies of form PEA-1523 must be attached.

6.   At the end of each calendar year, the Auditor's Department will include the taxable tuition reimbursement dollars received on the employees W-2.

48                                        POLICE OFFICERS ASSOCIATION

## D. EXCEPTIONS

1. Management and SDPOA agree to form a standing committee comprised of two (2) SDPOA representatives and two (2) Management representatives to meet approximately twice yearly for the purpose of reviewing prospective exceptions and establishing an initial list of Tuition Reimbursement exceptions. Exceptions must receive prospective approval. Disagreements will be referred to the Labor Relations Manager and SDPOA for discussion.

## ARTICLE 40

### FLIGHT PAY

Those members of the San Diego Police Department who are authorized to fly the Department's aircraft and who are additionally designated as a "Primary Pilot" shall receive approximately 11.5% of employee's base pay, effective July 1, 2003. During the term of this agreement, there shall be no less than two primary pilots.

Any officer relieving a primary pilot shall also receive flight pay for the period served in that capacity.

Effective July 1, 2003, Air Support Trainers shall receive approximately 3.5% of employee's base pay.

Effective July 1, 2000, the cost of the required FAA pilot physical shall be reimbursed by the City.

## ARTICLE 41

### OFFICER RIGHTS

I.  Public Safety Officers Procedural Bill of Rights (Cal. Gov. Code, Sec. 3300)

   A.  The parties hereto recognize that all members of the Police Unit are covered by the provisions and decisional interpretations of the Public Safety Officers Procedural Bill of Rights. (Bill of Rights.)

   B.  Officers may, with the approval of the POA Board of Directors, bring an action in Superior Court without exhausting the administrative remedies described in this Article, in those instances where it is alleged that a specific violation of the Public Safety Officers Procedural Bill of Rights has occurred and it is alleged that the remedies contained in this Article are inadequate.

0116

## II. Definitions

A. For purposes of this Article, the following definitions shall apply:

1. Punitive action - shall be defined as those actions which may directly lead to dismissal, demotion, suspension, reduction in salary, written reprimand, written warning, transfer for purposes of punishment, or less than satisfactory performance evaluation.

2. Interrogation - shall mean any inquiry concerning the actions or conduct of an officer which may lead to punitive action or criminal allegation.

3. Investigation - shall mean the process of conducting inquiry(ies) into the actions or conduct of an officer(s) from the moment it is reasonably apparent that such inquiry(ies) may lead to punitive action or criminal allegations directed toward an officer or officers.

## III. Civil Service Appeals

A. Officers may, in addition to other rights to administrative appeals and/or hearings set out herein, appeal any punitive action which is covered by provisions of City Civil Service Rules to the Civil Service Commission in accordance with those rules.

B. Where a punitive transfer action has taken place in conjunction with a disciplinary action over which the Civil Service Commission has jurisdiction the parties hereto agree that the Commission may rule on the propriety of the matter before it and that the Police Department will be bound on the matter of the punitive transfer by the findings of the Commission.

## IV. Investigations

A. Any officer(s) under investigation shall receive at least three days notice prior to an interrogation except where such delay will hamper the gathering of evidence as determined by an Assistant Chief. At the time an officer is advised that an interrogation is planned the said officer will be advised of the subject of the interrogation and that he/she has a right to obtain representation.

The actual scheduling of the interrogation will be subject to the reasonable accommodation of the schedules of the subject officer and his/her representative.

B. Investigations of shooting incidents involving officers and any incident involving the actions or conduct of an officer(s) where personnel from the Internal Affairs Unit are called to the scene of the incident will be reported to the Police Officers Association immediately. The Association will provide a telephone number to the Police Department and it shall be

the responsibility of the duty lieutenant to telephone the number and report the general nature of the incident.

C. Officers who are removed from the normal duties of the job during the pendency of an investigation shall not be so removed for longer than thirty (30) calendar days except where the business necessities of the Department require the removal from duties to extend beyond 30 days. Under circumstances of such an extension, the involved officer shall have the right to a hearing before an Assistant Chief concerning the business necessities alleged and shall have the opportunity to argue and present evidence to contradict those business necessities. This hearing is an informal opportunity for the officer to present to the Chief of Police regarding why the extension should not be granted. This is not to be confused with an evidentiary hearing afforded officers pursuant to the Public Safety Officer Procedural Bill of Rights for punitive action.

V. Intra-Department Hearings

A. Scope - The herein described intra-departmental hearing procedures shall be available to officers as follows:

1. Dismissal

2. Suspension

3. Demotion - in rank or classification

4. Reduction in compensation (as defined in Index Code L-2 of the Personnel Manual); does not include loss of overtime due to transfer or loss of a take-home car due to assignment)

5. Written reprimand

6. Written warning

7. Less than satisfactory performance evaluation

8. Punitive Transfers

9. Officers entitled to appeal any action to the Civil Service Commission shall retain such right notwithstanding the use of intra-departmental appeal procedures and may elect either or both procedures without prejudice to the other.

10. The intra-department hearing procedures shall be available to officers of all ranks and without regard to permanent or probationary status.

0118

B. Procedure - hearings regarding punitive actions shall be conducted as follows:

1. The hearing officer shall be the Chief of Police or his/her designee of not less than the rank of Assistant Chief, except that for hearings regarding notes of counseling and written warnings, a Captain may be the designated hearing officer. Such hearing officer shall have had no role in the original decision to take punitive actions.

2. Each officer requesting to appeal a matter shall have ten (10) working days to file an appeal with the office of the Chief of Police.

3. The appeal hearing shall be recorded in such a manner as to permit a transcript to be made. All parties shall have access to the original recordation, a duplicate copy and/or any transcript.

4. The officer shall have the right to present evidence, cross-examine witnesses and require the attendance of any witnesses who are city employees.

5. At the conclusion of the hearing the hearing officer shall render a written decision which shall state the facts found to be true and the decision of the hearing officer based upon those facts.

6. Officers who have reached permanent status may appeal a decision of the hearing officer in matters set out in Section A, 4 and 5 hereof, to the Office of the City Manager within ten (10) working days of receipt of the decision. Such appeal will consist solely of a review of the written record and/or audio tapes developed at prior steps of the appeal. The City Manager or representative shall issue findings within 30 working days of receipt of the full and entire appeal package.

C. Denial of Promotion on Grounds Other Than Merit - Any officer denied promotion on grounds other than merit may appeal such denial as set out herein. The appeal request shall state the grounds other than merit by way of factual allegations. At the conclusion of the hearing, one of the following decisions may be reached:

1. The grounds specified in the appeal are sufficiently job related to constitute grounds based on merit;

2. The allegations in the appeal are not supported by the evidence;

3. The grounds specified in the appeal are supported by the evidence and are not job related, in which case the decision of non-promotion will be adjusted to place the aggrieved employee in the next available opening in the classification or to reverse the original promotional decision if feasible.

A denial of an appeal under this section is appealable to the Office of the City Manager in the manner set out in this Article.

D. Other Negative Material - Any officer who has material negative to his/her employment relationship or a satisfactory performance evaluation containing negative comments placed in his/her personnel file may appeal the placement of such material to a ranking officer of not less than the rank of Captain.

   1. For the purposes of this section and this article, Personnel file shall mean any file or repository of material kept for the purpose of making employment related decisions concerning an officer.

VI. Other Policies, Practices and Procedures

A. During the term of this agreement, no policies, practices or procedures of the City or the Police Department which affect wages, hours or working conditions and which specifically affect investigations, or the procedures for conducting appeals and hearings shall be changed in any way without the agreement of the parties.

B. During the term of this agreement, the City agrees not to implement or adopt any changes in policy or procedure which adversely affects or diminishes the procedural or substantive rights of officers contained in this article, the Personnel Manual, the Charter of the City of San Diego, any applicable state or federal law, or the Constitutions of the State of California or the United States except by mutual agreement of the parties.

Furthermore, the City agrees not to meet and confer over any proposed changes to the above-described rights during the term of this agreement except by mutual agreement of the parties.

VII. Miscellaneous Provisions.

A. Conformity with Bill of Rights - All provisions of this article are to be read to expand and/or complement rights which officers enjoy under the Public Safety Officer Procedural Bill of Rights. The parties hereto do not intend to limit or reduce those statutory rights in any way.

B. Personnel Files - Any employee who has any material adverse to his/her employment relationship placed in a personnel file shall be allowed to file a complete written response to the material within 30 days of being notified of its placement in the file. The Police Department will notify an individual of the placement of such material in the file by certified mail within 30 days of its placement. Should there be a failure to notify, the material will be considered void and removed from the personnel file. The rights to protection of the personnel file established herein shall survive the termination of the employee should such material be placed into the file without the knowledge of the employee or after his/her termination.

0120

C.  Upon separation of a probationary officer who is terminated for less than satisfactory performance or failure to meet employment standards, the City will release to any person or entity seeking information only the name of the officer, the dates of employment, classification and "failed probation". The only exception will be proper process of the court and a waiver signed by the affected employee. Such separation will not be considered disciplinary in nature.

D.  Formal reprimands without further penalty more than two (2) years old, and those with additional penalty more than five (5) years old, will not be considered for purposes of promotion, transfer, special assignments and disciplinary actions except as to disciplinary actions, when such reprimands show patterns of specific similar police misconduct as defined in the Departmental Rules and Regulations and Department Instructions. All officers shall have the right to review their Departmental and Divisional Personnel Jackets and identify all such documents. Upon concurrence of the commanding officer that such documents have been appropriately identified, they will be placed in an envelope, sealed and initialed by the officer. The envelope will be placed in the officer's Department personnel file and will be opened only in the event the officer is in the future subject to discipline.

E.  Upon the adoption of this article, the appropriate provisions of policies, practices and procedures of the City and/or Police Department shall be amended to conform herewith. However, should there be a failure to so amend or should any such policies, practices or procedures conflict with the provisions of this article, this article shall prevail.

NOTE: The City and POA agree to negotiate in good faith modifications to the Police Department Discipline Procedures. Therefore, this article is exempt from any and all "zipper clauses" in this M.O.U. that would otherwise preclude meeting and conferring on changes to articles in this agreement.

## ARTICLE 42

### COPIES OF THE AGREEMENT

The Association may obtain copies of this agreement from the City by reimbursing the City for their cost.

## ARTICLE 43

### SENIORITY

A.  Seniority: Seniority shall be computed according to the length of last continuous service in the class or subdivision thereof, or an equal or higher ranking class. Ties shall be broken by first considering the length of total City service, and then at the discretion of the appointing authority.

0121

B. Job Rights: Subject to the provisions of Rules VI and IX, a permanent employee whose layoff is imminent shall have the right of transfer to any vacant position in the same class or subdivision thereof in any other department. If there is no such vacancy, said employee shall have the right of competition for retention in equal and the next successively lower classes in which he or she has served satisfactorily.

## ARTICLE 44

## RETIREMENT

1. The City agrees that it will apply an amount that is approximately equal to 7.3% of the base salary of employees in the Unit represented by P.O.A. into the City Retirement System, thereby reducing the amount deducted from employees' paychecks as the employees' retirement contribution by that amount. Effective July 5, 2002, this pickup was increased from 7.3% to 9%. Effective July 5, 2003, this pickup is increased from 9% to 10%. These increases to remain in effect until the Employee Contribution Reserve is exhausted. The employee, upon termination, will have no vested right in the amount so contributed by the City. Substitution of this portion of the employees' contribution by a City payment will not decrease the total amount applied towards the required retirement contribution, and will not affect retirement benefits. Provided, however, such payment shall not exceed any employee's total contribution to the system.

2. Federal law mandates that all employees be covered by a qualified retirement plan or by Social Security effective July 1, 1991. This impacts the classification of Police Recruit since they do not participate in any retirement system while in the Academy. Due to this mandate, it is agreed for the classification of Police Recruit that participation in a version of the Supplemental Pension Savings Plan is mandatory until becoming sworn and being enrolled in the City Retirement System.

3. 1981 Pension Plan: Effective July 1, 1991, for the purpose of benefit calculation only, 1981 Plan service will be made equivalent to CERS service.

4. C.O.L.A.: Effective July 1, 1992, and thereafter, the COLA for individuals who retired prior to October 6, 1980, will be increased from 1.5% to 2.0%.

5. IRS 414(H)(2)

   Beginning July 1, 1993, the City agrees to implement IRS Section 414(H)(2) for all members in the unit, allowing employee contributions to the Retirement system to be made pre-tax, contingent upon "safe harbor" limitations not being exceeded.

0122

6.    1997 Benefit Changes

The City and POA, having met and conferred, have agreed to benefit improve-
ments to the City Employees Retirement System, The City Council has
approved these changes by adoption of Ordinance No. O-18383 Adopted
February 25, 1997 and Ordinance No. O-18392 Adopted March 31, 1997;
subsequently the improvements were approved by a majority vote of System
Members in April 1997. Those changes include the following:

A.    Effective August 1, 1997, a Post Retirement Health Benefit is established
for Health Eligible Retirees and Non Health Eligible Retirees. A Health
Eligible Retiree is any retired Member who: (1) was on the active payroll
of the City of San Diego on or after October 5, 1980; and (2) retired on or
after October 6, 1980, and (3) is eligible for and is receiving a retirement
allowance from the Retirement System.

Health Eligible Retirees may choose to participate in a City sponsored
health insurance plan or any other health insurance plan of their choice.
The Retirement System will pay or reimburse the applicable Medicare-
eligible or non-Medicare eligible retiree-only premium up to but not to
exceed the cost of the retiree-only premium for the highest cost HMO plan
which is also a City sponsored health insurance plan made available to
Health Eligible Retirees. (Currently this is the Blue Cross California Care
health insurance plan.)

Additionally, the Retirement System will reimburse the Part B
Supplemental Medical Expense Premium for those Health Eligible
Retirees enrolled in Medicare.

Effective August 1, 1997, the "sliding scale" health benefit with a $2,000
cap is eliminated and replaced with the Post Retirement Health Benefit for
Health Eligible Retirees.

The City agrees that it will not diminish the benefits contained in its
current retiree HMO plans without mutual agreement with the exclusive
bargaining representatives; nor convert to a blended premium for active
employees and retirees without mutual agreement with the exclusive
bargaining representatives.

B.    The Disability Income Offset provision is eliminated. There will be no
reduction retirement benefits if the retiree has other income.

C.    A five year purchase of service credit provision is established effective
January 1, 1997. Under this provision, the Member may purchase up
to five years of service credit by paying both employee and employer
contributions in an amount and manner determined by the San Diego
City Employees Retirement System Board to make the System whole
for such time. In addition, members retiring on or after January 1,1997,
may purchase probationary periods, military and veterans code leaves,
waiting periods for the 1981 Pension Plan, actual time worked hourly or

56

part time, special leaves without pay occurring prior to January 1, 1997, the difference in time between part time and full time prior to January 1, 1997, long term disability, vocational rehabilitation maintenance (VRMA) and temporary total disability (TTD), FMLA periods, special leaves of absence with job to be saved periods and any preceding reinstatement by the Civil Service Commission following a termination appeal.

D.  A Deferred Retirement Option Plan (DROP) is established effective April 1, 1997. DROP provides an alternative form of benefit accrual while allowing a Member to continue working for the City. During the DROP period, a DROP Member retains all rights, privileges and benefits of being an active City employee, except as specifically modified in the DROP Plan Document, and is subject to the same terms and conditions of employment including disciplinary actions up to and including termination. The Member continues to be eligible for the active employee Flex Benefits Program for the classification and is not eligible for "retiree" health benefits until such time as the Member completes or terminates the DROP period. Under DROP, a monthly service retirement allowance along with any COLA increases, Supplemental Benefit checks and any adjustments to such payments applicable to retirements effective on the date the Member entered the DROP are deposited into a trust account. These SDCERS benefits are calculated as if the Member were retiring on the date the Member enters the DROP. The Member's contributions to the Retirement System cease. The Member and the City each contribute 3.05% of the Member's salary each pay period that the Member participates in the DROP. The Member's contribution is made on a pre-tax basis pursuant to Internal Revenue Code Section 414(h)(2). These monies are placed in a trust account and are distributed to the DROP participant upon termination of employment or completion of the DROP period whichever occurs first. No withdrawals may be made from the DROP account until the Member completes or terminates his or her DROP period. Interest will be credited to the Member's DROP account in the same manner and at the same rate that interest is credited to employee CERS accounts. The Member is 100% vested in the DROP from its inception.

A DROP participant who becomes disabled may apply for conversion of their deferred retirement allowance to a disability allowance calculated at the date of entry into the DROP, and the employee shall retain all of the DROP and matching contributions. A Member who participates in DROP irrevocably designates a specific consecutive period of months for participation, not to exceed sixty months. The Member must terminate City service at the end of the designated period.

At the completion of the DROP period, the DROP account will be distributed as a lump sum, or in any other manner permitted by the IRS as soon as those options are developed by the Retirement Administration.

0124

E. For retirements effective on or after January 1, 1997, the 50% continuance is available to the spouse to whom the Member was married on the date of retirement. The requirement that the member be married to his or her spouse at least one year prior to retirement for the spouse to receive the 50% continuance is eliminated.

F. The surviving spouse of a Member who is killed while in the performance of duty is entitled to continued health coverage as provided in California Labor Code Section 4856.

G. The modified special death benefit provided to the surviving spouse of a Member killed in the line of duty is amended to eliminate the requirement that the benefit be discontinued if the spouse remarries. Any benefit terminated to such spouse as a result of remarriage shall be reinstated effective January 1, 1997.

7.  A retirement allowance cap of 90% of Final Compensation (high one year salary) is established for Police Safety Members.

8.  2000 Retirement Benefit Changes

The City and the POA, having met and conferred, and having participated in the settlement of a class action lawsuit challenging the calculation of "compensation earnable" have agreed to benefit changes to SDCERS. The benefit changes resulting from this class action settlement were approved by the SDCERS active and retired membership in June, 2000.

A.  Formula Change For Calculation of SDCERS Monthly Retirement Benefit

The Retirement Calculation Factor to be applied to the Police Safety Member's high one year salary at specified ages may be increased from the current levels to those shown below for all retirements effective on or after July 1, 2000 if the Police Safety Member selects this option.

| Retirement Age | Retirement Calculation Factor effective 1/01/97-6/30/00 [Current] | Retirement Calculation Factor effective 7/01/00 [New] |
|---|---|---|
| 50 | 2.50% | 3.00% |
| 51 | 2.60% | 3.00% |
| 52 | 2.70% | 3.00% |
| 53 | 2.80% | 3.00% |
| 54 | 2.90% | 3.00% |
| 55+ | 2.99% | 3.00% |

Member Option: Pursuant to the class action settlement, a Police Safety Member may choose, upon application for retirement, one of the following two options:

58

(1)  The Retirement Calculation Factor in effect on July 1, 2000 with no change in the Police Safety Member's Final Compensation OR

(2)  A ten percent (10%) increase in the Police Safety Member's Final Compensation, with the Police Safety Member's Unmodified Service Retirement Allowance calculated using the Retirement Calculation Factor in effect on June 30, 2000.

This election must be made with SDCERS at the time of application for retirement.

B.  Police Safety Member's SDCERS Contribution Rate Change

(1)  On July 1, 2001, Police Safety Members' contribution rates to SDCERS will be increased by 0.53%.

(2)  Effective July 1, 2000, Police Safety Members' Contribution rates will increase by an additional 0.16% to pay for the cost of providing the choice of Retirement Calculation Factors described above. The additional 0.16% increase will be paid from the Employee Benefit Reserve described in SDMC Section 24.1507 until the Reserve is exhausted.

C.  Eligibility for Industrial Disability Retirement Change

A Police Safety Member may be eligible for an industrial disability retirement if it has been medically determined that the Police Safety Member has become psychologically or mentally incapable of performing his or her normal and customary duties as a result of a violent attack on the member with deadly force, such as a shooting or stabbing that causes great bodily injury, and that resulted in a nervous or mental disorder. The violent attack must occur on or after July 1, 2000, and such application for industrial disability retirement must be submitted before July 1, 2005. This provision shall sunset on June 30, 2005, and no such applications may be made after that date.

9.  Health Eligible Retiree Benefits

The City and POA, having met and conferred, have agreed to benefit improvements to the City Employees Retirement System for Health Eligible Retirees.

1.  Effective July 1, 2002, a Health Eligible Retiree, as defined in the Municipal Code, will have the applicable Medicare eligible or Non-Medicare eligible insurance premiums paid for the Health Eligible Retiree-only insurance, or the Health Eligible Retiree will be reimbursed the actual cost incurred from the Medicare eligible or non-Medicare eligible retiree-only premium up to the maximum amount allowed in the Municipal Code Division 12. Municipal Code Division 12 will be amended to set the maximum amounts to be paid on behalf of or reimbursed to a Health Eligible Retiree for retiree-only Medicare eligible or

non-Medicare eligible health insurance premiums based on the premium for the City-sponsored PPO plan for Fiscal Year (FY) 2003 and annually adjusted thereafter based on the Centers for Medicare & Medicaid Services, Office of the Actuary, projected increase for National Health Expenditures for the full year period ending in the January preceding the start of the new plan year; such adjustment shall not exceed 10% of such Medicare-eligible or non-Medicare eligible retiree-only premium. Pursuant to this provision the based monthly maximums are established for FY 2003 as follows:

a) For non-Medicare eligible retirees: $489.16
b) For Medicare eligible retirees: $460.67

## 10. 2003 Retirement Changes

Effective July 1, 2003, the City and the POA agree to participate in a joint study of possible revisions to the standard for an Industrial Disability Retirement including the relationship to standards applicable to PERS and the County Retirement Act. The studies shall, if possible, include representatives from other safety groups.

Effective July 1, 2003, the City agrees to meet statutory subrogation provisions as a pilot program for the term of the agreement.

Effective July 1, 2003, the City agrees to amend the Municipal Code to provide Safety Member retirement status for Police Recruits on day one of the police academy.

On or before January 1, 2004, the POA shall have the right to notice the City in writing of the intent to implement a medical expense reimbursement plan to provide a tax-favored benefit to retirees in accordance with the Plan's Trust document. The POA notice shall specify the proposed date of implementation, which shall be no later than January 1, 2005. The notice shall include a copy of the trust document and other pertinent operational documents that are sufficient for the City to determine compliance with IRS regulations. It is understood that the trust shall be established, governed and administered by the trust and POA. The City shall not be responsible for the trust and appropriate hold harmless and indemnity provisions shall be endorsed by the POA prior to implementation. All costs associated with the formation and administration of the trust shall be borne by the POA or trust as appropriate by IRS regulations. Once the City has approved the trust, the City agrees to implement payroll withholding from all employees in the bargaining unit in an amount designated by the trust and approved by the POA for deposit to the trust. The POA will not authorize payroll withholding from employees on a unit wide mandatory basis that has not been approved by the POA membership in the bargaining unit covered by this contract. Membership approval shall be determined by a majority of ballots cast following the notice of election.

0127

## ARTICLE 45

## LONG TERM DISABILITY PLAN

A.  The City will continue to offer a Long Term Disability Income Plan to eligible members of the Police Unit. This Article generally describes the benefits available under this Plan. Specific provisions are set forth in the Plan on file with the City Clerk. To apply for this benefit employees must be disabled (unable to work as a result of injury, accident, illness or pregnancy), subject to medical disablement certification. Benefits do not start for 30 calendar days from the date of disability and continue for the next 12 months. The benefit is 70% of basic biweekly earnings, less all other income benefits while totally disabled. To qualify for benefits you must file a claim on an approved form available from the Risk Management Department or the Police Personnel Office. The claim must be submitted within 60 days of disability date, or within 60 days of the date an employee is first aware of the disabling condition. If a claim is denied, the employee may appeal the decision to the City Manager or his designee within 10 working days.

This Article is not a complete description of the Plan and is intended only to supplement the Plan Document on file with the City Clerk and Risk Management Department.

B.  The City agrees to meet and confer with the P.O.A. prior to making any changes in this Plan.

C.  The City and P.O.A. agree to establish a *committee to discuss the administration* and implementation of this Plan. This committee will consist of three representatives of the P.O.A. and a representative of the City Manager, the Police Chief, and the Risk Management Director. The P.O.A. may present individual cases for review by the committee and the Risk Management Department may present the reasons for denial of claims in these cases. The committee will review the case and present an advisory recommendation to the City Manager. The decision of the City Manager will be final.

D.  Add a new section to Article V, Benefits, as follows:

Right of Recovery and Reimbursement. The City of San Diego has the right to recovery and subrogate from and against Third Parties or persons, as well as their agents or insurers, any payments made by the plan.

This additional language should help to clarify the existing procedures for subrogating third party claims.

E.  Amend Article II, Section 2.05, Eligible Employee, to read as follows:

All other employees will join the plan twelve (12) consecutive months after *they first become eligible employees. The twelve (12) month eligibility waiting* period need only be satisfied once. It must be repeated only in the event of termination of employment relationship and subsequent rehire.

0128

F.  Amend Article III, Section 3.01, Participation, to read as follows:

Or leave of absence is due to Total Disability as defined in Section 4.01. If participation ceases as a result of a leave of absence, eligibility will begin again upon return to work. There is no requirement for repeating the twelve (12) month eligibility.

These changes would eliminate the current requirement for employees to serve a second one-year eligibility period following a leave of absence.

G.  Add a definition under Article II, Definitions, as follows:

Third Party means any person or organization who causes illness or injury to any participant who is covered under a City sponsored health or dental plan or this plan and/or any of the Third Party's insurers including liability, homeowners and auto insurance contracts.

H.  Add to Article III, 3.01:

Participation shall cease upon the effective date of retirement.

Changes effective July 1, 1994

For claims filed based on a disability which arises on or after July 1, 1994, the City will implement the following changes in the LTD plan. The actual provisions of the Plan Document should be consulted for detailed language, and additional changes, related to mental or nervous disorders.

- The Plan will not pay benefits to any employee whose disability was caused by his or her employment with the City of San Diego.

- Participation in the Plan shall cease upon the effective date of retirement.

- The parties agree to study the feasibility of the City contracting with a private provider of Long Term Disability benefits.

FLEXIBLE BENEFITS

- The City will pay the Participant's flexible benefits for a maximum of one year while on Long Term Disability and thereafter will refer the employee to COBRA for extension of appropriate coverages.

- The City shall pay the Participant's flexible benefits while the Participant is receiving Long Term Disability benefits even if the LTD benefit is 100% offset by other income benefits.

- Participants who are in a Long Term Disability status during the City's annual open enrollment for its Flexible Benefits Plan shall be enrolled in Flexible Benefits as required during open enrollment. Participants shall

62                                                    POLICE OFFICERS ASSOCIATION

0129

keep their current health and life insurance coverage, while receiving
Long Term Disability. Participants will he allowed to change health care
plans provided the health care plans so stipulate.

Changes effective July 1, 1996

The parties agree to jointly study alternative approaches to providing Long
Term Disability as a tax-free benefit with an intent to provide the same
level of benefit at no additional cost to the City.

### ARTICLE 46

### CONTINUATION OF WAGES, HOURS AND FRINGE BENEFITS

A. The provisions of this agreement, together with those provisions of wages,
hours and working conditions subject to meet and confer currently in existence
and not changed by this agreement shall not be revised to adversely affect the
employees in this unit during the term of this agreement.

The parties agree to meet and confer during the term of this agreement on the
following subjects, if the City provides notice of its desire to do so:

Policy on Take Home Vehicles

The POA understands that the City's inclusion of the Take-Home Vehicle
Policy as a subject of meet and confer is not intended by the City to be
a waiver of any rights the City may have to determine such assignments
outside the formal meet and confer process.

POA agrees that, should the City introduce a proposal to amend the City
Charter in a manner that would change the reporting relationship of
the Personnel Director from the Civil Service Commission to the City
Manager, that POA will promptly meet and confer, at any time during the
term of this agreement, regarding any aspects of that proposal that would
effect wages, hour and terms and conditions of employment.

POA further agrees that should the City introduce a proposal to amend the
City Charter in a manner that would permit the City to privatize functions
which are currently performed by City employees, that POA will promptly
meet and confer, at any time during the term of this agreement, regarding
any aspects of that proposal that would effect wages, hours and terms and
conditions of employment.

B. Any claim of a violation of this provision shall be pursued solely through the
grievance procedure.

C. Nothing herein shall affect or impair the rights, if any, of the City or
Association granted pursuant to Section 3504.5 of the California Government
Code.

0130

D. This Article shall not apply to any policy, procedure or practice established by a member of the unit which was not approved by a superior authority. Those policies, procedures and practices established by a member of the unit and known by an unclassified police manager shall be deemed to be approved.

E. The parties acknowledge that this Article in no way diminishes the exercise of management rights as provided for in Article 9.

F. Paragraph A of this Article shall not apply to any enactment of any Police Review Board or Commission. However, the policies and procedures of this Board or Commission shall be subject to meet and confer to the extent required by the Meyers-Milias-Brown Act.

## ARTICLE 47

## PROBATION PERIOD

All new employees will be subject to a 12-month probation period which shall commence upon appointment as a sworn member of the Police Department.

## ARTICLE 48

## DETECTIVES

All members of the Police unit in the classifications of Police Officer II, and Police Sergeant, assigned to positions as Detective, as designated by the Police Chief, shall receive an additional 5% of their base rate, effective July 1, 2003.

Any of the above classifications assigned to the Juvenile Intervention Unit (not including the School Task Force) shall be eligible to receive detective pay at 5% of their base rate, effective July 1, 2003.

Effective July 1, 2003, the POA and the City agree to jointly submit a proposal to the Civil Service Commission to create a Detective classification. It is agreed that the proposal for a new Detective class will be created for the types of positions currently filled by the incumbents in the Police Officer II classification on a detective assignment.

Effective July 1, 2003, Detectives will work a 4 day, 10 hour per day work schedule, which will include a half-hour paid lunch.

## ARTICLE 49

## TRANSPORTATION INCENTIVES

A. Employees who utilize the Concourse Parkade and pay on a monthly basis will be charged 50% of the prevailing general public monthly rate. Participation in this program is limited, and available on a first-come first serve basis.

64                                    POLICE OFFICERS ASSOCIATION

0131

## ARTICLE 52

## REASONABLE NOTICE

Section 1.

Reasonable written notice shall be given to the P.O.A. if affected by any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the City Council, Retirement Board, or by the Civil Service Commission or by department heads and assistant department heads, and the P.O.A. shall be given the opportunity to meet with such body or person prior to adoption.

Section 2.

In cases of emergency pursuant to the City Charter, when the City determines that an ordinance, rule, resolution, or regulation must be adopted immediately without prior notice or meeting with the P.O.A., the City Council or the Board or Commission of the City shall provide such notice and the opportunity to meet at the earliest practicable time following the adoption of such ordinance, rule, resolution, or regulation.

## ARTICLE 53

## POLICE OFFICER III

Effective July 1, 2003, the POA and the City agree to jointly submit a proposal by July 1, 2003 to the Civil Service Commission to create a Police Officer III and a Detective classification.

The parties propose that the Police Officer III classification be created as a lead classification and will perform higher level duties, not already encompassed in the Police Officer II classification, such as acting as the lead in:

- Crime analyses

- Writing search warrants

- Schedule training for the entire command

- Crime Scene preservation

- Critical incident management

- Mentoring less senior staff

It is agreed that all duties currently being performed by Police Officer I, and Police Officer II classes such as crime analyses; writing search warrants; crime preservation; and mentoring less senior staff will continue to be appropriate duties for these classifications.

66

0132

It is agreed that once created the Police Officer III classification will be assigned to positions in patrol and specialized assignments identified by management.

## ARTICLE 54

## CONDUCT OF ELECTIONS

The parties hereto agree that the Association may make use of intra-departmental mail systems/mail slots, from time to time, to conduct Association elections and/or votes on issues among its members. There shall be no interference with the conduct of this Association business by management of the Police Department or the City.

## ARTICLE 55

## SWAT PAY

Effective July 1, 2003, employees in the classifications of Police Officer II, Police Agent, Police Sergeant, and Police Lieutenant assigned to the Special Weapons and Tactics unit (SWAT) shall receive an additional 3.5% of employee's base pay.

In addition, SWAT officers that are members of the Special Response Team (SRT) shall receive an additional 3.5% of employee base pay, Snipers will also be eligible to receive this pay.

## ARTICLE 56

## CORE INSTRUCTOR PAY

All Core Instructors assigned to the Training Development Division shall receive special assignment pay which is equal in salary range to Police Sergeant. All employees would retain their current pay step in the higher salary range and would be eligible for merit increases at their normal review dates. Further, all Core Instructors would continue to be eligible to receive the Training pay differential.

## ARTICLE 57

## DRUG AND ALCOHOL SCREENING

Effective July 1, 1991, it is mutually agreed that random drug/alcohol testing program shall be implemented to include all sworn personnel.

I.   Procedures

    A.   The Police Personnel Director will administer the Drug Screening Program.

    B.   All officers will be tested twice every 18 months through the provision of a urine sample which will be screened for the presence of specific drugs.

0133

C. The drug screening shall be conducted to detect only the following drug groups:

    1. Amphetamines/Methamphetamines (e.g. Speed, Crystal)

    2. Benzodiazepines (e.g. Valium, Librium, Oxazepam, Serax, Dalmane, Ativan)

    3. Barbiturates (e.g. Amobarbital, Butabarbital, Pentobarbital, Phenobarbital, Secobarbital)

    4. Cocaine

    5. Methadone

    6. Ethanol

    7. Opiates (e.g. Codeine, Heroin, Morphine)

    8. Phencyclidine (PCP)

    9. THC (Marijuana)

    10. Hallucinogenics (e.g. LSD)

D. Officers will be assigned a confidential number for testing purposes. Numbers will be selected on a random basis, using a secured computer program.

E. Officers may provide appropriate documentation of legally prescribed drugs. Such documentation shall be included in the review of test results.

II. Sample Collection

A. Medical Contractor's personnel will be responsible for obtaining the urine sample from the officer being tested.

B. Medical Contractor's personnel will be available for test processing between 0800 and 0200 hours, 5 days a week, to allow officers to be tested during normal work hours. (Hours vary at some Medical Contractor locations.)

C. Medical Contractor's personnel will not observe as the sample is being given.

D. Officers to be tested will be notified at the start of their shift. They will present themselves for testing at the earliest possible time during the shift, and no later than 4 hours after being notified that they are to be tested. Refusals or failures to complete the test as required will be referred by the Police Personnel Director to the Command for investigation and

0134

appropriate discipline up to and including termination. Officers who fail to appear for testing will be scheduled to test their next working day.

E.  At the Medical Contractor's site, the officer being tested will:

 1.  Identify himself/herself by presenting his/her S.D.P.D. identification or California driver's license.

 2.  Complete requested paperwork.

 3.  Remove jackets, bags or other bulky items of clothing prior to entering the testing area.

 4.  Provide a urine sample.

  a.  Officers will be required to stay within the Medical Contractor's facility until the required sample is given.

  b.  Sample must be at least 45 ml, the minimum amount required for testing purposes.

F.  At the Medical Contractor's site, the Medical Assistant (MA) will:

 1.  a.  Have the officer wash his/her hands and provide him/her with a pair of gloves. Washing hands and wearing gloves is required when providing the specimen. Failure or refusal to do so will be documented by the MA.

  b.  Direct the officer being tested to a private lavatory.

 2.  Assure that the lavatory is secured in accordance with established City procedures.

 3.  Wait outside of the lavatory for the sample.

 4.  Upon receipt of the urine sample, and in the presence of the officer, the MA will:

  a.  Split the sample into two unused separate containers which will be referred to as test sample and control sample.

  b.  Seal the containers.

 5.  Complete the appropriate chain-of-custody forms for the samples.

 6.  Refrigerate both the test sample and control sample until picked up by the laboratory courier.

0135

III. Screening Procedure

A.  The initial screening of all collected samples will generally be conducted within 48 hours of receipt by a City designated Laboratory certified by the Substance Abuse and Mental Health Services Administration (S.A.M.H.S.A.).

B.  Initial screening of urine samples will be conducted using a testing methodology based primarily upon an "Enzyme Immunoassay" or other testing methodology of equivalent quality and acceptability.

C.  If a confirmation test is conducted, it will be conducted by Gas Chromatography/Mass Spectrometry (GC/MS) testing or other testing methodology of equivalent quality and acceptability.

D.  Upon receipt of a sample for testing, the designated Laboratory will:

1.  Check the container to ensure it is not damaged, and that the seal is intact.

2.  Complete the appropriate "chain-of-custody" forms for the sample.

3.  Conduct the initial testing of the sample using an "Enzyme Immuno-assay" technique or other testing methodology of equivalent quality and acceptability.

4.  If the sample tests "negative", all urine samples will be discarded.

5.  If the sample tests "positive", a confirmation test will be performed for the specific drug(s) found in the sample during the initial test.

6.  If the confirmation test confirms the presence of drugs, any remainder of the test sample and the entire control sample will be retained in a locked freezer for a minimum of one year.

7.  If the confirmation test is "negative", the whole test will be considered negative.

E.  Alcohol Test

1.  The standard for alcohol testing will be the converted urinalysis equivalent of a blood alcohol level of 0.02 percent.

2.  An alcohol testing level of 0.02 percent will be treated as a "positive" result. Any measurable amount of alcohol shall be cause for mandatory referral of the officer to the City's Employee Assistance Program.

POLICE OFFICERS ASSOCIATION

136

IV. Reporting Test Results

    A.  Test results will be provided to the City Personnel Department's Random Drug Testing Coordinator by the Medical Contractor.

    B.  The officer will be notified of his/her test results in writing without delay.

    C.  If test results are positive, the Assistant Chief of Professional Responsibility will be notified, and will be responsible for initiating an investigation.

V. Independent Testing

    A.  If the test results are positive, the affected officer shall have the right to require independent testing of the control sample. That request must be made to the Assistant Chief of Professional Responsibility by the officer within thirty (30) calendar days of receipt of the notice of drug test results indicating that the officer's drug test was positive and a representative from the department is being contacted. The right of the officer to independent testing of the control sample shall include:

        1.  The right to designate the laboratory, which must be a S.A.M.H.S.A. certified laboratory.

        2.  The right to designate the type of test to be conducted in order to identify substances that will cause a positive finding for the test sample.

        3.  The designation of the test to be performed shall be communicated by the affected officer directly to the laboratory selected and shall be a confidential communication protected by the expert consultant privilege which shall extend to all communications between or on behalf of the affected officer and the independent test laboratory and its personnel. The privilege is waived if V.B is applicable.

    B.  If in any proceedings involving an appeal from a notice of adverse action based upon a positive drug test sample, the employee intends to challenge the accuracy of the results of the test sample or intends to introduce in evidence, whether during direct examination, cross-examination, or rebuttal, any evidence whether testimonial or documentary which results from the affected officer's demand for independent testing, the affected officer shall, without delay, and prior to any appeal hearing, including the Skelly meeting, furnish to the Department a copy of all reports setting forth a result of the testing of the control sample. If the reports are not provided prior to the Skelly meeting, the reports may not be used in any future appeal hearing.

0137

C.  If testing is done to confirm the presence of the drug(s) identified in the original test, it shall be done in accordance with SAMHSA's Mandatory Guidelines regarding Retesting of a Specimen, wherein quantitation for a retest is not subject to a specific cut-off requirement but must provide data sufficient to confirm the presence of the drug or metabolite.

D.  The officer and his/her representative shall make all necessary arrangements for transport and preservation of the control sample to the independent testing laboratory designated by the affected officer. He/she shall first inform the City's Random Drug Testing Coordinator, who in turn will initially contact the City's Laboratory to provide for release of the sample to the officer's courier.

E.  All costs associated with independent testing shall be borne by the officer.

VI.  Program Records

A.  All drug testing information relating to individual officers is strictly confidential.

B.  All records related to the program shall be maintained as directed by the Police Personnel Director.

VII. Use of Test Results

The Random Drug Screening Program shall be considered an administrative matter, and the results of this test shall not be used in any criminal action. However, if additional information is available through other means to support criminal action against an employee, the Department shall not be precluded from taking further action.

## ARTICLE 58

## CATASTROPHIC LEAVE PLAN

### PURPOSE

Establish a City of San Diego administered Catastrophic Leave Bank permitting City employees to assist other City employees who face extended leaves without pay due to a catastrophic occurrence in their lives. For the purpose of this plan, a catastrophic occurrence is defined as any event that would qualify the employee under the Family Medical Leave Act as determined by the City Manager. Catastrophic Leave determinations are non-grievable.

### PROCEDURES

A.  1.  The employee must have exhausted or expect to exhaust his/her accrued leave (to be verified by the department payroll specialist), as a result of a qualifying event in order to establish a leave bank.

72                                          POLICE OFFICERS ASSOCIATION

0138

If an employee is diagnosed as terminally ill, a leave bank may be established without meeting this requirement. In such cases, the donated leave will be paid out at termination. A recipient's total annual leave balance including donated leave cannot exceed 2080 hours.

   2.  The employee has received approval for an unpaid leave of absence from his/her Department Head.

B.  Requests to establish a Catastrophic Leave Bank for receipt of donations will be processed by the City Manager's Office.

   1.  An eligible employee will submit a completed "Request to Establish Catastrophic Leave Bank" form to the Labor Relations Manager, accompanied by:

      a.  A medical statement from the attending physician, including a brief statement of the nature of the illness or injury and an estimated time the employee will be unable to work, or other appropriate documentation supporting the request.

      b.  Evidence of the Department Head's approval of leave of absence.

C.  Donations of annual leave may be made to an employee eligible for catastrophic leave. The Donor Department will be billed for the dollar amount of the Donor's Annual Leave donation.

   1.  Donations of leave will be strictly voluntary; the identity of leave donors will be held in absolute confidence.

   2.  Employees may only donate accrued annual leave.

   3.  Donations may be made in whole hour increments. There is no tax benefit to the donor.

   4.  Donors must have an overall annual leave balance of 160 hours remaining after donated time has been deducted.

   5.  Once donated to an individual, donated leave cannot be reclaimed by the donor.

   6.  Employees wishing to donate time shall complete a "Confidential Authorization for Catastrophic Leave Donation" form and submit to their Department Payroll Specialist who will:

      a.  verify that donating employee has the minimum required leave balance (160 hours),

      b.  convert the donated time to dollars at the hourly rate of the donor and subtract from designated leave category, and

0139

    c.  forward to the Labor Relations Manager for tracking and submission to the Auditor-Comptroller.

        Donation authorization forms which do not contain all requested information shall not be processed.

D.  Upon receipt of donation authorizations, the Auditor-Comptroller shall take the following action:

    1.  Convert donated dollars as computed above to hours at the hourly rate of the recipient, and add to recipient's annual leave balance. Recipient will be taxed for the leave when taken.

    2.  Retain a confidential file of donation authorizations.

    3.  All deductions (e.g. health premiums, parking, credit union, union dues, etc.) which have previously been authorized by the recipient will be made unless notified in writing by the recipient to cancel deductions.

E.  Donated time is treated as annual leave accrued by the recipient of the donation. Payments up to 80 hours per pay period will be made to the recipient until the donated leave has been exhausted.

    1.  *Donated time does not alter the employment rights of the City or the recipient, nor extend or alter limitations otherwise applicable to Leaves of Absence or Annual Leave, except as noted in this Article.*

    2.  Employees who are utilizing donated annual leave hours will continue to accrue annual leave in accordance with Personnel Manual Section I-2, Annual Leave.

## ARTICLE 59

### SIDE LETTERS

Effective July 1, 1994, all side letters not represented by the current Memorandum of Understanding expire. The current M.O.U. as printed will represent all M.O.U. agreements between POA and the City.

## ARTICLE 60

### F.I.T. PROGRAM

The parties agree that the FIT Program will be modified as follows:

1)  A central component and goal of the FIT Program will be the development of a "FIT Plan" for each participating officer. The FIT plan will be developed by the FIT Core Instructor after a consultation with and assessment of each participating officer and their job duties.

0140

2) The activities and circumstances listed in Sections A and B below will not normally be included within the scope of the FIT program, and therefore any off-duty injury resulting from these activities and/or under these circumstances would not normally be covered under City Workers' Compensation programs.

However, if as a result of the job task analysis conducted by the FIT Core Instructor it is determined that an activity in Section A is critically linked and/or appropriate to the physical demands of a particular job, and is included in an employee's FIT Plan, the otherwise excluded activity may be considered within the scope of the FIT program for that employee and any injuries resulting from this activity may be covered by City Workers' Compensation programs. Absent a FIT Plan, under no circumstances would an activity or situation in Section A be considered within the scope of the FIT program.

Under no circumstances would a physical activity and/or situations listed under Section B below be properly considered within the scope of the FIT program and covered under City Workers' Compensation programs.

3) The lists below are not intended to be comprehensive and exclusive of all other activities. There may be additional exercise activities which involve extraordinary risk and strain, and which are inconsistent with the FIT program objectives of general physical fitness and cardiovascular health through a program of traditional, low risk, structured exercise, that would be properly considered in the A or B categories below and subject to the attendant conditions.

The traditional, low-risk, structured exercise activities which are intended to be the foundation of the FIT Program include those listed in Category C below. Injuries associated with these exercise activities, unless medically excluded, would be presumptively assumed to be job related.

A]
- Ocean Swimming
- Any exercise activity conducted outside the United States (unless specifically included in the employee's FIT contract)
- Any activities performed by an officer who has been medically exempted from any element of the FIT program
- The following weight lifting activities:
- Squats
- Clean and Jerk
- Dead Lifts
- Bent-over-rowing
- Leg Lunges

B]
- Downhill Skiing
- Water Skiing
- Parasailing
- Platform Diving
- Rock or Mountain Climbing
- Skate Boarding
- Snow Boarding

0141

- Boogie Boarding
- Surfing
- Body Surfing
- Whitewater Rafting
- Off-road Mountain Biking (exclusive of conditions in Section C)
- Roller Blading
- Contact Martial Arts (unless directly associated with a POST class)
- Competitive Events of any type
- Jet Skiing
- Bungee Jumping
- Sky Diving
- Any activity conducted while impaired by alcohol or drugs

C]     <u>Aerobic Activity</u>

- Aerobic Dance
- Cycling (stationary or outside)
- Off road Mountain Biking on established public rights-of-way designed for pedestrian and vehicular traffic, i.e. bike paths in Mission Trails Park or San Clemente Canyon Park
- Running
- Step Aerobics
- Stair Stepping
- Swimming (pool laps)
- Walking

<u>Muscular Strength & Endurance</u>

- Calisthenics
- Push-ups
- Sit-ups (crunches)
- Pull-ups
- Chin-ups
- Arm Dips
- Others

<u>Weight Training</u>

- Biceps Curls
- Triceps Extensions
- Bench Press
- Flies
- Leg Extensions
- Leg Curls
- Others

76                                          POLICE OFFICERS ASSOCIATION

## ARTICLE 61

### SPECIAL PAY FOR ADMINISTRATIVE ASSIGNMENTS

Police Sergeants assigned to specialized administrative assignments as designated specifically by the Police Chief, shall receive an additional 5% of their base rate, effective July 1, 2003.

### ARTICLE 62

### SHIFT DIFFERENTIAL

Effective December 20, 2003, PO IIs (E-step), Sergeants, and Agents, who are assigned to Third Watch, or the majority of their regularly scheduled work shift falls after 2100 hours shall receive additional compensation of 5.3% of the employee's base rate. PO IIs, Sergeants, and Agents, who are assigned to Second Watch or the majority of their regularly scheduled work shift falls after 1800 hours shall receive additional compensation of 3.8% of the employee's base rate. In addition, the Lieutenants assigned to the Watch Commander's Office and Communications will be eligible for this shift differential.

Effective December 20, 2003, those sworn officers in the classifications of Police Recruit, Police Officer I and Police Officer II ("A", "C" and "D" steps only) who are assigned to Third Watch, or the majority of their regularly scheduled work shift falls after 2100 hours shall receive additional compensation of one dollar and fifty-four cents per hour ($1.60), and those sworn officers in the classifications of Police Recruit, Police Officer I and Police Officer II ("A", "C" and "D" steps only) who are assigned to Second Watch or the majority of their regularly scheduled work shift falls after 1800 hours shall receive additional compensation of one dollar and ten cents ($1.15) per hour.

### ARTICLE 63

### PREMIUM PAYS

Mounted Patrol:
Effective July 1, 2003, members of the Mounted Patrol unit shall receive 3.5% of employee's base rate while assigned to the unit.

Effective July 1, 2003, Mounted Patrol Trainers shall receive 3.5% of employee's base rate while assigned as a Mounted Patrol Trainer.

Community Relations Officers:
Effective July 1, 2003, Community Relations Officers shall receive 3.5% of employee's base rate while assigned as a Community Relations Officer.

Emergency Negotiators:
Effective July 1, 2003, Emergency Negotiators shall receive 3.5% of employee's base rate while assigned as Emergency Negotiators.

0143

**K-9 Trainers:**
Effective July 1, 2003, K-9 Trainers shall receive 3.5% of employee's base rate while assigned as a K-9 Trainer.

**K-9 Officers:**
Effective July 1, 2004, K-9 handlers assigned a dog shall receive 3.5% of employee's base rate while assigned to the unit.

**Accident Investigation Bureau:**
Effective July 1, 2000, members of the AIB unit who have successfully completed the POST Traffic Collision Reconstruction Course shall receive an additional 4% of their base rate.

**Harbor Unit:**
Effective July 1, 2004, full-time members of the Harbor Unit shall receive 4% of base pay, while assigned to the Harbor Unit.

Effective July 1, 2003, officers working as trainers, as determined by the Chief of Police, shall receive 3.5% of employee's base rate while assigned as and performing the duties of a trainer in the manner specified by the department.

## ARTICLE 64

## PUBLIC SAFETY OFFICERS PROCEDURAL BILL OF RIGHTS ACT

The City agrees to include the following language of the Public Safety Officers Procedural Bill of Rights (PSOPBOR) Act in the MOU. The parties entered into this agreement with the understanding that any legislative changes to the PSOPBOR made during the term of the contract will be applicable to the parties but will not cause the City to update this Article of the MOU, for purposes of republishing the MOU, during the term of the contract.

GOVERNMENT CODE
SECTION 3300-3312

3300.   This chapter is known and may be cited as the Public Safety Officers Procedural Bill of Rights Act.

3301.   For purposes of this chapter, the term public safety officer means all peace officers specified in Sections 830.1, 830.2, 830.3, 830.31, 830.32, 830.33, except subdivision (e), 830.34, 830.35, except subdivision (c), 830.36, 830.37, 830.38, 830.4, and 830.5 of the Penal Code. The Legislature hereby finds and declares that the rights and protections provided to peace officers under this chapter constitute a matter of statewide concern. The Legislature further finds and declares that effective law enforcement depends upon the maintenance of stable employer-employee relations, between public safety employees and their employers. In order to assure that stable relations are continued throughout the state and to further assure that effective services are provided to all people of the state, it is necessary that this chapter be applicable to all public safety officers, as defined in this section, wherever situated within the State of California.

78                                    POLICE OFFICERS ASSOCIATION

0144

3302.  (a)  Except as otherwise provided by law, or whenever on duty or in uniform, no public safety officer shall be prohibited from engaging, or be coerced or required to engage, in political activity.

     (b)  No public safety officer shall be prohibited from seeking election to, or serving as a member of, the governing board of a school district.

3303.  When any public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action, the interrogation shall be conducted under the following conditions. For the purpose of this chapter, punitive action means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment.

     (a)  The interrogation shall be conducted at a reasonable hour, preferably at a time when the public safety officer is on duty, or during the normal waking hours for the public safety officer, unless the seriousness of the investigation requires otherwise. If the interrogation does occur during off-duty time of the public safety officer being interrogated, the public safety officer shall be compensated for any off-duty time in accordance with regular department procedures, and the public safety officer shall not be released from employment for any work missed.

     (b)  The public safety officer under investigation shall be informed prior to the interrogation of the rank, name, and command of the officer in charge of the interrogation, the interrogating officers, and all other persons to be present during the interrogation. All questions directed to the public safety officer under interrogation shall be asked by and through no more than two interrogators at one time.

     (c)  The public safety officer under investigation shall be informed of the nature of the investigation prior to any interrogation.

     (d)  The interrogating session shall be for a reasonable period taking into consideration gravity and complexity of the issue being investigated. The person under interrogation shall be allowed to attend to his or her own personal physical necessities.

     (e)  The public safety officer under interrogation shall not be subjected to offensive language or threatened with punitive action, except that an officer refusing to respond to questions or submit to interrogations shall be informed that failure to answer questions directly related to the investigation or interrogation may result in punitive action. No promise of reward shall be made as an inducement to answering any question. The employer shall not cause the public safety officer under interrogation to be subjected to visits by the press or news media without his or her express consent nor shall his or her home address or photograph be given to the press or news media without his or her express consent.

     (f)  No statement made during interrogation by a public safety officer under duress, coercion, or threat of punitive action shall be admissible in any

0145

subsequent civil proceeding. This subdivision is subject to the following qualifications:

(1) This subdivision shall not limit the use of statements made by a public safety officer when the employing public safety department is seeking civil sanctions against any public safety officer, including disciplinary action brought under Section 19572.

(2) This subdivision shall not prevent the admissibility of statements made by the public safety officer under interrogation in any civil action, including administrative actions, brought by that public safety officer, or that officer's exclusive representative, arising out of a disciplinary action.

(3) This subdivision shall not prevent statements made by a public safety officer under interrogation from being used to impeach the testimony of that officer after an in camera review to determine whether the statements serve to impeach the testimony of the officer.

(4) This subdivision shall not otherwise prevent the admissibility of statements made by a public safety officer under interrogation if that officer subsequently is deceased.

(g) The complete interrogation of a public safety officer may be recorded. If a tape recording is made of the interrogation, the public safety officer shall have access to the tape if any further proceedings are contemplated or prior to any further interrogation at a subsequent time. The public safety officer shall be entitled to a transcribed copy of any notes made by a stenographer or to any reports or complaints made by investigators or other persons, except those which are deemed by the investigating agency to be confidential. No notes or reports that are deemed to be confidential may be entered in the officer's personnel file. The public safety officer being interrogated shall have the right to bring his or her own recording device and record any and all aspects of the interrogation.

(h) If prior to or during the interrogation of a public safety officer it is deemed that he or she may be charged with a criminal offense, he or she shall be immediately informed of his or her constitutional rights.

(i) Upon the filing of a formal written statement of charges, or whenever an interrogation focuses on matters that are likely to result in punitive action against any public safety officer, that officer, at his or her request, shall have the right to be represented by a representative of his or her choice who may be present at all times during the interrogation. The representative shall not be a person subject to the same investigation. The representative shall not be required to disclose, nor be subject to any punitive action for refusing to disclose, any information received from the officer under investigation for non-criminal matters. This section shall not apply to any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal

80                                           POLICE OFFICERS ASSOCIATION

0146

verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer, nor shall this section apply to an investigation concerned solely and directly with alleged criminal activities.

(j) No public safety officer shall be loaned or temporarily reassigned to a location or duty assignment if a sworn member of his or her department would not normally be sent to that location or would not normally be given that duty assignment under similar circumstances.

3304. (a) No public safety officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter, or the exercise of any rights under any existing administrative grievance procedure. Nothing in this section shall preclude a head of an agency from ordering a public safety officer to cooperate with other agencies involved in criminal investigations. If an officer fails to comply with such an order, the agency may officially charge him or her with insubordination.

(b) No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency against any public safety officer who has successfully completed the probationary period that may be required by his or her employing agency without providing the public safety officer with an opportunity for administrative appeal.

(c) No chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefore and an opportunity for administrative appeal. For purposes of this subdivision, the removal of a chief of police by a public agency or appointing authority, for the purpose of implementing the goals or policies, or both, of the public agency or appointing authority, for reasons including, but not limited to, incompatibility of management styles or as a result of a change in administration, shall be sufficient to constitute "reason or reasons." Nothing in this subdivision shall be construed to create a property interest, where one does not exist by rule or law, in the job of Chief of Police.

(d) Except as provided in this subdivision and subdivision (g), no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct. This one-year limitation period shall apply only if the act, omission, or other misconduct occurred on or after January 1, 1998. In the event that the public agency determines that discipline may be taken, it shall complete its investigation and notify the public safety officer of its proposed disciplinary action within that year, except in any of the following circumstances:

0147

(1) If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period.

(2) If the public safety officer waives the one-year time period in writing, the time period shall be tolled for the period of time specified in the written waiver.

(3) If the investigation is a multi-jurisdictional investigation that requires a reasonable extension for coordination of the involved agencies.

(4) If the investigation involves more than one employee and requires a reasonable extension.

(5) If the investigation involves an employee who is incapacitated or otherwise unavailable.

(6) If the investigation involves a matter in civil litigation where the public safety officer is named as a party defendant, the one-year time period shall be tolled while that civil action is pending.

(7) If the investigation involves a matter in criminal litigation where the complainant is a criminal defendant, the one-year time period shall be tolled during the period of that defendant's criminal investigation and prosecution.

(8) If the investigation involves an allegation of workers' compensation fraud on the part of the public safety officer.

(e) Where a pre-disciplinary response or grievance procedure is required or utilized, the time for this response or procedure shall not be governed or limited by this chapter.

(f) If, after investigation and any pre-disciplinary response or procedure, the public agency decides to impose discipline, the public agency shall notify the public safety officer in writing of its decision to impose discipline, including the date that the discipline will be imposed, within 30 days of its decision, except if the public safety officer is unavailable for discipline.

(g) Notwithstanding the one-year time period specified in subdivision (c), an investigation may be reopened against a public safety officer if both of the following circumstances exist:

(1) Significant new evidence has been discovered that is likely to affect the outcome of the investigation.

(2) One of the following conditions exist:
(A) The evidence could not reasonably have been discovered in the normal course of investigation without resorting to extraordinary measures by the agency.

82                                    POLICE OFFICERS ASSOCIATION

0148

(B) The evidence resulted from the public safety officer's pre-disciplinary response or procedure.

(h) For those members listed in subdivision (a) of Section 830.2 of the Penal Code, the 30-day time period provided for in subdivision (e) shall not commence with the service of a preliminary notice of adverse action, should the public agency elect to provide the public safety officer with such a notice.

3304.5. An administrative appeal instituted by a public safety officer under this chapter shall be conducted in conformance with rules and procedures adopted by the local public agency.

3305. No public safety officer shall have any comment adverse to his interest entered in his personnel file, or any other file used for any personnel purposes by his employer, without the public safety officer having first read and signed the instrument containing the adverse comment indicating he is aware of such comment, except that such entry may be made if after reading such instrument the public safety officer refuses to sign it. Should a public safety officer refuse to sign, that fact shall be noted on that document, and signed or initialed by such officer.

3306. A public safety officer shall have 30 days within which to file a written response to any adverse comment entered in his personnel file. Such written response shall be attached to, and shall accompany, the adverse comment.

3306.5. (a) Every employer shall, at reasonable times and at reasonable intervals, upon the request of a public safety officer, during usual business hours, with no loss of compensation to the officer, permit that officer to inspect personnel files that are used or have been used to determine that officer's qualifications for employment, promotion, additional compensation, or termination or other disciplinary action.

(b) Each employer shall keep each public safety officer's personnel file or a true and correct copy thereof, and shall make the file or copy thereof available within a reasonable period of time after a request therefore by the officer.

(c) If, after examination of the officer's personnel file, the officer believes that any portion of the material is mistakenly or unlawfully placed in the file, the officer may request, in writing, that the mistaken or unlawful portion be corrected or deleted. Any request made pursuant to this subdivision shall include a statement by the officer describing the corrections or deletions from the personnel file requested and the reasons supporting those corrections or deletions. A statement submitted pursuant to this subdivision shall become part of the personnel file of the officer.

(d) Within 30 calendar days of receipt of a request made pursuant to subdivision (c), the employer shall either grant the officer's request or notify the officer of the decision to refuse to grant the request. If the employer refuses to grant the request, in whole or in part, the employer

0149

shall state in writing the reasons for refusing the request, and that written statement shall become part of the personnel file of the officer.

3307.  (a)  No public safety officer shall be compelled to submit to a lie detector test against his or her will. No disciplinary action or other recrimination shall be taken against a public safety officer refusing to submit to a lie detector test, nor shall any comment be entered anywhere in the investigator's notes or anywhere else that the public safety officer refused to take, or did not take, a lie detector test, nor shall any testimony or evidence be admissible at a subsequent hearing, trial, or proceeding, judicial or administrative, to the effect that the public safety officer refused to take, or was subjected to, a lie detector test.

(b)  For the purpose of this section, "lie detector" means a polygraph, deceptograph, voice stress analyzer, psychological stress evaluator, or any other similar device, whether mechanical or electrical, that is used, or the results of which are used, for the purpose of rendering a diagnostic opinion regarding the honesty or dishonesty of an individual.

3307.5.  (a)  No public safety officer shall be required as a condition of employment by his or her employing public safety department or other public agency to consent to the use of his or her photograph or identity as a public safety officer on the Internet for any purpose if that officer reasonably believes that the disclosure may result in a threat, harassment, intimidation, or harm to that officer or his or her family.

(b)  Based upon his or her reasonable belief that the disclosure of his or her photograph or identity as a public safety officer on the Internet as described in subdivision (a) may result in a threat, harassment, intimidation, or harm, the officer may notify the department or other public agency to cease and desist from that disclosure. After the notification to cease and desist, the officer, a district attorney, or a United States Attorney may seek an injunction prohibiting any official or unofficial use by the department or other public agency on the Internet of his or her photograph or identity as a public safety officer. The court may impose a civil penalty in an amount not to exceed five hundred dollars ($500) per day commencing two working days after the date of receipt of the notification to cease and desist.

3308.  No public safety officer shall be required or requested for purposes of job assignment or other personnel action to disclose any item of his property, income, assets, source of income, debts or personal or domestic expenditures (including those of any member of his family or household) unless such information is obtained or required under state law or proper legal procedure, tends to indicate a conflict of interest with respect to the performance of his official duties, or is necessary for the employing agency to ascertain the desirability of assigning the public safety officer to a specialized unit in which there is a strong possibility that bribes or other improper inducements may be offered.

3309.  No public safety officer shall have his locker, or other space for storage that may be assigned to him searched except in his presence, or with his consent, or unless a valid search warrant has been obtained or where he has been

notified that a search will be conducted. This section shall apply only to lockers or other space for storage that are owned or leased by the employing agency.

3309.5. (a) It shall be unlawful for any public safety department to deny or refuse to any public safety officer the rights and protections guaranteed to him or her by this chapter.

(b) The superior court shall have initial jurisdiction over any proceeding brought by any public safety officer against any public safety department for alleged violations of this chapter.

(c) (1) In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a temporary restraining order, preliminary, or permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer.

(2) If the court finds that a bad faith or frivolous action or a filing for an improper purpose has been brought pursuant to this chapter, the court may order sanctions against the party filing the action, the parties attorney, or both pursuant to Sections 128.6 and 128.7 of the Code of Civil Procedure. Those sanctions may include, but not be limited to, reasonable expenses, including attorney's fees, incurred by a public safety department, as the court deems appropriate. Nothing in this paragraph is intended to subject actions or filings under this section to rules or standards that are different from those applicable to other civil actions or filings subject to Section 128.6 or 128.7 of the Code of Civil Procedure.

(d) In addition to the extraordinary relief afforded by this chapter, upon a finding by a superior court that a public safety department, its employees, agents, or assigns, with respect to acts taken within the scope of employment, maliciously violated any provision of this chapter with the intent to injure the public safety officer, the public safety department shall, for each and every violation, be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) to be awarded to the public safety officer whose right or protection was denied and for reasonable attorney's fees as may be determined by the court. If the court so finds, and there is sufficient evidence to establish actual damages suffered by the officer whose right or protection was denied, the public safety department shall also be liable for the amount of the actual damages. Notwithstanding these provisions, a public safety department may not be required to indemnify a contractor for the contractor's liability pursuant to this subdivision if there is, within the contract between the public safety department and the contractor, a "hold harmless" or similar provision that protects the public safety department from liability for the actions of the contractor. An individual shall not be liable for any act for which a public safety department is liable under this section.

3310.   Any public agency which has adopted, through action of its governing body or its official designee, any procedure which at a minimum provides to peace officers the same rights or protections as provided pursuant to this chapter shall not be subject to this chapter with regard to such a procedure.

3311.   Nothing in this chapter shall in any way be construed to limit the use of any public safety agency or any public safety officer in the fulfilling of mutual aid agreements with other jurisdictions or agencies, nor shall this chapter be construed in any way to limit any jurisdictional or interagency cooperation under any circumstances where such activity is deemed necessary or desirable by the jurisdictions or the agencies involved.

3312.   Notwithstanding any other provision of law, the employer of a public safety officer may not take any punitive action against an officer for wearing a pin or displaying any other item containing the American flag, unless the employer gives the officer written notice that includes all of the following:

    (a)   A statement that the officer's pin or other item violates an existing rule, regulation, policy, or local agency agreement or contract regarding the wearing of a pin, or the displaying of any other item, containing the American flag.

    (b)   A citation to the specific rule, regulation, policy, or local agency agreement or contract that the pin or other item violates.

    (c)   A statement that the officer may file an appeal against the employer challenging the alleged violation pursuant to applicable grievance or appeal procedures adopted by the department or public agency that otherwise comply with existing law.

## ARTICLE 65

### Presidential Leave

The parties agree to a Presidential Leave Program for the President of POA with the following elements:

1.   The President will remain a full-time City employee receiving a salary equal to the salary the President is receiving at the time he or she takes office. This amount will reflect the base pay the President receives as calculated for retirement purposes and will not include any add-ons that are not part of the retirement calculation. During Presidential Leave, the President will receive raises commensurate to the raises of employees in his or her classification.

2.   The President will maintain all the rights and benefits of a City employee. During normal work hours the President shall be subject to all applicable provisions of law, including all the policies and procedures of the City, all terms and conditions contained in this Memorandum of Understanding, and the affidavit of adherence referenced in paragraph 7 below. Normal work hours means 8:00 a.m. to 5:00 p.m. Monday through Friday, or an equivalent schedule approved in advance by the City Manager.

0152

3. The President will be covered by the City's Workers' Compensation Plan for any injuries incurred while the President is performing representational activities during normal work hours as defined in paragraph 2 above. Worker's compensation benefits will not cover travel time to and from the President's home to his or her primary workplace, or to and from social activities from any location, but will cover travel time to or from representational meetings during normal work hours.

4. POA will indemnify, defend, and hold harmless the City, and its employees and agents, for any liabilities, including costs and attorneys' fees, resulting from any conduct by the President in violation of any federal, state, or local law, or any City policy or procedure, including but not limited to Council Policies, Administrative Regulations, Personnel Regulations, Administrative Manuals, or Department Directives, Policies and Procedures.

5. POA will indemnify, defend, and hold harmless the City, and its employees and agents, for any liabilities resulting from the City's not withholding employment taxes pursuant to the Federal Insurance Contributions Act (FICA) from the President's wages, including but not limited to the obligation to pay those employment taxes determined to be due (both the employee and City portions), interest on the late payment of those taxes, penalties for failure to timely file, pay, withhold and remit the taxes, plus costs and attorneys' fees

6. An employee on approved Presidential Leave will submit his/her bi-weekly time card in a timely manner to the Labor Relations Manager or his/her designee for authorization signature. The bi-weekly time card will then be forwarded to the Manager's Payroll Specialist for processing and transmission to Personnel for review and the Auditor and Comptroller for payment.

7. The Union President may enter Presidential Leave by providing a notice of such election to the City Manager/Labor Relations Office and executing an affidavit of adherence to the provisions of Presidential Leave outlined above.

0153

IN WITNESS THEREOF, the undersigned agree to submit this Memorandum of Understanding, effective July 1, 2003 – June 30, 2005, to the appropriate bodies.

**Date:    May 8, 2003**

**For the City of San Diego:**                    **For the Police Officers Association:**

Kathleen Murphy

Scott Nalebuff

Tom Bond

Robert Werner on leave

*This information is available in alternative formats upon request.*

♻ *Printed on Recycled Paper*

# EXHIBIT 2



## CLAIM AGAINST THE CITY OF SAN DIEGO
(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

**Received by - via**

TIME STAMP

U.S. Mail ☐
Inter-Office Mail ☐
Over the Counter ☐                    File No._____

A claim must be presented to the **Risk Management Department** of the City of San Diego not later than six (6) months after the date of the incident or event. Where space is insufficient, please use additional paper and identify information by paragraph number. Completed claims must be presented to: *City of San Diego, Risk Management Dept., 1200 Third Ave., Suite 1000, San Diego, CA 92101.*

TO THE HONORABLE MAYOR AND CITY COUNCIL, The City of San Diego, California

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

1. **NAME OF CLAIMANT:** San Diego Police Officers' Association (on behalf of all its members)
    a. **ADDRESS OF CLAIMANT** 8388 Vickers Street

   | San Diego | | CA | 92111 |
   |---|---|---|---|
   | (CITY) | | (STATE) | (ZIP) |

    b. **PHONE NO.** Home_____ c. **DATE OF BIRTH** N/A
       Business (858) 573-1199

    d. **SOCIAL SECURITY NO.** N/A _____ e. **DRIVER'S LIC. NO.** N/A _____

2. Name, telephone and post office address to which claimant desires notices to be sent if other than above:
    Castle, Petersen & Krause, 4675 MacArthur Court, Suite 1250, Newport Beach, CA 92660, 949-417-5600

3. Occurrence or event from which the claim arises:

    a. DATE: 7/1/05 _____ b. TIME: N/A _____ c. PLACE (exact and specific location):

    _____

    d. Specify the circumstances of the occurrence, event, act or omission which you claim caused the injury, damage or loss. (use additional paper if necessary):
    City's unilateral imposition of new employment terms against the SDPOA which deprive, eliminate and/or reduce retirement benefits - which includes vested pension benefits - owed to members of the SDPOA after negotiations between the City and SDPOA came to an impasse.

    e. State how or in what manner the City of San Diego or its employees were at fault: _____
    New retirement plan is in violation of: U.S. Const., Art. I, sec. 10, Cal. Const., Art. I, sec. 9, 42 U.S.C. sec. 1983, 5th Amend. of U.S. Const., 14th Amend. of U.S. Const., Cal. Const., Art. I, sec. 7, 42 U.S.C. sec. 1988, common laws of Cal., including but not limited to unjust enrichment.

RM-9 (Rev.4-00)                                        *This information is available in alternative formats upon request*

Clear Entire Form

0155

4. Give a description of the injury, property damage or loss incurred so far as is known at the time of this claim. If there were no injuries, state "no injuries". (If your claim involves a vehicle, include license, year, make and model.)

The changes include, but are not limited to: (1) a 3.2% increase in employee contributions into retirement system; (2) a 3.2% salary reduction; (3) the elimination of the purchase of service credits; (4) the elimination of the formula for the calculation of SDCERS Monthly Retirement Benefits, etc.

5. Give the name(s) of the City employee(s) causing the injury, damage or loss, if known:

Agents and/or employees of the City of San Diego.

6. Name and address of any other person injured: _____

All members of the SDPOA.

7. Name and address of the owner of any damaged property: _____

8. Damages claimed:
   a. Amount claimed as of this date:          $ > $10,000 _____
   b. Estimated amount of any future costs:    $ > $10,000 _____
   c. Total amount claimed:                    $ > $10,000 _____
   d. Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc.):

Based on changes in benefits program and value of benefits lost by members of the SDPOA.

9. Names and addresses of all witnesses, hospitals, doctors, etc.
   a.
   b.
   c.
   d
10. Any additional information that might be helpful in considering claim:

WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (Penal Code § 72; Insurance Code § 556.1)
I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.

Signed this 21st day of July    20 05 at Newport Beach, CA _____

_____
CLAIMANTS SIGNATURE

Clear Entire Form

0156

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

FILED

05 AUG -9  PM 4: 09

CLERK, U.S. DIST...
...RICT OF CALIFORNIA

BY: _____
DEPUTY

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

SAN DIEGO POLICE OFFICERS' ASSOCIATION, on behalf of
itself and on behalf of its members,

**DEFENDANTS**

MICHAEL AGUIRRE; CITY OF SAN DIEGO; SAN DIEGO CITY
EMPLOYEES' RETIREMENT SYSTEM, et al.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

'05 CV 1581 H (POR)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Gregory G. Petersen
Castle, Petersen & Krause, LLP
8388 Vickers Street
San Diego, CA 92111

**ATTORNEYS (IF KNOWN)**

Unknown

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

Violation of First Amendment of U.S. Constitution, 42 U.S.C. 1983, Violation of Public Policy; Violation of Contracts Clause, U.S. Constitution,
Article I, sec. 10, 42 U.S.C. 1983, et al.

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instruments | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:   JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See instructions):**   JUDGE _____   Docket Number _____

DATE  8/9/05    SIGNATURE OF ATTORNEY OF RECORD _____

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

# 116198   $250.00   ℞   8/9/05